1 | David S. Kupetz (CA Bar No. 125062)
    dkupetz@sulmeyerlaw.com
2 | Steven F. Werth (CA Bar No. 205434)
    swerth@sulmeyerlaw.com
3 | **Sulmeyer**Kupetz
    A Professional Corporation
4 | 333 South Hope Street, Thirty-Fifth Floor
    Los Angeles, California  90071-1406
5 | Telephone: 213.626.2311

6 | (Proposed) Bankruptcy Counsel for No
    Fear Retail Stores, Inc., Debtor and Debtor
7 | in Possession

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 · FAX 213.629.4520

## UNITED STATES BANKRUPTCY COURT

### Southern District of California

| | |
|---|---|
| In re | Case No.  11-02896-MM11 |
| | **DATE:** March 1, 2011 |
| NO FEAR RETAIL STORES, INC., | **TIME:** 9:00 a.m. |
| a California corporation, | **JUDGE:** Hon. Margaret M. Mann |
| | **PLACE:** Chamber 1—Room 218 |
| | U.S. Bankruptcy Court |
| | 325 West "F" Street |
| Debtor. | San Diego, CA 92101 |
| | |
| | Chapter 11 |
| | |
| | **OMNIBUS DECLARATION OF  MARK SIMO IN SUPPORT OF DEBTORS' "FIRST-DAY" MOTIONS** |
| | |
| Employer ID# 20-5238208 | |

SWERTH\ 703400.11

- 1 -

## DECLARATION OF MARK SIMO

I, MARK SIMO, declare:

1.    I have personal knowledge of the facts stated herein.  I can testify that said facts are true and correct.

2.    I am the Chief Executive Officer of No Fear Retail Stores, Inc. ("NFRS"), Simo Holdings, Inc. ("Simo Holdings"), and No Fear MX, Inc. ("NFMX"). NFRS, Simo Holdings, and NFMX are related entities that are operated and function together as a business enterprise.  NFRS, Simo Holdings, and NFMX are collectively referred to herein as the "Company".

3.    NFRS, Simo Holdings, and NFMX are each California corporations.  The Company's corporate and administrative offices and warehouse are located at 1812 Aston Avenue, Carlsbad, California.

4.    The Board of Directors for each of NFRS, Simo Holdings, and NFMX consist of myself, Brian Simo (my brother), and Scott Benjamin.  The senior officers for each of the entities are also the same.  As stated above, I am the CEO. Brian Simo (President and Assistant Secretary), Scott Benjamin (Executive Vice President, Secretary, and General Counsel), and Ken Aurigemma (Chief Financial Officer) are the other senior officers of NFRS, Simo Holdings, and NFMX.

5.    The information, in the paragraphs that follow, relating to the Company's employees (including their compensation, benefits, reimbursements, and other claims), utility providers, credit card transactions, bank accounts and cash management system, gift cards and customer credits, and proposed eight-week budgets, has been prepared by the Company's accounting personnel at my request and under my direction.  As such, I believe this information to be accurate. In preparing the Budgets (defined below) the Company's accounting personnel at my request and under my direction, took into account the Company's recent sales results, the current retail sales environment, the Company's current and anticipated inventory, and historical seasonal sales levels.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    6.    I have been employed by Simo Holdings as its Chief Executive

2    Officer since its founding in 1990.  I have been CEO of NFRS since its

3    incorporation in 2006 and of NFMX since its formation in 2007.

4    7.    NFRS, Simo Holdings, and NFMX commenced reorganization

5    cases by filing voluntary chapter 11 petitions on February 24, 2011 (the "Petition

6    Date").

7    8.    NFMX is a wholly-owned subsidiary of Simo Holdings.  Simo

8    Holdings owns 97.75% of the stock of NFRS (Gatorz Inc. owns the balance).

9    Brian Simo (37.15%) and I (38.2%) own approximately 75% of the stock of Simo

10   Holdings.  A chart setting forth the corporate structure of the Company, including

11   three entities (MX No Fear Europe SAS, No Fear International Ltd., and FMF

12   International, Inc.) that have not commenced chapter 11 cases, is attached hereto

13   as Exhibit "1" and is incorporated herein by this reference.

14   9.    NFRS, Simo Holdings, and NFMX continue to manage and

15   operate their business as debtors in possession.  No creditors' committee has yet

16   been appointed in their chapter 11 cases.

17   ## BACKGROUND

18   A.    **Founding of Simo Holdings**

19   10.    Brian Simo and I founded Simo Holdings in 1990. The entity

20   was originally incorporated as No Fear, Inc., and changed its name to Simo

21   Holdings, Inc., in March 2009.  Through the 1990s, Simo Holdings' primary

22   activities were the design, manufacture and sale of casual apparel and

23   accessories under the "No Fear" brand to wholesale accounts in the United

24   States., primarily department stores.  Simo Holdings also licensed "No Fear" for

25   the sale of products internationally.  The popularity of the "No Fear" brand grew

26   explosively into the mid 1990s, with annual revenues reaching approximately $140

27   million in 1995.

28   B.    **Shift in Distribution Strategy**

1    11.    Sales began to decline after 1995, as customers for "No Fear"

2  and similar brands shifted from department stores to specialty retailers catering to

3  the youth market.  Profitability also declined, as department stores squeezed

4  margins to make up for shrinking sales in this market segment.  Because of these

5  developments, and because the "No Fear" brand appeared to be losing relevance

6  in the core sports-oriented youth market, Simo Holdings changed its business

7  model, terminating distribution of its products through department stores and other

8  "big box" retailers in favor of lower volume, but more relevant and profitable,

9  specialty retailers.  As part of this shift in distribution strategy, Simo Holdings also

10  decided to experiment with its own retail stores.  The first "No Fear" retail store

11  was opened in 1999, to sell both "No Fear" branded products and third party

12  products.  Nineteen more stores were added by the end of 2004.

### C.    Funding of Retail Store Growth -- Spy Optic IPO and Sale of International Rights

13    12.    By the end of 2004, it appeared to management of the

Company that its retail store strategy was sound, and that there existed the

opportunity to grow to several hundred stores.  However, management understood

that such growth would require significant capital investment, as each new store

cost approximately $250,000 to $400,000 to open, primarily for leasehold

improvements, fixtures and equipment, and inventory.

13.    In December 2004, Simo Holdings took public its Spy Optic

subsidiary and cashed out some of its Spy Optic shares to fund new store

openings.  Simo Holdings had started Spy Optic in about 1999, to design,

manufacture and sell sunglasses and sport goggles.  Spy Optic grew to

approximately $35 million in annual revenues by the time of its IPO.  From 2004 to

2009, Simo Holdings and its affiliates retained a significant minority ownership

position in Spy Optic and "No Fear" retail stores became the single largest

customer for Spy Optic products.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

14.    In October 2005, Simo Holdings sold, for $12.5 million, 50% of its rights to "No Fear" outside the U.S. (excluding rights to use "No Fear" for motocross products, which had been licensed to a third party).  The rights were sold to Sports Direct International plc, a major European sporting goods retailer based in the United Kingdom.  The sale was accomplished through the creation of a new British company, No Fear International Ltd., managed by a Sports Direct subsidiary and owned 50% by Simo Holdings and 50% by another Sports Direct subsidiary.   Simo Holdings used the sale proceeds primarily to fund growth of its "No Fear" retail stores.

D.    **Formation of No Fear Retail Stores, Inc.**

15.    As of September 2006, Simo Holdings was operating approximately 30 "No Fear" stores.  Simo Holdings set a target of 50 stores, which Company management believed would provide the critical mass necessary to show that "No Fear" could grow to a national chain of several hundred stores. With a 50-store "proof of concept," management believed that Simo Holdings would be in a position to attract significant financing, from private equity sources or possibly through an IPO, to fund an additional 50 to 100 stores.  In anticipation of that future financing, Simo Holdings created a new wholly-owned subsidiary, NFRS (incorporated under the laws of California on July 25, 2006) and, in September 2006, transferred the retail store business to NFRS, including all related assets (except cash and inventory) and subject to all related liabilities and commitments, in exchange for 40,000,000 shares of NFRS common stock.  As stated above, as of the Petition Date, NFRS  is 97.75% held by Simo Holdings and 2.25% held by Gatorz Inc.

16.    Following the transfer, Simo Holdings purchased both proprietary and third party products for NFRS, creating a payable from NFRS to Simo Holdings.  Simo Holdings also provided support services including warehousing, design, accounting and production to NFRS.  As a result, a portion

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 · FAX 213.629.4520

of Simo Holdings' shared overhead was allocated to NFRS.  Simo Holdings also filed a consolidated tax return for all of its subsidiaries, creating a payable from NFRS to Simo Holdings for NFRS's portion of taxes.

17.    In September 2008, Simo Holdings transferred ownership of the "No Fear" trademark to NFRS, together with associated copyrighted designs, and assigned to NFRS certain license contract rights related to the "No Fear" mark.

**E.    Formation of No Fear MX, Inc.**

18.    In about 2000, Simo Holdings granted to one of its employees, Jeffrey Surwall, a license to use "No Fear" for the design, production and sale of protective equipment for the sport of motocross.  Mr. Surwall built the business to approximately $14 million in annual revenues.  In July 2007, Simo Holdings purchased the assets of the business from Mr. Surwall for $7 million.  The business was acquired through a newly formed subsidiary, NFMX.  The purchase price was to be paid out at established increments over a 5-year period.  Following the acquisition, Simo Holdings provided support services for NFMX and a portion of Simo Holdings' shared overhead was allocated to NFMX.


**F.    Attempted Merger with Gatorz, Inc.**

19.    Beginning in 2007 and continuing through 2010, Simo Holdings and NFRS pursued a series of efforts and transactions in order to raise capital to fund the growth of NFRS.  These efforts and transactions included (i) in 2007 and 2008, a proposed reverse merger, combined with a public stock offering, with Orange 21 Inc. (the parent company of Spy Optic), then listed on the NASDAQ, (ii) in 2008, a private placement of preferred stock, and (iii) in 2009 and 2010, a proposed reverse merger and public stock offering with Gatorz Inc., a company listed on the Toronto Stock Exchange – Venture.  Throughout this period, Simo Holdings and NFRS also had discussions regarding possible investment with

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  dozens of private equity firms and other potential financing sources.  None of

2  these efforts were successful.

3        20.    The spin-off of NFRS in 2006 and the subsequent attempts to

4  raise capital from 2007 through 2010 were expensive.  Simo Holdings and NFRS

5  incurred significant accounting and audit fees in connection with the NFRS spin-

6  off, substantial legal fees in pursuit of the Orange 21 transaction, and a large

7  amount, approximately $1 million in total, for both accounting and legal fees in the

8  Gatorz transaction.

9                                    II.

10  **PRODUCTS AND BUSINESS OF NO FEAR RETAIL STORES, INC.**

11  **A.    The Product**

12        21.    NFRS is a retailer of action sports and casual youth lifestyle

13  apparel and accessories targeting young adults and teens.  NFRS sells a broad

14  range of apparel and accessories, including t-shirts, jackets, sweatshirts, jeans,

15  walkshorts, board shorts, eyewear, bags and watches complemented by a

16  selection of video and music, auto and motocross accessories, home décor,

17  bedding, toys and gifts.  Products are sold primarily under brands owned by NFRS

18  or Simo Holdings, principally "No Fear" and "So Cal."  In addition to its own

19  brands, NFRS sells apparel and accessories consistent with its lifestyle focus from

20  leading third party vendors including "FMF", "SRH", "Spy Optic", "Metal Mulisha",

21  "Oakley" and "Gatorz".  NFRS's primary customers historically are young males,

22  with the men's category accounting for 56% of sales while women's and youth

23  make up 27% and 3% of sales, respectively.  The remaining 14% of sales consists

24  of optics in addition to other categories that are not age or gender specific, such

25  as decals.  As of the Petition Date, NFRS operated 41 retail stores in seven

26  states, primarily in the south-western United States.

27        22.    NFRS's products primarily target young adults and teens

28  seeking an action sports inspired lifestyle.  Unlike a number of retailers and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  apparel brands that have a history targeting the major board sports (surfing,

2  skateboarding and snowboarding), the "No Fear" brand was founded in motocross

3  and freestyle motocross and has maintained an intimate and continuous

4  involvement in these and other major motorsports.

5        23.    Products are delivered to NFRS stores on a daily basis from its

6  warehouse in Carlsbad, California.  The point of sale system in its stores provides

7  daily inventory updates, allowing NFRS to replenish stores based on suggested

8  inventory levels.  As an item driven business, new styles and colors are

9  periodically introduced into NFRS stores throughout the year.

10        24.    NFRS utilizes a number of third party suppliers to design,

11  source and import proprietary branded product.  NFRS has creative control of the

12  product to maintain the consistency of the brand and image.  Unlike a majority of

13  its competitors, NFRS typically sources its proprietary branded product on a

14  consignment basis, so that it does not take title to the products until they are

15  shipped from the Carlsbad facility to individual NFRS stores.  In some instances,

16  NFRS does not take title to these products until immediately prior to their sale to

17  the end consumer.  In this way, NFRS's suppliers have historically assumed

18  inventory risk for product, funding NFRS's inventory and limiting its markdown risk.

19        25.    I believe that NFRS has several qualities that are of substantial

20  value and that distinguish NFRS from its competitors.

21        •    Established Brand.  The "No Fear" brand has been in

22  continuous use for over 20 years and has become synonymous with an attitude of

23  irreverent and spirited engagement.  From the brand's inception, substantial

24  resources have been devoted to develop and nurture the brand consistent with

25  this attitude.  From sponsorships of leading action sports athletes, including

26  Jeremy McGrath, Travis Pastrana and Rickey Carmichael, to the nationwide

27  distribution and marketing of the "No Fear" energy drink, these efforts have

28

1    created a brand that is recognized nationally in the United States, maintains high

2    consumer awareness, and speaks to NFRS's target customer.

3    • Retail Concept Based on Intellectual Property. Unlike most of

4    NFRS's retail competitors in the action sports market, which primarily sell third

5    party brands, NFRS owns or controls a majority of the brands that it sells. "So

6    Cal" and "No Fear" are the two leading brands in NFRS's stores, representing

7    approximately 43% of NFRS's sales. National or regional licensing of the brands

8    can enhance the profitability of the retail stores. NFRS believes its ownership of

9    intellectual property can provide a distinct competitive advantage over retailers

10    that primarily sell third party brands.

11    • Differentiated Market Positioning and Product Offering. Unlike

12    numerous familiar action sports retailers and apparel brands that have a history in

13    surfing or skateboarding, the "No Fear" brand was founded in motorsports and has

14    stayed true to its roots while expanding into other action sports. While numerous

15    retailers address a board sports or beach lifestyle, NFRS believes it is the largest

16    retailer to address the market from a motorsports perspective. Further, NFRS

17    offers a distinct selection of products under both its proprietary brands and third

18    party labels. A large portion of NFRS's products are sold only by NFRS,

19    differentiating NFRS from other retailers in a mall setting that carry products from

20    major action sports brands. As a result of these factors, NFRS believes it offers a

21    desirable and distinctive retail experience in a typical mall setting.

22    • Experienced, Entrepreneurial Management Team. NFRS is led

23    by a management team with significant experience in the action sports and

24    retailing industries. Before creating the "No Fear" brand, I was instrumental in the

25    founding of the brands "Life's a Beach" and "Bad Boy Club". I am complemented

26    by a talented group of management and professionals that embody the "No Fear"

27    brand and spirit.

28    **B.    Intellectual Property**

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

26.   The intellectual property associated with the "No Fear" name, including the "No Fear" trademark and various other rights were transferred from Simo Holdings to NFRS on August 31, 2008.  The trademarks, which had no carrying value for financial statements, have certain associated deferred tax benefits in the amount of approximately $214,000 which were recorded to additional paid-in capital as a non-cash contribution of intangibles by Simo Holdings.  As a result of the assignment of the "No Fear" trademark, NFRS receives royalty income from a license to PepsiCo, Inc. for a No Fear-branded energy drink.  In addition, the eCommerce activities of www.nofear.com were consolidated with NFRS.

27.   NFRS and Simo Holdings hold more than 45 U.S. trademark registrations, including "No Fear," "So Cal," "Fearless" and other marks, the majority of which cover clothing and retail store operations.  The remaining registrations include but are not limited to the following products:  sunglasses and eyeglasses; autos, motorcycles and related parts; jewelry; decals, stickers and other printed matter; helmets and protective equipment; and non-alcoholic beverages and nutrition bars.  As intellectual property is a critical component of NFRS's success, NFRS carefully maintains and vigorously defends its intellectual property rights.

28.   NFRS licenses, on a royalty-free basis, the "No Fear" trademark to NFMX for the development and sale of protective motocross equipment worldwide.  NFRS believes this license agreement adds to the authenticity of the "No Fear" brand while limiting product liability exposure associated with the sale of protective equipment.  NFRS also licenses the "No Fear" mark to NFMX and to third parties for the wholesale sale of apparel and accessories in select channels.

C.   **Competition**

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

29.     NFRS competes broadly in the apparel retail market and in particular in the sale of action sports apparel and accessories.  NFRS competes with other retailers for vendors, customers, store locations, store associates and management personnel.  Competing action sports and apparel wholesalers and retailers include Fox Racing, Inc., Pacific Sunwear of California, Inc., Quiksilver, Inc., Volcom, Inc. and Zumiez, Inc.  In addition, NFRS competes with independent specialty action sports shops, department stores, and direct marketers that sell similar lines of merchandise and target customers through catalogues and eCommerce.  Many of NFRS's competitors are larger and have substantially greater financial, marketing and other resources than NFRS does.

**D.     Real Estate Leases**

30.     As of the Petition Date, NFRS operated 41 retail stores in seven states primarily in the south western United States.  Approximately 60% of NFRS's stores are located in California.  NFRS's retail stores are located in major shopping malls, with stores ranging in size from 1,000 to 2,400 square feet, and average approximately 1,750 square feet.  The table below outlines the growth of NFRS's concept by stores over the last six fiscal years through September 30, 2010.  Since September 30, 2010, NFRS  has closed approximately one dozen stores.

| | Fiscal Years Ended August 31, | | | | | | Through September 30, 2010 |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | |
| Stores open, beginning of period | 19 | 22 | 34 | 39 | 48 | 54 | 55 |
| Net new stores | 3 | 12 | 5 | 9 | 6 | 1 | (2) |
| Stores open, end of period | 22 | 34 | 39 | 48 | 54 | 55 | 53 |

31.    All of NFRS's store locations are leased.  Leases typically range in term from 1 to 10 years.  NFRS periodically executes temporary leases (with terms of less than 12 months) for locations where it is seeking permanent space.

E.    **Revenue**

32.    NFRS's stores generated same store sales growth of 0.3%, 17.7%, 16.5% and 10.0% for the fiscal years ended August 31, 2008, 2007, 2006 and 2005, respectively.  NFRS operates on a fiscal year ending August 31.  NFRS does not operate on a traditional 4-5-4 quarterly retail calendar similar to a majority of its competitors or other apparel retailers.  NFRS reports "comparable store net sales" based on net sales in a calendar monthly period, and stores are included in NFRS's comparable store sales if they are open for the entire month and the same month the previous year.  Stores purchased from licensees are accounted for in comparable store sales as if they opened on the date of the acquisitions.  Some of NFRS's competitors and other apparel retailers calculate comparable or same store sales differently.  As a result, data herein regarding NFRS's comparable store sales may not be comparable to similar data made available by its competitors or other retailers.

33.    As a result of the challenging economic environment that has prevailed since early 2008, NFRS's same store sales were down 19.4% in fiscal 2009 and were down 10.2% in the first nine months of fiscal 2010.  With NFRS's geographic concentration in California, Arizona and Nevada, NFRS believes its performance was consistent with its peers in the regions where NFRS operates.  In fiscal 2009, NFRS's stores open for the entire year generated average revenue of approximately $777,000.  Substantially all of NFRS's consolidated revenues are derived from sales of apparel and related accessories to consumers.  NFRS believes the productivity of its retail stores, as measured by sales per square foot, is equal to or better than a majority of its peers.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

34.   For its 2008, 2009 and 2010 fiscal years, NFRS generated total revenues of approximately $40.2 million, $39.3 million, and $37.6 million, respectively.   Earnings before interest, taxes, depreciation and amortization in 2008 and 2009 were $1.9 million and $2.5 million, respectively.   In its 2010 fiscal year NFRS incurred a loss of $412,000 before interest, taxes, depreciation and amortization.

35.   NFMX generated total revenues of approximately $5.1 million, $2.7 million, and $2.4 million for its fiscal years 2008, 2009 and 2010, respectively. NFMX incurred a loss before interest, taxes, depreciation and amortization in each of those years, of $309,000, $1,295,000, and $915,000 respectively.

36.   Simo Holdings generated total revenues of approximately $32.6 million, $26.4 million, and $22.2 million for its fiscal years ended 2008, 2009 and 2010, respectively.   Simo Holdings incurred profit (loss) before interest, taxes, depreciation and amortization in each of those years, of ($1,510,000), $1,126,000, and $507,000.

37.   The retail apparel industry is cyclical and, consequently, NFRS's net sales are affected by general economic conditions.   Purchases of apparel and accessories are sensitive to a number of factors that influence the levels of consumer spending, including economic conditions and the level of disposable consumer income, consumer debt, interest rates and consumer confidence.   Since May 2008, NFRS has experienced declining comparable store sales as a result of the challenging economic environment in the United States as consumers have reduced discretionary spending, and apparel purchases in particular.

38.   An average NFRS retail store, including inventory, historically cost approximately $250,000 to $400,000 to construct, assuming no tenant improvement allowances.   Approximately $200,000 to $250,000 of the cost consists of fixed assets, including fixtures and NFRS's point of sale system.   The

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  remainder of the expense is the cost of inventory required to stock the stores.

2  NFRS seeks to achieve payback on its investment in new stores in less than three

3  years.

4          39.    As is the case with many retailers of apparel and related

5  merchandise, NFRS's business is subject to seasonal influences. As a result,

6  NFRS has historically experienced and expects to continue to experience

7  seasonal and quarterly fluctuations in its net sales and operating results.  NFRS's

8  net sales and operating results are typically lower in the first and third quarters of

9  its fiscal year, while the winter holiday and back-to-school periods historically have

10  accounted for the largest percentage of NFRS's annual net sales. Variable costs

11  such as store labor expense can be adjusted to match seasonal fluctuations in

12  revenue but costs such as occupancy are fixed.  As a result, NFRS has historically

13  generated a disproportionate level of earnings in its fiscal second and fourth

14  quarters.  Quarterly results of operations may also fluctuate significantly as a

15  result of a variety of factors, including the timing of store openings and the relative

16  proportion of NFRS's new stores to mature stores, fashion trends and changes in

17  consumer preferences, calendar shifts of holiday or seasonal periods, changes in

18  merchandise mix, timing of promotional events, general economic conditions,

19  competition and weather conditions.

20          40.    Selling expenses consist primarily of store payroll and store

21  level advertising and marketing.  General and administrative expenses consist

22  primarily of rent, personnel wages and benefits, administrative staff and

23  infrastructure expenses, depreciation and travel and entertainment.

24    F.    **Factors Precipitating the Chapter 11 Filing**

25          41.    As a consumer business selling discretionary items, the

26  Company has been negatively impacted by the recession that hit the United

27  States starting in late 2007.  The Company has been disproportionately impacted

28  by the downturn in consumer spending given (i) the discretionary nature of its

1    products, (ii) its target customer and (iii) its geographic concentration.  The

2    Company's businesses primarily consist of the wholesale and retail sale of casual

3    apparel and accessories as well as protective motocross equipment.  All of these

4    items are discretionary purchases for consumers and have been

5    disproportionately impacted by the downturn in consumer spending.  In addition,

6    the Company targets "blue collar" customers, who have been severely hurt by the

7    housing and labor crises, further driving down their discretionary spending power.

8    Further, the Company's retail stores are concentrated in California, Arizona and

9    Nevada, three of the hardest hit areas in the United States.  In fact, the Company's

10    stores in these states tend to be concentrated in the most negatively affected

11    markets in the states – the Central Valley and Inland Empire in California (where

12    the majority of the Company's stores are located), Phoenix in Arizona, and Las

13    Vegas in Nevada.

14        42.    As a result of these factors, the Company has experienced

15    declining comparable store sales and declining overall sales for the last three

16    years.  Sales declined approximately 20% in NFRS's fourth fiscal quarter

17    compared to the fourth quarter of 2009 and same store sales were down

18    approximately 12.0% in fiscal 2010.  NFRS is bound by a number of long term

19    leases with landlords who have generally been unwilling to renegotiate its leases

20    to reflect the current state of NFRS's business.

21        43.    The Company is also burdened by a significant amount of

22    expenses as a result of a failed attempt in 2009 and 2010 to raise capital through

23    a proposed reverse merger with Gatorz Inc.  The Company incurred approximately

24    $1,000,000 in professional fees including legal and accounting fees in order to

25    execute a public financing which ultimately failed.  Finally, the Company has been

26    unable to secure third party inventory for NFRS's retail stores due to its lack of

27    financing.  Lack of third party inventory, which serves as the primary traffic driver

28    in NFRS's stores, has created a negative downward spiral – the lack of inventory

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  has impaired store sales, which has further impacted cash flow, which, in turn, has

2  further impaired the Company's ability to secure third party inventory.

3       44.    Having been unable to renegotiate leases with landlords, NFRS

4  has already closed a number of unprofitable stores in an attempt to mitigate its

5  losses.  The Company anticipates continuing to attempt to secure third party

6  financing, while pursuing a reorganization that likely would result in a smaller store

7  base, a reduction in corporate overhead, and a focus on licensing of the

8  Company's established brands in order to create a smaller, profitable entity going

9  forward.

10     **G.**    **Employees**

11      45.    As of the Petition Date, the Company employed approximately

12 377 individuals.  Of these employees, approximately 374 employees work in the

13 retail store operations, a majority of which are part-time and approximately 60 are

14 salaried individuals.  NFMX employs 3 individuals.  The majority of NFRS's senior

15 executives, as well as certain employees in accounting, legal, information

16 technology, administrative support and human resources, are currently directly

17 employed by either NFRS or NFMX but perform services for both those entities as

18 well as Simo Holdings.  Portions of the salaries of these executives and

19 employees are paid for by NFRS in accordance with the Management Services

20 Agreement between the two entities, based on a historical review of time

21 dedicated to each entity.  No employees of NFRS or NFMX are covered by a

22 collective bargaining agreement.

23           **FACTS IN SUPPORT OF FIRST DAY MOTIONS**

24     **H.**    **Emergency Motion for Joint Administration of Chapter 11 Cases.**

25      46.    As stated above, NFRS, Simo Holdings, and NFMX are related

26 entities that are operated and function together as a business enterprise.  Each

27 are California corporations with their corporate headquarters, administrative

28 offices and warehouse located together in Carlsbad, California.  The members of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  the Board of Directors for each of the entities are the same as are the senior

2  officers of NFRS, Simo Holdings, and NFMX.

3      47.   It is anticipated that we will move forward with the development

4  and presentation of a joint chapter 11 plan for each of the debtors and many of the

5  issues that will arise in the chapter 11 cases of NFRS, Simo Holdings, and NFMX

6  will be interrelated and/or the same.

7      48.   As stated above, NFMX is a wholly-owned subsidiary of Simo

8  Holdings and Simo Holdings owns 97.75% of the stock of NFRS.

9  I.    **Emergency Motions of NFRS and NFMX for Order Authorizing**

10      **Payment and/or Honoring of Prepetition Employee Compensation**

11      **Benefits, Reimbursements, Withholding Taxes, Accrued**

12      **Vacation, and Related Employee Claims (the "Employee Claims Motions")**

13      49.   As of the Petition Date, as stated above, the Company has

14  approximately 377 employees.  A true and correct list of the NFRS's and NFMX's

15  current employees, including name, position, and salary, is attached to the

16  Employee Claims Motion of NFRS and NFMX, respectively, as Exhibit 1.  NFRS

17  and NFMX also provides its employees with health, disability, life insurance, and

18  paid time off.

19      50.   Each of the employees for whom NFRS and NFMX requests

20  the relief in the Employee Claims Motions is currently employed with the

21  Company.  The Company will not pay pre-petition wages or claims to employees

22  who are no longer employed by the Company, or to those employees who have

23  provided notice to the Company that they will be leaving.

24      51.   I believe that paying and/or honoring employee claims and

25  benefits will allow the Company to retain necessary employees, maximize the

26  value of the Company's business and assets, and leave the Company in a position

27  where it can move forward with its business operations on a viable basis.  Subject

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  to Court approval of the use of cash collateral, the Company has access to

2  adequate funds to continue its ongoing operations.

3      52.    The amounts of the Company's employees' salaries for each

4  pay period are set forth in the chart attached to NFRS and NFMX's Employee

5  Claims Motions as Exhibit 1.  The Company is not seeking to pay out the vacation

6  pay to the employees, but only honor accrued vacation days in the ordinary course

7  of its business.  I submit that it is appropriate to honor such claims, provided,

8  however, that the vacation pay is not actually paid out.  Moreover, the Company

9  will not pay any employee any amount for prepetition claims in excess of the

10  $11,725 priority limit.

11      53.    The Employee Claims Motions relates to payroll due to be paid

12  on February 25, 2011 (approximately $437,078), which covers the work period

13  from February 7, 2011 to February 19, 2011.  As of the Petition Date, all but

14  approximately $147,417.51 of this has cleared the bank.  Subject to Court

15  authorization to use cash collateral (NFRS and NFMX have filed motions for

16  authorization to use cash collateral contemporaneously with the filing of the

17  Employee Claims Motions), the Company has sufficient funds to make the

18  remaining payment of $147,417.51.  Moreover, the Company's projections (*see*

19  Exhibit "2" attached hereto, which is also discussed further below) reflect that the

20  Company has the ability to continue to operate its business without rendering the

21  estates administratively insolvent.

22      54.    In large part, the Company's ongoing operations, the

23  opportunity for the Company to maximize the value of the estate, and the

24  Company's ability to meet its obligations is dependent upon a stable and

25  productive work force.  In order to maintain employee stability, morale, and loyalty

26  and to sustain the work effort and ethic being demonstrated by its employees, I

27  believe that it is imperative that payment to all employees and honoring of all

28  employee benefits remains current.  Further, many of the Company's employees

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   simply cannot afford to miss a pay period or be deprived of benefits they receive in

2   the ordinary course of their employment.

3        55.    The stability of the Company's employee pool is tenuous.  The

4   labor pool is mobile.  At the same time, it could be difficult for the Company to find

5   qualified replacement employees with the unfavorable publicity of disrupted pay or

6   benefits.  Even if replacements could be hired, it could take significant time before

7   they could be fully trained and qualified for the jobs, resulting in further disruption

8   and harm to the Company's business operations and the pending reorganization

9   process.  Any interruption in the Company's business or downturn in productivity

10  could detrimentally impact the value of the estate and harm the interests of

11  creditors of the Company.

12       56.    If prepetition compensation, reimbursement amounts and

13  customary benefits are not received and honored in the ordinary course, some of

14  the employees will suffer extreme personal hardship and in many cases may be

15  unable to pay basic living expenses.  Such a result would obviously devastate

16  employee morale.  At this time, any serious deterioration in employee morale

17  would substantially and adversely impact the Company's ability to move forward in

18  a manner that maximizes the value of the estate.  I submit that the total amount to

19  be paid to or for the benefit of the Company's employees if the requested relief is

20  granted is significantly outweighed by the importance and necessity of the

21  employees and the magnitude of loss of business value the Company would suffer

22  if those amounts are not paid.

23       57.    The Company's employees receive compensation for services

24  rendered in amounts that are competitive within the Company's industry.  The

25  Company's employees are compensated in arrears every 2 weeks.  As discussed

26  above, this Motion seeks authority to pay compensation earned during the pay

27  period ending February 20, 2011 where payment comes due postpetition for

28  prepetition work.  The Company's total employee base pay (salary) per pay period

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    shall amount to approximately $348,000 for NFRS and $7,000 for NFMX.  The

2    Company uses ADP as a third-party payroll processor.

3        58.    The Company offers its employees various benefits consistent

4    with industry standards, including medical and dental coverage and paid

5    vacations.  As with the payment of wages, it is important that benefits continue to

6    be provided on an uninterrupted basis.  By the Employee Claims Motions, the

7    Company requests that it be authorized to continue the employee benefit plans

8    identified below.

9        59.    The Company has established and maintained its own benefit

10    plans for its employees.  The general benefit plans that were available to

11    Company's employees include:

12        Medical and Vision coverage;

13        Dental Insurance;

14        Short term disability coverage;

15        Life insurance; and

16        Paid Vacation and company holidays.

17        60.    The Company customarily reimburses employees who incur

18    business expenses in the ordinary course of the Company's business.  The

19    Company's employees submit reimbursement requests following the date on

20    which the expenses are incurred.  It is estimated that some of the Company's

21    employees will not have timely submitted receipts and/or other documentation for

22    a minimal amount of reimbursement of business expenses as of the Petition Date.

23    Further, some checks that were issued prior to the Petition Date will likely not have

24    been cashed before the bankruptcy was filed.  The Company estimates that the

25    total of both the unpaid expenses and outstanding checks for expenses already

26    paid will total less than $25,000.  I request that the Court authorize the Company

27    to pay any outstanding expense reimbursements as of the Petition Date, and

28

SWERTH\ 703400.11                           - 20 -

1    direct the Company's bank (City National Bank) to honor any outstanding checks

2    issued to employees for reimbursement of expenses.

3

J.    **Emergency Motion of NFRS for Order (1) Deeming Utility
4         Companies Adequately Assured of Future Performance,
          (2) Establishing Procedures for Requests for Additional
5         Assurance, and (3) Restraining Utility Companies From
          Discontinuing Alternating or Refusing Service (the
6         "Utilities Motion")**

7         61.    In connection with the operation of its business, NFRS obtains

8    electricity, natural gas, water/sewage, trash removal/waste, telephone and other

9    similar services from a number of different utility suppliers (the "Utility Providers").[1]

10   The Utility Providers are identified to the best of NFRS's ability in the chart

11   attached to the Utilities Motion as Exhibit 2.[2]  This Exhibit 2 details the locations

12   where NFRS operates its business, NFRS's Utility Providers, the name and

13   address of the providers, the type of service provided, the amounts of NFRS's

14   average one month and two week charges for each utility during the 10 months

15   prior to the commencement of the Companies' chapter 11 case .  The Utility

16   Providers supply NFRS with services essential to the continuation of NFRS's

17   business.  Any interruption in the utility services provided to NFRS would seriously

18   disrupt NFRS's operations and could jeopardize NFRS's opportunity to maximize

19   the value of the estate.  As set forth in the Utilities Motion, NFRS shall furnish

20   adequate assurance of payment to its Utility Providers.  NFRS's business involves

21   the locations listed in Exhibit 3 to the Utilities Motion.

---

23   [1]  NFRS leases all of the locations where it conducts its business.  Pursuant to certain of
24   NFRS's leases, certain utility services may be provided to NFRS under its leases.  In
     such situations, NFRS may not have any contractual relationship with the utility provider
25   and the utility provider may not have any claim against NFRS.

26   [2]  NFRS's decision to list the parties included in Exhibit 2 shall not be deemed an
     acknowledgement that such a party is a utility within the purview of § 366 of the
27   Bankruptcy Code.  NFRS reserves the right to subsequently argue whether any given
     entity is properly deemed a utility provider for purposes of the Utilities Motion and § 366.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**K.    Emergency Motion of NFRS for Order Directing Credit Card Processor and Honor Agreements with the Debtor Pending Assumption or Rejection (the "Credit Card Motion")**

62.    In the ordinary course of its business, NFRS accepts credit card payments from its customers for the clothing and accessories sold by NFRS. Approximately half of the payments received by NFRS are the result of credit card transactions.  During the past year NFRS received, on average, an aggregate amount of approximately $1,552,044 in credit card transactions for each monthly period (on an annualized basis, approximately 56% of total sales).

63.    To facilitate the credit card transactions, NFRS has a contract (the "Processing Agreement") with Paymentech, L.P., a Delaware limited partnership d/b/a Chase Paymentech (hereafter, "Chase").  Pursuant to the Processing Agreement, Chase aggregates all of NFRS's credit card transactions for Visa, MasterCard, American Express, and Discover credit cards.  Under the Processing Agreement, NFRS's Visa and Mastercard credit card transactions, including both charges and credits, are processed for payment, and authorization and settlement services are provided with respect to NFRS's American Express and Discover credit card transactions.  A true and correct copy of the Processing Agreement is attached to the Credit Card Motion as Exhibit 1.

64.    Granting NFRS the relief requested in the Credit Card Motion is crucial to NFRS's ability to continue to operate its business during this chapter 11 case without interruption.  Any interruption in NFRS's ability to handle credit card transactions would have a devastating impact on the customer support and loyalty, the value of the estate, and the interests of creditors in this case. Accordingly, it is imperative so that this case is not irreparably undermined at its inception and that the Processing Agreement and the Credit Card Retailer Agreement continue to be honored and performed.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**L.   Emergency Motions of NFRS, Simo Holdings, and NFMX for Order Authorizing Debtor to Maintain Bank Accounts and Cash Management System and Continue Use of Its Existing Business Forms (the "Cash Management Motions")**

65.     As of the Petition Date, the Company maintains several bank accounts (the "Company's Accounts") for use in its business operations. A schedule of the Company's bank accounts with Signature Bank, City National Bank, California Bank And Trust, and Ford Advantage, which also sets forth the Company's bank account structure and cash management system, is attached to each of the Cash Management Motions as Exhibit 1 and is incorporated herein by this reference.

66.     If the Company is required to immediately close its existing accounts, open all new bank accounts and substantially alter its existing cash management system, there likely would be a significant disruption in the Company's ability to collect and disburse funds in the ordinary course of its operations. Such a disruption would negatively impact the Company's ability to make a smooth transition into chapter 11. Accordingly, I respectfully request that the Court enter an order authorizing (but not directing) the Company's continued use of the Company's Accounts, rather than opening new debtor in possession accounts, provided however, that the Company will promptly open a new payables account and will promptly close its prepetition payables account.[3]

67.     Additionally, I request that, as a way of minimizing expense to the Companies' bankruptcy estates, the Company be authorized to continue to use its correspondence and business forms including, but not limited to, invoices, purchase orders, checks, letterhead, envelopes and other business forms

---

[3]   I propose to maintain the Company's Accounts on an interim basis for the next forty-five (45) days. If the United States trustee does not have an objection, I request that the Company be authorized to maintain and utilize the Company's Accounts postpetition on a permanent basis.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  (collectively, the "Business Forms"), substantially in the form existing immediately

2  before the commencement of the Company's chapter 11 cases, without reference

3  to the Companies' status as a debtor in possession.  I propose that, in the event

4  that the Company needs to purchase/print new Business Forms during the

5  pendency of this chapter 11 case, such forms will include a legend referring to the

6  Companies' status as a debtor in possession.

7        68.   If the Company is not permitted to maintain and utilize its cash

8  management and banking system (with certain modifications described below),

9  and is not permitted to continue to use its existing business forms, the Company,

10  the estate, and creditors will be prejudiced by: (a) the resulting disruption in the

11  ordinary financial affairs and business operations of the Company; (b) potential

12  delay in the administration of the estate; and (c) the unnecessary cost to the

13  estate to set up new accounts and new systems and purchase/print new business

14  forms.  In order to prevent the inadvertent cashing of outstanding prepetition

15  checks by the Companies' bank, the Company will provide the institutions where

16  the Companies' Accounts are maintained with notice of the commencement of the

17  chapter 11 case and direction that outstanding prepetition checks are not to be

18  honored, unless and until a court order (if any) is entered authorizing payment of

19  such obligations.  If such an order or orders of the Court are entered, the

20  Companies' banks will be directed to honor checks for prepetition obligations only

21  to the extent the Company has authorized payment of such obligations.

22        69.   A schedule of the Companies' bank accounts and a chart

23  setting forth the structure of the accounts and the Companies' cash management

24  system is attached as Exhibit 1 to the Cash Management Motions.  NFRS's main

25  operating account is with City National Bank (Account No. 112834419).  NFRS

26  has three additional zero-balance accounts with City National Bank (Account nos.

27  123303601, 12303644, and 12303636) which receive non-credit card payments

28  and transfer their balances to NFRS's main operating account.  These accounts

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    transfer in and disburse the same amount of funding when needed to maintain its

2    zero balance.  Additionally, NFRS has an account with Signature Bank (Account

3    No. 1501216522) which receives payments made pursuant to credit card.  These

4    amounts are also deposited into NFRS's main operating account.

5       70.    NRFS's main funding account also has one zero balance

6    account attached it to it for payroll funding purposes (Account No. 11257419).

7    This account transfers in and disburses the same amount of funding when needed

8    to maintain its zero balance.

9       71.    Cash and checks from sales are deposited daily by each store.

10   The deposit is transported to the bank by Brinks, an armored car service, to

11   designated cash vaults for City National Bank.  City National Bank operates two

12   types of cash vaults; bank owned (mainly southern California) and contracted

13   vaults (Wells Fargo).  Upon verification of the deposit by the cash vaults, the funds

14   are deposit into one of three zero balance accounts (ZBA).  See Exhibit 1 to

15   NRFS's Cash Management Motion to identify which account is used by each

16   store.  At the end of the day, the funds are transfer from each ZBA account into

17   the main operating account at City National Bank.

18      72.    At the end of each day, credits cards are batched by store and

19   processed by NFRS's credit card processor, Paymentech.  It normally takes 2 to 3

20   days to receive the funds from the processor.  Each store has a unique merchant

21   ID for Mastercard, Visa, Discover and American Express.  These funds are

22   deposited into the Signature Bank account (Account No. 1501216522).  This

23   account is a controlled account and is swept nightly by Credit Cash NJ, LLC,

24   NFRS's lender ("Credit Cash"), into its bank account.  Credit Cash then reduces

25   the settlement by a daily agreed upon amount and transfers the funds by wire or

26   ACH directly into NFRS's main operating account with City National Bank.

27      73.    NFRS processes all payroll related items though a ZBA account

28   with City National Bank.  At the end of each day as checks are processed by the

1  bank and direct deposit and taxes are processed by our payroll provider (ADP),

2  the payroll account is debited and then the funds are swept from the main

3  operating account with City National Bank.

**M.**    **Motion of NFRS, NFMX, and Simo Holdings for Order Limiting Extent of Notice Required for Administrative Matters and Authorizing Service by Email (the "Limiting Notice Motions")**

74.    NFRS has in excess of 300 creditors and other parties which

will be included in its Master Mailing List. Simo Holdings has in excess of 250

creditors and other parties which will be included in its Master Mailing List. NFMX

has in excess of 50 creditors and other parties which will be included in its Master

Mailing List. Further, I contemplate that the Company may be required to bring

numerous administrative matters before the Court in these cases. Limiting the

extent of notice required for such matters will greatly reduce the substantial

burden and expense that would be imposed upon the estates if the Company is

required to provide notice of all administrative matters in this case to all of its

creditors and various other parties. At the same time, a creditor, shareholder, or

other party in interest desiring to receive notice of administrative matters can

ensure that notice will be received by filing and serving a request for special

notice. Moreover, in order to save the estate substantial expense in postage and

copying costs, and to make receipt of documents more convenient and expedient

for various interested parties, I also request that the Court authorize the Company

to serve notices, pleadings, and other documents filed in this case by email on

those parties who consent in advance to receiving service of such documents by

email.

75.    Company seeks to reduce the burden and expense of providing

notice of all administrative matters in this case. Service of notices, pleadings, and

other documents filed with the Court by email on parties who consent, in advance,

to receiving service of documents by email will dramatically reduce postage and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  copying expenses in this case and will expedite service in a manner that many

2  parties will likely find preferable to the other more costly alternatives.  Further, the

3  Court's approval of the Limiting Notice Motions will eliminate the necessity and

4  expense of the Company by requesting limited notice separately in each

5  administrative matter as it arises.

6      N.    **Emergency Motion of NFRS for Order Authorizing**

             **Debtor to Honor and Comply with Customer**

7               **Programs and Obligations (the "Customer Motion")**

8        76.    The success of NFRS's operations and the maximizing of the

9  value of property of NFRS's estate are dependent upon the patronage,

10  confidence, and loyalty of NFRS's customers.  I believe that the best means for

11  maximizing the value of NRFS's  estate will be through the preservation of its retail

12  store operations.  The support and confidence of NFRS's customers will be

13  severely harmed if NFRS is not able to honor and comply with certain existing

14  customer obligations.  Honoring and complying with certain of NFRS's existing

15  customer obligations is essential in order for NFRS to (i) meet competitive

16  pressures in its retail business operations, (ii) preserve the going concern value of

17  its business, (iii) ensure customer satisfaction and generate goodwill, (iv)

18  maximize the value of the estate, and (v) maintain existing customers and attract

19  new customers.  Accordingly, it is imperative that the Court approve this Motion

20  and authorize NFRS to honor and comply with its customer obligations and

21  customer programs in the ordinary course of business in order to avoid damage to

22  NFRS's business operations and customer confidence that would result in

23  postpetition damages prejudicing creditors and harming the value of property of

24  NRFS's estate.

25        77.    NFRS has the following customer programs in place and/or

26  outstanding obligations to customers:

27      **Gift Cards**

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Gift cards are processed at point of sale and are accounted through

2  credit card terminals.  As of the Petition Date, NFRS has outstanding gift cards

3  worth approximately $286,000.

4  **Customer Refunds**

5  NFRS's policy is to allow refunds upon returns with 30 days of receipt

6  of product.

7  **Customer Credits**

8  NRFS's policy is that credits are issued immediately to customers by

9  way of original tender in the case of credit card purchases.  As of the Petition

10  Date, NFRS had outstanding store credits worth approximately $103,000.

11  78.  There may be no constituency of NFRS that is more important

12  to the success of NRFS's chapter 11 case than NRFS's customers.  The

13  continued patronage, confidence, and loyalty of its customers is essential to the

14  ongoing vitality of NRFS's business and NFRS's ability to maximize the value of

15  the estate.  Pursuant to the Customer Motion, NFRS seeks authorization on an

16  emergency basis to honor and comply with certain customer obligations because

17  any delay or interruption in honoring certain customer obligations, providing

18  refunds, or in having the flexibility to resolve customer claims in the ordinary

19  course of business will seriously harm NRFS's customer relations at a time when

20  customer confidence, loyalty, and patronage is critical.

21  O.  **Motion of NFRS, Simo Holdings, and NFMX for Extension of Time**
   **to File Bankruptcy Schedules, Statement of Affairs and Lists (the**

22  **"Schedules Extension Motions")**

23  79.  In the Schedules Extension Motions filed by the Company, the

24  Company requests an extension of time of thirty (30) days to file its bankruptcy

25  schedules, statement of affairs, and lists.

26  80.  The reasons for this request, among other things, include the

27  following:

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    a.    Upon commencement of this case, in order to continue

2   its operations and avoid irreparable harm to the estate, the Company was

3   required, among other things, to file various "first day" motions, including (among

4   others) motions (i) to obtain authorization to pay and honor priority prepetition

5   wage and benefit claims owed to its employees, (ii) to provide adequate

6   assurance in accordance with Bankruptcy Code section 366 to utility providers,

7   (iii) to obtain authorization to honor and comply with certain customer obligations,

8   (iv) to obtain authorization to use cash collateral in the ordinary course of business

9   and grant replacement liens, and (v) in general, to avoid disruption to the

10  Company's business operations and potential harm to the estate.  These matters

11  required the immediate attention of the Company and its accounting personnel.

12    b.    The size and complexity of the Companies' cases are

13  sufficient reasons to warrant additional time for the Company to file the required

14  schedules, statements and lists.  NFRS currently operates 41 retail locations in 7

15  states.  The Company has in excess of 300 creditors and other parties in interest

16  included in its master mailing list and approximately 377 employees.

17    c.    The Companies' accounting personnel are working

18  diligently to compile and analyze the information necessary to prepare the

19  Companies' schedules, statements and lists.  However, voluminous

20  documentation and records must be reviewed.  Additional time is required to allow

21  for proper preparation of the Companies' schedules, statements and lists.

22    d.    In this case, merely compiling and preparing the

23  information required by the Office of the United States trustee under its initial

24  requirements will require many hours attention of the Companies' accounting

25  personnel.

26  **P.    Motion of NFRS For Order Approving Debtor's Rejection Of
        Unexpired Leases Of Nonresidential Real Property (the "Lease**

27  **Motion")**

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

81.    NFRS's operations have not been profitable during the last year.  NFRS believes that the best means of maximizing the value of the estate will be through the closure of NFRS's less desirable stores.  Prior to the Petition Date, NFRS closed 12 of its retail stores covered by the Leases identified in Exhibit "1" to the Lease Motion.  In order to achieve the goal of maximizing the value of the estate, it is imperative that there not be delay with respect to rejection of the Leases relating to such stores.  The stores have already closed, and are no longer generating any revenue for the estate.

82.    Rejection of the Leases will avoid the continuing imposition of administrative claims for rent or adequate protection against the estate for properties where the reasonable business decision is that marketing NFRS's leasehold interest is not cost effective and would not benefit the estate.  The Leases either relate to Properties which are no longer profitable for NFRS, or have terms that are burdensome to NFRS.  Under the circumstances, as evaluated by NFRS, the Leases have no residual value for NFRS or the estate.  Accordingly, approval of rejection of the Leases is in the best interest of NFRS, creditors, all other interested parties, and the estate.

83.    NFRS has already closed the stores that are the subject of the Leases.  In determining that the Leases should be rejected, NFRS exercised reasonable business judgment and considered, among other things:  (1) the continued liabilities associated with the Leases and the significant negative impact of such liabilities on NFRS's estate; (2) the lack of profitability of the operations previously conducted at the leasehold locations; and (3) various financial factors dictating that NFRS's interests in the Leases are not worth marketing to proposed assignees and cannot feasibly be sold to the landlords, including:  (a) above market rental rates or rental rates within a range of market rents that cause it not to be feasible for NFRS to assign its interests in the leases when considering the time necessary to market, (b) the cost of carrying the lease while marketed, (c) the

1   remaining term of the lease (including options), (d) the security risk/expenses

2   associated with a closed location, (e) the likelihood of a lease premium being paid

3   in a cash lump sum payment or over time, and (f) legal fees and transaction costs

4   association with assumption and assignment of the lease.

5         84.    NFRS has evaluated the Leases.  NFRS has determined that

6   the Leases all have terms that are burdensome to NFRS and the estate.  Further,

7   NFRS has determined that burdens under the Leases outweigh any benefit that

8   might be derived for the estate pursuant to the Leases.  In summary, NFRS, in the

9   reasonable exercise of its business judgment, has determined that the Leases are

10   burdensome and have no residual value for NFRS or the estate.

**Q.**    **Motions for Authorization to Use Cash Collateral on an Interim and Final Basis (the "Cash Collateral Motions")**

13       1.    <u>No Fear Retail Stores, Inc.</u>

14         85.    In order to continue to operate its business in a manner that will

15   maximize the value of the estate, NFRS requires the use of cash collateral.

16   Attached hereto as **Exhibit "2"** is a proposed eight-week budget of the Company

17   (the "Company Budget") showing that the Company as a whole will generate

18   sufficient funds to meet operating and administrative expenses.  Also attached

19   hereto as **Exhibit "3"** is a budget showing the NFRS's proposed eight-week

20   budget (the "NFRS Budget") showing that continuing NFRS's operations, as

21   reflected in the NFRS Budget, will generate sufficient funds to meet operating and

22   administrative expenses and make payments to NFRS's secured lender Credit

23   Cash, and does not impair Credit Cash's collateral position.  The NFRS Budget,

24   which is conservative, shows that NFRS can pay its expenses without additional

25   financing from a third party.  Even so, the Company is currently in discussions with

26   third parties regarding post-petition financing, and the Company hopes to reach an

27   agreement on that within the next eight weeks.  The Company's business is a

28   seasonal one, and the Company is currently in a traditionally slow period.  Based

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   on the facts and circumstances of this case as discussed above and set forth in

2   the cash collateral motion, and the Budget, the necessary and appropriate course

3   of action is for the Company to obtain authorization to use cash collateral to

4   facilitate NFRS's efforts to maximize the value of the estate

5           86.     The only entity with an interest in NFRS's cash collateral is

6   Credit Cash. Credit Cash asserts a first priority lien on NFRS's assets. As of the

7   Petition Date, Credit Cash asserts a claim against NFRS in the approximate

8   amount of $1,129,038.

9           87.     NFRS sells products to customers through cash, credit card

10   and check transactions. Credit card transactions are processed by a third party

11   credit card processor, which remits the proceeds to NFRS after deducting a

12   processing fee.

13           88.     In November 2009, NFRS entered into a credit card receivables

14   financing arrangement with Credit Cash. Under this arrangement, Credit Cash

15   makes loans to NFRS, secured by a first lien on all assets of NFRS, and repaid

16   through deductions from NFRS's daily credit card receipts.

17           89.     Specifically, the arrangement works as follows: Credit Cash

18   makes periodic loans to NFRS of $500,000 and charges a fee of $70,000 for each

19   loan. Repayment of each loan and fee ($570,000 in total) is made in payments of

20   $2,192.31 each business day ($4,384.62 on the day after federal holidays). These

21   daily payments are effected via a NFRS account at Signature Bank (Account No.

22   1501216522, the ("Control Account"), controlled by Credit Cash, to which all credit

23   card receipts are transferred by NFRS's credit card processor, Paymentech, L.P.

24   After Credit Cash has pulled its daily fee from the Control Account, any remaining

25   funds in the account are disbursed to NFRS's account with City National Bank.

26           90.     NFRS took separate loans in the amount of $500,000 from

27   Credit Cash in each of November 2009, December 2009, July 2010, November

28   2010, and December 2010. As of the Petition Date, NFRS has repaid Credit Cash

1  all but approximately $1,129,038 relating to such loans.  Prior to the Petition Date,

2  Credit Cash pulled $6,576.93 from the Control Account each business day.  NFRS

3  has general unsecured claims of approximately $8 million.

4        91.    In return for the service Credit Cash provides to NFRS, Credit

5  Cash obtained a security interest in substantially all of NFRS assets as well as the

6  assets of NFMX.  Credit Cash's collateral has value that is dramatically greater

7  than the amount owing to Credit Cash.  As of the Petition Date, NFRS assets have

8  an estimated value of $27,000,000.  This consists of approximately $260,000 in

9  cash, $5 million in inventory, $500,000 in non-intercompany accounts receivable,

10  $700,000 in fixed assets, $90,000 in deposits, and approximately $20,000,000 in

11  intellectual property.  Simo Holdings transferred the "No Fear" trademark to NFRS

12  in September 2008.  My estimate of the value of the "No Fear" trademark is based

13  primarily on my long experience with and general knowledge of the value of

14  trademarks used in the apparel and action sports industries, on past licensing

15  transactions for the "No Fear" trademark, and on indications of value for the "No

16  Fear" trademark given informally by third parties in recent years in the course of

17  discussions relating to potential financing and licensing transactions between

18  NFRS and such third parties.

19        92.    As more fully detailed in the NFRS Budget attached hereto as

20  Exhibit "3", NFRS's income on a weekly basis is approximately $500,000 to

21  $600,000.  Post-petition, I anticipate that NFRS will have administrative expenses

22  of approximately that amount, which fluctuates depending on whether payroll and

23  rent must be paid in that week.  Therefore, I anticipate that NFRS will generate

24  revenue approximately equal to its expenses.

25        2.    <u>Simo Holdings, Inc.</u>

26        93.    Attached as **Exhibit "4"** is Simo Holdings' proposed eight-week

27  budget (the "Simo Budget") showing that continuing Simo Holdings' operations, as

28

SulmeyerKupetz, A Professional Corporation<br>333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR<br>LOS ANGELES, CALIFORNIA 90071-1406<br>TEL. 213.626.2311 • FAX 213.629.4520

1  reflected in the Simo Budget, will generate sufficient funds to meet operating and

2  administrative expenses.

3        94.    There are only two entities with an interest in the cash collateral

4  of Simo Holdings, and both entities obtained such interest by filing a writ of

5  attachment against Simo Holdings.  These entities are FMF Racing, which filed a

6  writ of attachment against Simo Holdings in the amount of $1,500,000, and Don

7  Emler (together with FMF Racing, the "Secured Parties"), who filed a writ of

8  attachment against Simo Holdings in the amount of $802,333.33.  True and

9  correct copies of these writs of attachment are attached as Exhibit 1 to the Cash

10  Collateral Motion of Simo Holdings.  Pursuant to California Code of Civil

11  Procedure section 487.010, all of Simo Holdings' property within California is

12  subject to attachment if there is a statutory method of levy for the property.  The

13  levy provisions contained in California Code of Civil Procedure section 488.300 *et*

14  *seq.* provide for levy of substantially all assets of a corporation, with the exception

15  of certain intellectual property.  Thus, the Secured Parties have a collective claim

16  against Simo Holdings in the amount of $2,302,333.33, which is secured by all

17  property of Simo Holdings' estate to which a writ of attachment may attach,

18  including equipment, inventory, deposit accounts, and accounts receivable.

19        95.    The interests of the Secured Parties in Simo Holdings' cash

20  collateral is adequately protected by a substantial equity cushion on account of the

21  assets of Simo Holdings.  As of the Petition Date, Simo Holdings' assets have an

22  estimated value of $12,500,000.  This consists of approximately $25,000 in cash,

23  $700,000 in non-intercompany accounts receivable, $290,000 in fixed assets, a

24  50% ownership in real property in North Carolina which interest is estimated to be

25  valued at $1.5 million, and $10 million in intellectual property.  Simo Holdings

26  owns the "So Cal" and "Fearless" trademarks.  My estimate of the value of these

27  trademarks is based primarily on my long experience with and general knowledge

28  of the value of trademarks used in the apparel and action sports industries, on

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

- 34 -

past licensing transactions for the "So Cal" and "Fearless" trademark, and on indications of value for the "No Fear" trademark given informally by third parties in recent years in the course of discussions relating to potential financing and licensing transactions between Simo Holdings and such third parties.

96.     As more fully detailed in the Simo Budget attached hereto as Exhibit "4", Simo Holdings' income on a monthly basis is approximately $25,000, consisting of rental income from the property it has an interest in North Carolina. Its expenses are less than this amount.  Therefore, I anticipate that Simo Holdings will generate sufficient revenue post-petition to pay its expenses.

97.     This equity cushion alone provides the Secured Parties with adequate protection.  Further, even if this equity cushion was declining, the Secured Parties would be adequately protected by a combination of (a) the continued operation of Simo Holdings' business as well as the business of its wholly-owned subsidiary NFMX and its 97.75%-owned subsidiary NFRS; and (b) the granting of a replacement lien on post-petition receivables to the extent of any diminution in value of the Secured Parties' collateral as a result of Simo Holdings' use of cash collateral.  The replacement lien would be on all post-petition assets in the same priority and to the same extent and validity as the Secured Parties interest.

98.     As of the Petition Date, Simo Holdings has estimated unsecured debt in the approximate amount of $14.6 million, primarily owed to trade vendors, suppliers, shippers, and other service providers.

99.     Simo Holdings' equity interests are held by numerous individuals, including the founders of Simo Holdings, Brian Simo (37.15%) and Mark Simo (38.20%).  Approximately 26 other individuals hold the remaining 24.65% interest in Simo Holdings, the largest of which is Don Emler with 6.64%.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

3. <u>No Fear MX, Inc.</u>

100. Attached hereto as **Exhibit "5"** is NFMX's proposed eight-week budget (the "NFMX Budget") showing that continuing NFMX's operations, as reflected in the NFMX Budget, will generate sufficient funds to meet operating and administrative expenses.

101. As of the Petition Date, NFMX has estimated unsecured debt in the approximate amount of $6 million, primarily owed to trade vendors, suppliers, shippers, warehousers, and other service providers

102. The only entity with an interest in the cash collateral of NFMX is Credit Cash NJ, LLC ("Credit Cash"), pursuant to a guaranty issued by NFMX of the obligations of NFRS to Credit Cash. Credit Cash asserts a first priority lien on NFMX's assets. As of the Petition Date, Credit Cash has a claim against NFRS, in the approximate amount of $1,129,038, which claim is also secured by the assets of NFRS. Credit Cash's collateral is significant. As detailed above, the assets of NFRS have a value in excess of $5 million.

103. Further, the interests of the Credit Cash in NFMX's cash collateral is adequately protected by a substantial equity cushion on account of the assets of NFRS, which have an estimated value of $27 million. As of the Petition Date, NFMX's assets have an estimated value of $300,000. This consists of approximately $5,000 in cash, $160,000 in inventory, and $145,000 in non-intercompany accounts receivable.

104. NFMX's income on a monthly basis is approximately $100,000. As further detailed in the NFMX Budget, NFMX's expenses are less than this amount. Therefore, I anticipate that NFMX will generate revenue post-petition each month, in excess of administrative expenses.

1    105.    The terms of the proposed interim orders on the Cash

2    Collateral Motions do not include any provisions inappropriate for an interim

3    agreement as described in the Local Bankruptcy Rules of the Southern District of

4    California.  Specifically, the proposed orders do not contain any of the provisions

5    which this Court requires moving parties to direct the Court's attention to, as

6    specified in the "Guidelines for Motions To Use Cash Collateral Or To Obtain

7    Credit", which is Appendix D2 to the Local Rules of the United States Bankruptcy

8    Court for the Southern District of California.

9        I declare under penalty of perjury that the foregoing is true and

10    correct.

11    Executed this 25th day of February, 2011, at Dallas, Texas.

12

13

14    MARK SIMO

# EXHIBIT "1"

# NO FEAR
# CORPORATE STRUCTURE



**Simo Holdings, Inc.**
("Holdings")

75% M & B Simo
25% other

**No Fear Retail Stores, Inc.**
97.75% Holdings
2.25% Gatorz Inc.

**No Fear MX, Inc.**
100% Holdings

**MX No Fear Europe SAS**
100% No Fear MX, Inc.

**No Fear International Ltd.**
50% Holdings
50% Brands Holdings Ltd.
(Sports World Int'l Ltd.)

**FMF International, Inc.**
50% Holdings
50% FMF Racing

# EXHIBIT "2"

Simo - Consolidated
Cash Flow Analysis
as of 02/14/11

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| | 2/21/2011 | 2/28/2011 | 3/7/2011 | 3/14/2011 | 3/21/2011 | 3/28/2011 | 4/4/2011 | 4/11/2011 | 4/18/2011 |
| **Cash Inflows** | | | | | | | | | |
| Retail Sales | $500,329 | $461,392 | $525,938 | $566,911 | $544,122 | $486,527 | $512,616 | $473,272 | $481,314 |
| Sales Tax | $40,026 | $36,911 | $42,075 | $45,353 | $43,530 | $38,922 | $41,009 | $37,862 | $38,505 |
| Wholesale Sales | $25,000 | $25,000 | $0 | $0 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rental Income - North Carolina | $0 | $0 | $25,000 | $0 | $0 | $0 | $25,000 | $0 | $0 |
| Capital/Debt Infusion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | |
| Total | $565,355 | $523,304 | $618,013 | $637,264 | $612,651 | $550,449 | $603,625 | $536,133 | $544,819 |
| | | | | | | | | | |
| **Cash Outflows** | | | | | | | | | |
| Payroll | $250,000 | $110,000 | $260,000 | $110,000 | $260,000 | $110,000 | $260,000 | $110,000 | $260,000 |
| Mgmt Support Allocation | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Credit Cash | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales Tax | $134,363 | $0 | $0 | $0 | $115,275 | $0 | $0 | $0 | $169,880 |
| Credit Card Fees | $0 | $0 | $28,709 | $0 | $0 | $0 | $32,602 | $0 | $0 |
| Insurance | $2,010 | $40,000 | $13,425 | $12,671 | $0 | $40,000 | $13,425 | $0 | $0 |
| Rent - Retail Stores | $0 | $0 | $346,000 | $0 | $0 | $0 | $343,000 | $0 | $0 |
| Rent - HQ | $0 | $0 | $87,486 | $0 | $0 | $0 | $87,486 | $0 | $0 |
| Rent - Allocation | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Vendors | $50,000 | $157,626 | $210,375 | $226,765 | $217,649 | $194,611 | $205,046 | $189,309 | $192,526 |
| Freight | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Mortgage - North Carolina | $0 | $0 | $20,000 | $0 | $0 | $0 | $20,000 | $0 | $0 |
| Bank Fees | $0 | $0 | $17,000 | $0 | $0 | $0 | $17,000 | $0 | $0 |
| Utilities - Store | $10,595 | $0 | $10,595 | $0 | $10,595 | $0 | $10,595 | $0 | $10,595 |
| Music - Store | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Supplies | $3,250 | $0 | $3,250 | $2,640 | $3,250 | $0 | $3,250 | $2,640 | $3,250 |
| IT - Phones and Internet | $8,593 | $0 | $8,593 | $0 | $8,593 | $0 | $8,593 | $0 | $8,593 |
| Celerant | $15,664 | $0 | $0 | $15,664 | $0 | $0 | $0 | $15,664 | $0 |
| Full Circle | $2,020 | $0 | $0 | $2,020 | $0 | $0 | $0 | $2,020 | $0 |
| Professional Fees - Financial Advisor | $15,000 | $0 | $0 | $0 | $30,000 | $0 | $0 | $0 | $30,000 |
| Professional Fees - Bankruptcy Counsel | | $0 | $0 | $0 | $0 | $0 | $15,000 | $15,000 | $15,000 |
| Professional Fees - Creditors' Committee Counsel | | $0 | $0 | $0 | $0 | $0 | $5,000 | $5,000 | $5,000 |
| Professional Fees - Legal Fees - DIP Lender | | $25,000 | $25,000 | $0 | $0 | $0 | $0 | $0 | $0 |
| Travel | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Total | $605,495 | $321,626 | $1,044,433 | $383,760 | $659,362 | $358,611 | $1,034,998 | $353,633 | $708,843 |
| | | | | | | | | | |
| Beginning Balance | $333,685 | $393,545 | $595,222 | $168,802 | $422,306 | $375,596 | $567,435 | $136,062 | $318,562 |
| Cash Gained/(Used) | 59,860 | 201,677 | (426,421) | 253,505 | (46,710) | 191,838 | (431,373) | 182,501 | (164,024) |
| Ending Balance | $393,545 | $595,222 | $168,802 | $422,306 | $375,596 | $567,435 | $136,062 | $318,562 | $154,538 |

Financial Advisor - Venturi & Company
Bankruptcy Counsel - SulmeyerKupetz

**EXHIBIT "3"**

No Fear Retail
Cash Flow Analysis
as of 02/14/11

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| | 2/21/2011 | 2/28/2011 | 3/7/2011 | 3/14/2011 | 3/21/2011 | 3/28/2011 | 4/4/2011 | 4/11/2011 | 4/18/2011 |
| **Cash Inflows** | | | | | | | | | |
| Retail Sales | $500,329 | $461,392 | $525,938 | $566,911 | $544,122 | $486,527 | $512,616 | $473,272 | $481,314 |
| Sales Tax | 40,026 | 36,911 | 42,075 | 45,353 | 43,530 | 38,922 | 41,009 | 37,862 | 38,505 |
| Wholesale Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Royalties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Income - North Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital/Debtor Financing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | |
| Total | $540,355 | $498,304 | $568,013 | $612,264 | $587,651 | $525,449 | $553,625 | $511,133 | $519,819 |
| | | | | | | | | | |
| **Cash Outflows** | | | | | | | | | |
| Payroll | $160,000 | $100,000 | $240,000 | $100,000 | $240,000 | $100,000 | $240,000 | $100,000 | $240,000 |
| Mgmt Support Allocation | $0 | $95,000 | $0 | $0 | $0 | ($30,000) | $0 | $0 | $0 |
| Credit Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Tax | 134,363 | 0 | 0 | 0 | 115,275 | 0 | 0 | 0 | 169,880 |
| Credit Card Fees | 0 | 0 | 27,959 | 12,671 | 0 | 0 | 31,852 | 0 | 0 |
| Insurance | 0 | 40,000 | 12,425 | 0 | 0 | 40,000 | 12,425 | 0 | 0 |
| Rent - Retail Stores | 0 | 0 | 346,000 | 0 | 0 | 0 | 343,000 | 0 | 0 |
| Rent - HQ | 0 | 0 | 87,486 | 0 | 0 | 0 | 87,486 | 0 | 0 |
| Rent - Allocation | 0 | 0 | (6,000) | 0 | 0 | 0 | (6,000) | 0 | 0 |
| Vendors | 50,000 | 157,626 | 210,375 | 226,785 | 217,649 | 194,611 | 205,046 | 189,309 | 192,526 |
| Freight | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 |
| Mortgage - North Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Fees | 0 | 0 | 14,000 | 0 | 0 | 0 | 14,000 | 0 | 0 |
| Utilities - Store | 9,485 | 0 | 9,485 | 0 | 9,485 | 0 | 9,485 | 0 | 9,485 |
| Music - Store | 0 | 0 | 0 | 2,640 | 0 | 0 | 0 | 2,640 | 0 |
| Supplies | 3,000 | 0 | 3,000 | 0 | 3,000 | 0 | 3,000 | 0 | 3,000 |
| IT - Phones and Internet | 8,218 | 0 | 8,218 | 0 | 8,218 | 0 | 8,218 | 0 | 8,218 |
| Celerant | 15,664 | 0 | 0 | 15,664 | 0 | 0 | 0 | 15,664 | 0 |
| Full Circle | 1,010 | 0 | 0 | 1,010 | 0 | 0 | 0 | 1,010 | 0 |
| Professional Fees - Financial Advisor | 15,000 | 0 | 0 | 0 | 30,000 | 0 | 0 | 15,000 | 30,000 |
| Professional Fees - Bankruptcy Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 15,000 | 15,000 | 15,000 |
| Professional Fees - Creditors' Committee Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 5,000 | 5,000 |
| Professional Fees - Legal Fees - DIP Lender | 0 | 0 | 25,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Travel | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Total | $409,740 | $405,626 | $990,948 | $371,750 | $636,627 | $317,611 | $981,513 | $341,623 | $686,108 |
| | | | | | | | | | |
| Beginning Balance | $415,291 | $545,906 | $638,583 | $215,648 | $456,162 | $407,187 | $615,025 | $187,138 | $356,648 |
| Cash Gained/(Used) | 130,615 | 92,677 | (422,936) | 240,515 | (48,975) | 207,838 | (427,888) | 169,511 | (166,289) |
| Ending Balance | $545,906 | $638,583 | $215,648 | $456,162 | $407,187 | $615,025 | $187,138 | $356,648 | $190,359 |

# EXHIBIT "4"

Simo
Cash Flow Analysis
as of 02/14/11

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| | 2/21/2011 | 2/28/2011 | 3/7/2011 | 3/14/2011 | 3/21/2011 | 3/28/2011 | 4/4/2011 | 4/11/2011 | 4/18/2011 |
| **Cash Inflows** | | | | | | | | | |
| Retail Sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wholesale Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Royalties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Income - North Carolina | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 |
| Capital/Debt Infusion | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | $0 | $0 | $25,000 | $0 | $0 | $0 | $25,000 | $0 | $0 |
| **Cash Outflows** | | | | | | | | | |
| Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Mgmt Support Allocation | $0 | $5,000 | $0 | $0 | $0 | $5,000 | $0 | $0 | $0 |
| Credit Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Retail Stores | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - HQ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Allocation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vendors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Freight | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mortgage - North Carolina | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 |
| Bank Fees | 0 | 0 | 500 | 0 | 0 | 0 | 500 | 0 | 0 |
| Utilities - Store | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Music - Store | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IT - Phones and Internet | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Celerant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Full Circle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Financial Advisor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Bankruptcy Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Creditors' Committee Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Legal Fees - DIP Lender | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Travel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | $0 | $5,000 | $20,500 | $0 | $0 | $5,000 | $20,500 | $0 | $0 |
| | | | | | | | | | |
| Beginning Balance | $17,472 | $17,472 | $12,472 | $16,972 | $16,972 | $16,972 | $11,972 | $16,472 | $16,472 |
| Cash Gained/(Used) | 0 | (5,000) | 4,500 | 0 | 0 | (5,000) | 4,500 | 0 | 0 |
| Ending Balance | $17,472 | $12,472 | $16,972 | $16,972 | $16,972 | $11,972 | $16,472 | $16,472 | $16,472 |

# EXHIBIT "5"

No Fear MX
Cash Flow Analysis
as of 02/14/11

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
|  | 2/21/2011 | 2/28/2011 | 3/7/2011 | 3/14/2011 | 3/21/2011 | 3/28/2011 | 4/4/2011 | 4/11/2011 | 4/18/2011 |
| **Cash Inflows** | | | | | | | | | |
| Retail Sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wholesale Sales - AR | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Royalties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Income - North Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital/Debt Infusion | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| **Cash Outflows** | | | | | | | | | |
| Payroll | $90,000 | $10,000 | $20,000 | $10,000 | $20,000 | $10,000 | $20,000 | $10,000 | $20,000 |
| Mgmt Support Allocation | $0 | ($100,000) | $0 | $0 | $0 | $25,000 | $0 | $0 | $0 |
| Credit Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Fees | 0 | 0 | 750 | 0 | 0 | 0 | 750 | 0 | 0 |
| Insurance | 2,010 | 0 | 1,000 | 0 | 0 | 0 | 1,000 | 0 | 0 |
| Rent - Retail Stores | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - HQ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Allocation | 0 | 0 | 6,000 | 0 | 0 | 0 | 6,000 | 0 | 0 |
| Vendors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Freight | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Mortgage - North Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Fees | 0 | 0 | 2,500 | 0 | 0 | 0 | 2,500 | 0 | 0 |
| Utilities | 1,110 | 0 | 1,110 | 0 | 1,110 | 0 | 1,110 | 0 | 1,110 |
| Music | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supplies | 250 | 0 | 250 | 0 | 250 | 0 | 250 | 0 | 250 |
| IT - Phones and Internet | 375 | 0 | 375 | 0 | 375 | 0 | 375 | 0 | 375 |
| Celerant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Full Circle | 1,010 | 0 | 0 | 1,010 | 0 | 0 | 0 | 1,010 | 0 |
| Professional Fees - Financial Advisor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Bankruptcy Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Creditors' Committee Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees - Legal Fees - DIP Lender | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Travel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | $95,755 | ($89,000) | $32,985 | $12,010 | $22,735 | $36,000 | $32,985 | $12,010 | $22,735 |
| | | | | | | | | | |
| Beginning Balance | $18,588 | ($52,167) | $61,833 | $53,848 | $66,838 | $69,103 | $58,103 | $50,118 | $63,108 |
| Cash Gained/(Used) | (70,755) | 114,000 | (7,985) | 12,990 | 2,265 | (11,000) | (7,985) | 12,990 | 2,265 |
| Ending Balance | ($52,167) | $61,833 | $53,848 | $66,838 | $69,103 | $58,103 | $50,118 | $63,108 | $65,373 |