FILED

11 APR -1 PM 1:33

CLERK
U.S. BANKRUPTCY CT.
SO. DIST. OF CALIF.

IRA BENJAMIN KATZ (STATE BAR NO. 81007)
GREGORY B. GERSHUNI (STATE BAR NO. 82109)
LESLIE S. GOLD (STATE BAR NO. 154362)
GERSHUNI & KATZ, A LAW CORPORATION
1901 Avenue of the Stars, Suite 300
Los Angeles, CA 90067
Telephone: (310) 282-8580
Facsimile: (310) 282-8149

Counsel for BIOWORLD MERCHANDISING, INC.

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re NO FEAR RETAIL STORES, INC., a California corporation, SIMO HOLDINGS, INC., a California corporation, and NO FEAR MX, INC., a California corporation,<br><br>Related Debtors. | Case No. 11-02896-MM11<br><br>(Jointly Administered with Cases No. 11-02897-MM11; 11-02898-MM11)<br><br>Chapter 11 Cases<br><br>**PROPOSAL FOR BETTER AND MORE ADVANTAGEOUS DEBTOR-IN-POSSESSION FINANCING; DECLARATION OF RAJ MALIK;**<br><br>Date: April 1, 2011<br>Time: 2:00 p.m.<br>Place: Room 218<br>United States Bankruptcy Court<br>325 West "F" Street<br>San Diego, CA 92101 |

BioWorld Merchandising, Inc. ("BioWorld") is prepared to provide debtor-in-possession ("DIP") financing to debtors No Fear Retail Stores, Inc. ("NFRS"), Simo Holdings, Inc. ("SHI") and No Fear MX, Inc. ("NFMX," and with NFRS and SHI, the "Debtors or the "Company") on the terms set forth in the term sheet attached to the Declaration of Raj Malik ("Malik Declaration") as Exhibit A and incorporated herein by this reference (the "BioWorld Term Sheet") which is accompanied by a commitment letter attached to the Malik Declaration. A comparison of the terms

FINANCING PROPOSAL

of the financing offered by HilcoBrands, LLC and Infinity FS Brands, LLC (collectively, "Hilco") with that offered by BioWorld demonstrates that BioWorld's terms are more favorable for the Debtors' estates and preserve maximum value for creditors.

As set forth in the Malik Declaration attached hereto, BioWorld is a manufacturer and distributor of licensed and branded products including apparel, headwear, bags, small leather goods and casual footwear. It has established relationships with numerous of the industry's most powerful brand owners, such as Warner Brothers, Marvel Enterprises, Williamson Dickies, Sesame Workshop, Groupo Modelo, Activision, Nintendo, Microsoft, Lego, Hasbro and Live Nation. Malik Declaration, paragraph 4.

BioWorld distributes its merchandise to all retail tiers, and in addition to serving thousands of specialty retailers, is a preferred supplier to Wal-Mart, Target, Lids, Kohl's, Urban Outfitters, Nordstrom and Gap, Inc. The company's corporate offices are located in Irving, Texas. Malik Declaration, paragraph 5.

BioWorld believes that its business and that of the Debtors are compatible and that a mutually beneficial relationship between the companies is possible. Malik Declaration, paragraph 6. In addition to DIP financing, BioWorld offers expertise in the field of branded apparel and may be able to assist the Debtors in stabilizing their Company, increasing exposure and ultimately generating revenue. Malik Declaration, paragraph 7.

The significant difference between the DIP financing offered by BioWorld and that offered by Hilco is are the interest rates. BioWorld proposes a non-default rate of 15%, and a default rate of 17%. Hilco's interest rate is 18%, with a default rate of 20%. Given the Debtors' financial condition, 3% is a meaningful difference in the non-default interest rate.

For the foregoing reasons, BioWorld asks the Court to enter an order approving the terms of its proposal as set forth in Exhibit A.

Dated: April 1, 2011        GERSHUNI & KATZ, A Law Corporation

_____
Leslie S. Gold
Counsel for BioWorld Merchandise, Inc.

## DECLARATION OF RAJ MALIK

I, Raj Malik, declare as follows:

1. I am the founder and CEO of BioWorld Merchandising, Inc. I have personal knowledge of all facts stated herein, and if called as a witness could and would testify thereto under oath.

2. Attached hereto as Exhibit A is a true and correct copy of a term sheet describing BioWorld's financing proposal.

3. Attached hereto as Exhibit B is a true and correct copy of BioWorld's committment letter.

4. BioWorld is a manufacturer and distributor of licensed and branded products including apparel, headwear, bags, small leather goods and casual footwear. It has established relationships with numerous of the industry's most powerful brand owners, such as Warner Brothers, Marvel Enterprises, Williamson Dickies, Sesame Workshop, Groupo Modelo, Activision, Nintendo, Microsoft, Lego, Hasbro and Live Nation.

5. BioWorld distributes its merchandise to all retail tiers, and in addition to serving thousands of specialty retailers, is a preferred supplier to Wal-Mart, Target, Lids, Kohl's, Urban Outfitters, Nordstrom and Gap, Inc. The company's corporate offices are located in Irving, Texas.

6. BioWorld believes that its business and that of the Debtors are compatible and that a mutually beneficial relationship between the companies is possible.

In addition to DIP financing, BioWorld offers expertise in the field of branded apparel and may be able to assist the Debtors in stabilizing their Company, increasing exposure and ultimately generating revenue.

I swear under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2001 at Irving, TX.

*see Next page*

_____
RAJ MALIK

DECLARATION OF RAJ MALIK

I, Raj Malik, declare as follows:

1. I am the founder and CEO of BioWorld Merchandising, Inc. I have personal knowledge of all facts stated herein, and if called as a witness could and would testify thereto under oath.

2. Attached hereto as Exhibit A is a true and correct copy of a term sheet describing BioWorld's financing proposal.

3. Attached hereto as Exhibit B is a true and correct copy of BioWorld's commitment letter.

4. BioWorld is a manufacturer and distributor of licensed and branded products including apparel, headwear, bags, small leather goods and casual footwear. It has established relationships with numerous of the industry's most powerful brand owners, such as Warner Brothers, Marvel Enterprises, Williamson Dickies, Sesame Workshop, Groupo Modelo, Activision, Nintendo, Microsoft, Lego, Hasbro and Live Nation.

5. BioWorld distributes its merchandise to all retail tiers, and in addition to serving thousands of specialty retailers, is a preferred supplier to Wal-Mart, Target, Lids, Kohl's, Urban Outfitters, Nordstrom and Gap, Inc. The company's corporate offices are located in Irving, Texas.

6. BioWorld believes that its business and that of the Debtors are compatible and that a mutually beneficial relationship between the companies is possible.

In addition to DIP financing, BioWorld offers expertise in the field of branded apparel and may be able to assist the Debtors in stabilizing their Company, increasing exposure and ultimately generating revenue.

I swear under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2001 at Irving, TX.

*/s/ RAJ MALIK*

Simo Holdings, Inc., No Fear Retail Stores, Inc. and No Fear MX, Inc.
Summary of Terms and Conditions
For Senior DIP Credit Facility
04/01/2011

*These proposed terms and conditions are provided as part of the commitment letter, dated April 1, 2011, (the "Commitment Letter"), addressed to the Borrower by the Lenders and is subject to the terms and conditions of the Commitment Letter. Capitalized terms used herein shall have the meanings set forth in the Commitment Letter, unless otherwise defined herein.*

| | |
|---|---|
| Borrower: | Simo Holdings, Inc., ("Simo"), No Fear Retail Stores, Inc., ("No Fear Retail"), and No Fear MX, Inc., ("No Fear MX"), and other legal entities deemed appropriate by Lenders in their reasonable discretion, (collectively, "Borrower" or the "Company"), on a cross-collateralized basis. |
| Lender: | BioWorld Merchandising, Inc. ("Lender") |
| Credit Facility: | Three Million Dollars and No Cents ($3,000,000.00) Debtor-In-Possession ("DIP") Term Loan ("DIP Facility"). |
| Purpose: | To finance (i) the costs associated with the Borrower's Chapter 11 cases; (ii) the continued operations of the Borrower's business; (iii) the maintenance of the Borrower's assets while the Borrower restructures and/or pursues a strategic transaction which will provide the basis for a chapter 11 plan of reorganization; and (iv) the repayment of at least 50% of the outstanding Credit Cash NJ, LLC ("Cash Credit") facility. |
| Maturity: | Eighteen months from the date of the Borrower's chapter 11 bankruptcy filing accelerated by typical DIP financing acceleration events, including and without limitation, reasonable performance and timing milestones to be agreed to by the parties. If the Borrower successfully emerges from Chapter 11, the DIP Facility can be converted to an exit loan at the Borrower's option, (subject to a 2.0% conversion fee applied to the principal amount converted). |
| Security: | The DIP Facility will be secured by: 1) first priority security interest in on all of the Borrower's Intellectual Property, (including, but not limited to: trademarks, trade names, artwork, designs/logos, customer lists and domain names) (with respect to the No Fear trademark, this first position may be obtained either through consensual subordination by Credit Cash, or by a full payment of Credit Cash's claim from the initial proceeds disbursed under the DIP Facility); 2) subject only to the attachment liens held by FMF Racing and Don Emler, a first priority security interest in all of Simo's other current and future assets and capital stock, including but not limited to accounts |

1

*Exhibit A*

Exhibit A

|  |  |
|---|---|
|  | receivable, inventory, furniture, fixtures and equipment, shares and cash, but excluding real estate: 3) second security interest in all real estate of the Borrower's, subordinate only to the existing senior mortgage; 4) first security interest in on all other of No Fear MX's and No Fear Retail's current and future assets, capital stock, excluding accounts Receivable and cash balances, (including, but not limited to: inventory, FF&E, and shares); and 5) second security interest in all of No Fear MX's and No Fear Retail's accounts receivable and cash balances, subordinated only to liens held by Credit Cash. |
| Commitment Fee: | 1.50% of the total DIP Facility paid at closing. |
| Interest Rate: | 11% per annum payable quarterly in arrears, and an additional 4% per annum, that at the Borrower's option may be paid quarterly in arrears of else accrues and compounds annually and is payable upon maturity or default. |
| Default Rate: | 2.00% |
| Early Termination Fee: | 3.0% of any principal amount repaid in year 1 (if Borrower converts the DIP Facility to an exit loan then Early Termination Fee would not apply). |
| Amortization: | Bullet maturity at close. |
| Financial and Other Covenants: | In addition to typical and customary covenants applicable to transactions of this type:<br>1) Any licensing of Intellectual Property subject to DIP Facility liens will require Lender's approval, which will not be reasonably withheld.<br>2) Any net proceeds from the sale of Borrower's owned real estate (including but not limited to property located in North Carolina) ("Net Sale Proceeds") will be allowed, with the Lender's approval, not to be unreasonably withheld, to support the Company's working capital. Lender shall provide any such approval based upon receipt of a detailed plan showing the uses of such Net Sale Proceeds, with such approval not being reasonably withheld. Under no case will any Net Sale Proceeds by allowed to repay any creditor except to repay the DIP Facility. |
| Financial Reporting: | The financing documentation would require Borrower, on a monthly and quarterly basis, to provide to the Lender internally prepared financial statements. Annually, Borrower would be required to provide audited financial statements and a board approved operating plan for the subsequent fiscal year. All financial statements would be prepared on a consolidated and consolidating basis. Lender would also receive additional reporting and valuation as reasonably requested by Lender. |
| Conditions Precedent: | Closing shall be conditioned upon satisfaction of the following conditions precedent and other conditions customary to transactions of this type or as reasonable required by the Lender. |

2

1. Bankruptcy Court grants approval of the DIP Facility and all associated terms.
2. Liens on all of the Borrower's collateral shall have been filed and otherwise perfected to the satisfaction of the Lender, including but not limited to all UCC filings.
3. Satisfactory review of the following items ("The Financials"):
    a. Financial projections.
    b. Most recent consolidated and consolidating financial statement, (income statement, balance sheet, and statement of cash flow).
4. All necessary consents and approvals to the financing shall have been obtained.
5. Completion of legal due diligence by the Lender's counsel, with results satisfactory to the Lenders and their counsel.
6. Preparation, execution and delivery of definitive documentation satisfactory to the Lender. Documentation shall contain representations, covenants, events of default, expense reimbursement, and indemnification provisions for the benefit of the Lender, customary for transactions of this size, type and purpose.
7. The Lender shall have received such corporate resolutions, certificates and other documents as the Lender shall reasonably request.
8. No material misstatements in or omissions from the materials previously furnished to the Lender. The Lender must be satisfied any financial statements and projections delivered to them fairly represent the business and financial condition of the Borrower; and there had been no material adverse change in the assets, business, financial condition, income or prospects of the Borrower since the date of the most recent financial information delivered to the Lender.
9. Except as disclosed in the Debtors Bankruptcy Schedules and/or Statement of Financial Affairs filed with the Court. The absence of any litigation or other proceedings, the result of which may have a material adverse effect on the Borrower.
10. Except as disclosed in the Debtors Bankruptcy Schedules and/or Statement of Financial Affairs to be filed with the Court, the absence of any default of any material contract or agreement of the Borrower and/or any of its subsidiaries or related entities.
11. The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or Lenders involved in this transaction occur prior to the closing date.
12. Understanding of and approval of Restructuring Advisor's role in the bankruptcy case and approval thereof, which will not be unreasonably withheld.

**Expenses:** Lender's reasonable legal costs, after funding of the Credit Facility, will be deemed a priority administrative expense in the Borrower's chapter 11 proceeding and once approved by the Court, to the extent they require Court approval, they are payable on demand or added to the balance of the outstanding principal amount of the DIP Facility if not timely paid.

3

<u>Expense Deposit:</u>   In connection with the proposed DIP Facility, Borrower agrees to pay to the Lender a good faith deposit of Twenty Thousand Dollars, ($20,000.00), (the Expense Deposit), as a deposit for the Lender's reasonable expenses which may be incurred by the Lender in connection with the transactions contemplated by this Term Sheet, including the reasonable expenses of the Lender's due diligence and the preparation of any definitive documents. The Expense Deposit will not be segregated and may be commingled with other funds. The Borrower will not be entitled to receive interest on the Expense Deposit. The legal and due diligence costs associated with the negotiation and documentation of the DIP Facility will not exceed Sixty Thousand Dollars, ($60,000.00).

Please note, this Term Sheet is a framework upon which the documentation for this transaction shall be structured, and is the basis for future discussion and negotiation of the terms as may be appropriate.

BioWorld Merchandising, Inc.

*[signature]*

Raj Malik, Chief Executive Officer

Accepted and Agreed to in all respects:

Simo Holdings, Inc., No Fear Retail Stores, Inc., and No Fear MX, Inc.

Mark Simo, Chief Executive Officer

4

 

Simo Holdings, Inc.  
1812 Aston Ave.  
Carlsbad, CA 92008

April 1, 2011

Attention: Mark Simo

REF:   DIP Financing Commitment

Mark:

BioWorld Merchandising, Inc. (the "Lender") is pleased to advise you the Lender is willing to provide Simo Holdings, Inc., No Fear Retail Stores, Inc. and No Fear MX, Inc. (collectively the "Borrower") as Debtor-In-Possession with the DIP Facility, substantially on the same terms and conditions set forth in the Terms and Conditions attached hereto (the "Term Sheet"). The Lender's commitment to provide the DIP Facility is subject in all respects to satisfaction of, among other things, the terms and conditions contained in this Commitment Letter and in the Term Sheet.

Borrower acknowledges this Commitment Letter and the Term Sheet are intended as an outline only and do not purport to summarize all the conditions, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the DIP Facility. The loan documentation for the DIP Facility will include, in addition to the provisions which are summarized in this Commitment Letter and the Term Sheet, provisions which, in the opinion of the Lender, are customary or typical for this type of financing transaction and other provisions which the Lender determines to be appropriate in the context of the proposed transaction. Such definitive loan documentation shall be in form and substance which is satisfactory to the Lender.

By its execution hereof and its acceptance of the commitment contained herein, Borrower agrees to indemnify and hold harmless the Lender and each of its respective assignees and affiliates and their respective directors, officers, employees and agents, (each an "Indemnified Party"), from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities, (or actions or other proceedings commenced or threatened in respect thereof), or other expenses arise out of, or in any way relate to or result from, this letter or the extension of the DIP Facility contemplated by this Commitment Letter, or in any way arise from any use or intended use of this Commitment Letter or the proceeds of the DIP



Exhibit B

2111 W. Walnut Hill Lane • Irving, Texas 75038 • Toll Free: 888-831-2138 • Tel: 972-488-0655 • Fax: 972-488-0152 • www.bioworldmerch.com

-2-

Facility, and Borrower agrees to reimburse each such Indemnified Party for any legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding, (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise), but excluding there from all expenses, losses, claims, damages and liabilities which are finally determined in a final non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. If for any reason the foregoing indemnification is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless, then Borrower shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of (i) Borrower and their respective affiliates, stockholders, partners or other equity holders on the one hand and (ii) the Indemnified Parties on the other hand in the matters contemplated by this commitment letter as well as the relative fault of (a) Borrower and their respective affiliates, stockholders, Partners or other equity holders and (b) the Indemnified Party with respect to such loss, claim, damage or liability and any other relevant equitable considerations. In the event of any litigation or dispute involving this Commitment Letter or the DIP Facility, the Lender shall not be responsible or liable to Borrower, or any other person or entity for any special, indirect, consequential, incidental or punitive damages. In addition: 1) Borrower agrees to reimburse the Lender for all reasonable fees and expenses (the "Expenses") incurred by or on behalf of the Lender in connection with the negotiation, preparation, execution and delivery of this Commitment Letter, the Term Sheet and any and all definitive documentation relating hereto and thereto, subject to the terms in the attached Term Sheet; and 2) In the event the Lender are prepared to close the transaction on substantively the same terms and conditions contained herein, and the Borrower chooses not to proceed, any outstanding expense reimbursements due to the Lender will be, (a) first offset against the Expense Deposit, (b) will then be submitted for reimbursement, up to the maximum Expense amount of $60,000.00 as outline in the Term Sheet.

The Lender's commitment to provide the DIP Facility is subject to (i) negotiation, execution and delivery of definitive loan documentation in form and substance reasonably satisfactory to the Lender and its counsel (including, but not limited to, the form and substance of the orders of the Bankruptcy Court approving the DIP Facility) (ii) satisfaction of the Lender that since the date of this Commitment Letter there has not occurred or become know to the Lender any material adverse change with respect to the condition, financial or otherwise, business, operations, assets, liabilities or prospects of the Borrower, and (iii) the conditions set forth in the Term Sheet. If at any time the Lender shall determine (in its sole and absolute discretion) that either (A) the Borrower will be unable to fulfill any condition set forth in this Commitment Letter or in the Term Sheet or (B) any Material Adverse Change has occurred, the Lender may terminate this letter by giving notice thereof to Borrower, (subject to the obligation of Borrower to pay all Expenses as outlined in the Term Sheet, which shall survive the termination of this letter).

Should the terms and conditions of the offer contained herein meet with your approval, please indicate your acceptance by signing and returning a copy of this Commitment Letter to the Lender.

This Commitment Letter, including the Term Sheet (i) supersedes all prior discussions, agreement, commitments, arrangements, negotiating or understandings, whether oral or written, of the parties with respect thereto (ii) shall be governed by the law of the State of California, without giving effect to the conflict of laws or provisions, thereof (iii) shall be binding upon the parties and their respective successors and assigns (iv) may not be relied upon or enforced by any other person or entity, and (v) may be signed in multiple counterparts and delivered by facsimile or electronic transmission, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. If this Commitment Letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury. This Commitment Letter may be amended, modified or waived only in writing signed by the parties hereto.

Respectfully,

BioWorld Merchandising, Inc.

By: *[signature]*

Raj Malik, CEO & President

THIS SPACE HAS BEEN INTENTIONALLY LEFT BLANK

AGREED & ACCEPTED

No Fear Retail Stores, Inc.

By:

Mark Simo, CEO

Simo Holdings, Inc.

By:

Mark Simo, CEO

No Fear MX, Inc.

By:

Mark Simo, CEO