David S. Kupetz (CA Bar No. 125062)
     dkupetz@sulmeyerlaw.com
Steven F. Werth (CA Bar No. 205434)
     swerth@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Bankruptcy Counsel for No Fear Retail
Stores, Inc. Simo Holdings, Inc, and No
Fear MX, Inc., Debtors and Debtors in
Possession

# UNITED STATES BANKRUPTCY COURT

## Southern District of California

| | |
|---|---|
| In re | Case No. 11-02896-MM11 |
| | (Jointly Administered with Case Nos. 11-02897-MM11; 11-02898-MM11) |
| NO FEAR RETAIL STORES, INC., a California corporation, SIMO HOLDINGS, INC., a California corporation, and NO FEAR MX, INC., a California corporation, | Chapter 11 Cases |
| | **DEBTORS' STATEMENT OF POSITION RE DEBTOR IN POSSESSION CREDIT FACILITY; DECLARATION OF MATTHEW VENTURI** |
| Related Debtors. | Date: April 18, 2011
Time: 10:00 a.m.
Judge: Hon. Margaret M. Mann
Place: U.S. Bankruptcy Court
325 West "F" Street
San Diego, CA 92101 |
| Employer ID Nos. 20-5238208, 93-1037856, 26-0432196 | |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

DKUPETZ\ 714493.1 4/15/2011 (6:41 AM)

In accordance with the Court's order (the "Order") entered in the above-captioned jointly administered chapter 11 reorganization cases on April 7, 2011 (Docket No. 145), No Fear Retail Stores, Inc., Simo Holdings, Inc., and No Fear MX, Inc. (collectively, the "Debtors" or the "Company"), debtors in possession, respectfully represent as follows:

1.    Following the hearing conducted by the Court in these jointly administered cases on April 1, 2011, at which time the Court authorized the Debtors to enter into a non-exclusive Commitment Letter with Hilco/Infinity (as defined in the Order), which allowed the Debtors to continue to consider and evaluate alternative postpetition financing opportunities and proposals, the Debtors (through Venturi & Company, the Debtors' financial advisor/investment banker) communicated with various parties who had expressed interest in providing postpetition financing. Two parties, Hilco/Infinity and "Gordon Brothers" (through an entity named 1903 Onshore Funding, LLC), moved forward with discussions, negotiations, and final documentation of proposed debtor in possession credit facilities for the Debtors. The Debtors have also consulted with the creditors' committees appointed in the No Fear Retail Stores and Simo Holdings cases (the "Retail/Simo Committees") in connection with this process.

2.    At this time, the Debtors have determined that, while both Hilco/Infinity and Gordon Brothers presented viable financing proposals, taken as a whole the more favorable postpetition credit facility is offered by Gordon Brothers. The Debtors have made this determination in consultation with Venturi & Company, bankruptcy counsel (SulmeyerKupetz), and the Committees.

3.    The financial terms of the credit facility proposed by Gordon Brothers are superior to those offered by Hilco/Infinity. The amount of the proposed Gordon Brothers credit facility ($3,500,000 compared to $3,000,000 offered by Hilco/Infinity) and the interest rate (12.5% [10.5% pay rate + 2% accrual rate] compared to 18% [12% pay rate + 6% accrual rate] offered by Hilco/Infinity) are more favorable to the Debtors and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   the estates than those that have been offered by Hilco/Infinity. Moreover, the covenants

2   and restrictions contained in the loan and security documents negotiated with Gordon

3   Brothers are somewhat less restrictive and burdensome the Debtors and more

4   advantageous to the estates than those required by Hilco/Infinity.

5           4.      The Debtors seek authority to enter into the credit agreement (the

6   "DIP Agreement"), substantially in the form attached hereto as Exhibit 1, and the security

7   agreement (collectively with the DIP Agreement and related agreements, including,

8   without limitation, the Intercreditor Agreement (defined below), the "DIP Documents,"

9   and, the financing provided thereunder, the "DIP Facility"), substantially in the form

10  attached hereto as Exhibit 2, with Gordon Brothers (1903 Onshore Funding LLC or its

11  designee).  The Debtors believe that these drafts are in substantially final form.

12  However, due to time constraints, not all of the relevant parties have reviewed and

13  approved final forms of the documents.  In connection with the DIP Facility, the Debtors

14  also seek approval of the intercreditor agreement by and between the Gordon Brothers

15  and Credit Cash NJ, LLC (the "Intercreditor Agreement"), substantially in the form

16  attached hereto as Exhibit 3.  Attached hereto as Exhibit 4 is the proposed form of Order

17  (the "Proposed DIP Financing Order") approving the DIP Facility.  Gordon Brothers has

18  approved the Proposed DIP Financing Order.  The Retail/Simo Committees provided

19  comments to the proposed DIP Financing Order and those comments have been taken

20  into account and satisfied in the Proposed DIP Financing Order.

21          5.      As set forth in the pleadings and declarations previously filed by the

22  Debtors in this matter, postpetition financing is necessary in order for the Company to

23  maintain its business operations, fund the necessary administrative expenses, preserve

24  and enhance enterprise value, and avoid immediately jeopardizing the prospects for a

25  successful reorganization in these cases.

26          6.      The Debtors request that the Court approve postpetition financing to

27  be provided to the Debtors by Gordon Brothers and authorize the Debtors to enter into

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  and execute the DIP Documents.  The Debtors also request that the Court approve the

2  Intercreditor Agreement.

3         7.     The Debtors have determined that postpetition financing is not

4  available to the Debtors on terms more favorable than those offered by Gordon Brothers

5  and has determined that it is in the best interests of the estates to enter into the proposed

6  agreements with Gordon Brothers and grant Gordon Brothers the rights and liens

7  provided for thereunder.

8         8.     The DIP Facility and the Intercreditor Agreement have been

9  negotiated in good faith and at arm's length.  The Debtors believe that the terms of the

10  DIP Facility and the Proposed  DIP Financing Order are fair and reasonable, and reflect

11  the Debtors' exercise of prudent business judgment consistent with their fiduciary duties,

12  and are supported by reasonably equivalent value and fair consideration

13        **WHEREFORE,** the Debtors request that the Court approve the DIP Facility

14  and Intercreditor Agreement, authorize the Debtors to execute the DIP Documents, and

15  enter the Proposed DIP Financing Order.

16

17  Dated: April 15, 2011           Respectfully submitted,

18                       **Sulmeyer**Kupetz

19                       A Professional Corporation

20                       By:

21                       David S. Kupetz

22                       Bankruptcy Counsel for No Fear Retail

23                       Stores, Inc. Simo Holdings, Inc, and No

24                       Fear MX, Inc., Debtors and Debtors in

                        Possession

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

### DECLARATION OF MATTHEW B. VENTURI

I, Matthew Venturi, declare:

1.     I have personal knowledge of the facts stated herein.  I can testify that said facts are true and correct.

2.     I am the principal of Venturi & Company LLC ("Venturi & Company"). My declarations ("My Prior Declarations") were previously submitted in support of the "Motion of Debtors and Debtors in Possession for Order Authorizing Debtors to Enter Into Financing Agreement With Hilco Brands, LLC and Infinity FS Brands, LLC" (the "Motion") and "Debtors' Reply to Objections of Creditors' Committee and United States Trustee to Motion for Order Authorizing Debtors to Enter Into Debtor in Possession Credit Facility With Hilco Brands, LLC and Infinity FS Brands, LLC" (the "Reply").  My Prior Declarations submitted with the Motion and the Reply are  incorporated herein by this reference.

3.     Venturi & Company has been retained as financial advisor to provide financial advisory and investment banking services to No Fear Retail Stores, Inc., Simo Holdings, Inc., and No Fear MX, Inc. (collectively the "Debtors" or the "Company").

4.     Without the benefit of having prompt access to debtor in possession financing at this stage of the process, the opportunity for reorganization in these cases could be ended very quickly, and the potential recovery for unsecured creditors could become significantly impaired.

5.     Following the hearing conducted by the Court in the Debtors' jointly administered chapter 11 cases on April 1, 2011, at which time the Court authorized the Debtors to enter into a non-exclusive Commitment Letter with Hilco/Infinity (as defined in the Order), which allowed the Debtors to continue to consider and evaluate alternative postpetition financing opportunities and proposals, the Debtors (through Venturi & Company, the Debtors' financial advisor/investment banker) communicated with various parties who had expressed interest in providing postpetition financing.  Two parties, Hilco/Infinity and "Gordon Brothers" (through an entity named 1903 Onshore Funding,

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

LLC), moved forward with discussions, negotiations, and final documentation of proposed

debtor in possession credit facilities for the Debtors.  The Debtors have also engaged the

creditors' committees (the "Committees") appointed in these cases in connection with this

process.  I have personally participated in a number of telephone conversations with

counsel for the committees in the No Fear Retail Stores, Inc. and Simo Holdings, Inc.

cases, regarding postpetition financing issues and alternatives.

        6.     I have concluded that the most favorable postpetition credit facility

offered to the Debtors has been presented by Gordon Brothers.

        7.     The financial terms of the credit facility proposed by Gordon Brothers

are superior to those offered by Hilco/Infinity.  The amount of the proposed Gordon

Brothers credit facility ($3,500,000 compared to $3,000,000 offered by Hilco/Infinity) and

the interest rate (12.5% [10.5% pay rate + 2% accrual rate] compared to 18% [12% pay

rate + 6% accrual rate] offered by Hilco/Infinity) are more favorable to the Debtors and

the estates than those that have been offered by Hilco/Infinity. Moreover, the covenants

and restrictions contained in the loan and security documents negotiated with Gordon

Brothers are less restrictive and burdensome on the Debtors and more advantageous to

the estates than those required by Hilco/Infinity.

        8.     The Debtors seek authority to enter into the credit agreement (the

"DIP Agreement"), substantially in the form attached hereto as Exhibit 1, and the security

agreement (collectively with the DIP Agreement and related agreements, including,

without limitation, the Intercreditor Agreement (defined below), the "DIP Documents,"

and, the financing provided thereunder, the "DIP Facility"), substantially in the form

attached hereto as Exhibit 2, with Gordon Brothers (1903 Onshore Funding LLC or its

designee).  The Debtors and I believe that these drafts are in substantially final form.  In

connection with the DIP Facility, the Debtors also seek approval of the intercreditor

agreement by and between the Gordon Brothers and Credit Cash NJ, LLC (the

"Intercreditor Agreement"), substantially in the form attached hereto as Exhibit 3.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   Attached hereto as Exhibit 4 is the proposed form of Order (the "Proposed DIP Financing
2   Order") approving the DIP Facility.  Gordon Brothers has approved the Proposed DIP
3   Financing Order.

4          9.      As set forth in the pleadings and declarations previously filed by the
5   Debtors in this matter, postpetition financing is necessary in order for the Company to
6   maintain its business operations, fund the necessary administrative expenses, preserve
7   and enhance enterprise value, and avoid immediately jeopardizing the prospects for a
8   successful reorganization in these cases.

9          10.     The Debtors and I have determined that postpetition financing is not
10  available to the Debtors on terms more favorable than those offered by Gordon Brothers
11  and has determined that it is in the best interests of the estates to enter into the proposed
12  agreements with Gordon Brothers and grant Gordon Brothers the rights and liens
13  provided for thereunder.

14         11.     The DIP Facility and the Intercreditor Agreement have been
15  negotiated in good faith and at arm's length.  I believe that the terms of the DIP Facility
16  and the Proposed  DIP Financing Order are fair and reasonable, and reflect the Debtors'
17  exercise of prudent business judgment consistent with their fiduciary duties, and are
18  supported by reasonably equivalent value and fair consideration

19         I declare under penalty of perjury that the foregoing is true and correct.
20         Executed this _14_ day of April, 2011, at _Burlingame_, California.

21

22

23         _MATTHEW B. Venturi_
24         MATTHEW B. VENTURI

25

26

27

28

7

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**EXHIBIT 1**

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

SIMO HOLDINGS, INC.,

NO FEAR RETAIL STORES, INC.,

and

NO FEAR MX, INC.,

as Borrowers,

and

1903 ONSHORE FUNDING, LLC,

as Lender

Dated as of April [___], 2011

## TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ................................................................................................................ 2

    1.1    Defined Terms ........................................................................................................ 2
    1.2    Other Definitional Provisions ................................................................................ 9

SECTION 2. AMOUNT AND TERMS OF COMMITMENT ........................................................... 10

    2.1    Commitment ........................................................................................................ 10
    2.2    Procedure for Borrowing .................................................................................... 10
    2.3    Repayment of the Loans ...................................................................................... 10
    2.4    Optional Prepayments ......................................................................................... 10
    2.5    Interest Rates and Payment Dates ....................................................................... 11
    2.6    Pro Rata Treatment and Payments ...................................................................... 11
    2.7    Taxes ................................................................................................................... 12
    2.8    Notes ................................................................................................................... 12
    2.9    Priority and Liens ................................................................................................ 13
    2.10   Security ................................................................................................................ 13
    2.11   Fees ..................................................................................................................... 13

SECTION 3. REPRESENTATIONS AND WARRANTIES .............................................................. 14

    3.1    Existence; Compliance with Law ....................................................................... 14
    3.2    Power; Authorization; Enforceable Obligations ................................................. 14
    3.3    No Legal Bar ....................................................................................................... 14
    3.4    No Default ............................................................................................................ 14
    3.5    Federal Regulations ............................................................................................ 15
    3.6    Investment Company Act; Other Regulations .................................................... 15
    3.7    Accuracy of Information, etc .............................................................................. 15
    3.8    Financial Statements; No Material Adverse Effect ............................................. 15
    3.9    Ownership Of Property; Liens; Investments ....................................................... 16

SECTION 4. CONDITIONS PRECEDENT ...................................................................................... 16

    4.1    Conditions to Initial Loan ................................................................................... 16
    4.2    Conditions to Each Subsequent Loan ................................................................. 18

SECTION 5. AFFIRMATIVE COVENANTS ................................................................................... 18

    5.1    Further Assurances .............................................................................................. 19
    5.2    Use Of Proceeds ................................................................................................. 19
    5.3    Preservation Of Existence; Business, Etc .......................................................... 19
    5.4    Financial Information; Default Notices ............................................................... 19
    5.5    Insurance ............................................................................................................. 21

SECTION 6. NEGATIVE COVENANTS .......................................................................................... 21

    6.1    Liens ................................................................................................................... 21

| | | |
|---|---|---|
| 6.2 | Indebtedness | 22 |
| 6.3 | Investments | 22 |
| 6.4 | Fundamental Changes | 22 |
| 6.5 | Dispositions | 22 |
| 6.6 | Change In Nature Of Business | 23 |
| 6.7 | Transactions With Affiliates | 24 |
| 6.8 | Accounting Changes | 24 |
| 6.9 | Partnerships, Etc. | 24 |
| 6.10 | Speculative Transactions | 24 |
| 6.11 | Formation Of Subsidiaries | 24 |

SECTION 7. EVENTS OF DEFAULT .................................................................. 24

| | | |
|---|---|---|
| 7.1 | Events of Default | 24 |
| 7.2 | Application of Proceeds | 27 |

SECTION 8. MISCELLANEOUS ...................................................................... 28

| | | |
|---|---|---|
| 8.1 | Amendments and Waivers | 28 |
| 8.2 | Notices | 28 |
| 8.3 | No Waiver; Cumulative Remedies | 30 |
| 8.4 | Survival of Representations and Warranties | 30 |
| 8.5 | Payment of Expenses and Taxes | 30 |
| 8.6 | Payments Set Aside | 31 |
| 8.7 | Successors and Assigns; Assignments; Participations | 31 |
| 8.8 | Press Releases and Related Matters | 32 |
| 8.9 | Counterparts | 32 |
| 8.10 | Severability | 32 |
| 8.11 | Integration | 32 |
| 8.12 | **GOVERNING LAW** | 32 |
| 8.13 | Submission To Jurisdiction; Waivers | 33 |
| 8.14 | Acknowledgements | 33 |
| 8.15 | Releases of Liens | 34 |
| 8.16 | **WAIVERS OF JURY TRIAL** | 34 |
| 8.17 | Regulatory | 34 |
| 8.18 | Joint and Several Liability | 34 |

SCHEDULES:

| | |
|---|---|
| 3.9(b) | Owned Real Property |
| 3.9(c) | Leased Real Property |
| 6.1 | Existing Liens |
| 6.2 | Existing Debt |

EXHIBITS:

| | |
|---|---|
| A | Form of Loan Notice |
| B | Form of Security Agreement |
| C | Form of Note |

645433.05-Los Angeles Server 2A - MSW

D      Order

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of April [ ], 2011, among Simo Holdings, Inc., a California corporation ("Simo Holdings"), No Fear Retail Stores, Inc., a California corporation ("No Fear Retail") and No Fear MX, Inc., a California corporation and each a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (each a "Borrower" and collectively, the "Borrowers"), and 1903 Onshore Funding, LLC ("Onshore Funding"), as lender (together with its successors and assigns, the "Lender").

## PRELIMINARY STATEMENTS

1.    On February 24, 2011 (the "Filing Date"), the Borrowers commenced Chapter 11 Case Nos. 11-02896-MM11 through 11-02898-MM11 (each a "Case" and collectively, the "Cases") by filing separate voluntary petitions with the Bankruptcy Court for reorganization under Chapter 11 and have continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Borrowers have requested that the Lender provide a either a single or multiple draw term loan facility to the Borrowers in an aggregate principal amount not to exceed the Commitment (as defined herein).

3.    The proceeds of the Loans will be used (i) to pay post-Filing Date related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Borrowers to the extent not prohibited hereunder, including, without limitation, the maintenance of Borrowers' assets while Borrowers restructure and/or secure a strategic transaction consistent with the administration of the Cases, (iii) to pay all costs, fees and expenses associated with Borrowers' Chapter 11 Cases, including, without limitation, all fees and expenses of the Borrowers' advisors (professionals employed pursuant to Orders of the Bankruptcy Court) and the advisors to any Creditors' Committee, in each case associated with the Cases , (iv) to payoff the outstanding Indebtedness under the Existing Credit Cash Facility on the Closing Date and (v) to make any other payments permitted to be made in the Order or in the First Day Orders or by the Bankruptcy Court to the extent not prohibited by this Agreement or the Order or otherwise consented by the Lender.

4.    To provide security for the repayment of all obligations of the Borrowers hereunder and under the other Loan Documents, the Borrowers will provide to the Lender the following (all as more fully described herein):

a.    pursuant to Section 364 (c)(1) of the Bankruptcy Code and the Order, as applicable, a Superpriority Claim in the Case having priority over any claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject to claims relating to Avoidance Actions (and the recoveries and proceeds derived therefrom) and the Carve-Out Amount (as defined below),

b.    pursuant to Section 364(c)(2) of the Bankruptcy Code and the Order, as applicable, a perfected first priority Lien on all unencumbered property and assets of the Borrowers of any kind (other than with respect to Avoidance Actions, certain attachment liens against Simo Holdings by Emler and FMF, real property leases in which Borrowers have an interest, and the proceeds therefrom),

1

c.    pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on the property of the Borrowers as more fully described herein subject to (i) unavoidable valid and perfected Liens in existence at the time of the commencement of the Case, (ii) unavoidable valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the Liens described in clause (i) above and this clause (ii), being "Existing Liens"), (iii) Liens for taxes not yet due and payable, including, without limitation, property taxes and payroll and employment taxes, and (iv) mechanic's, materialmen's, warehousemen's or similar Liens that arise by operation of law (the Liens described in clauses (i) through this clause (iv), being "Permitted Liens"), and the claims relating to Avoidance Actions (and the recoveries and proceeds derived therefrom).

The parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1 Defined Terms.  As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 51% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement":  as defined in the preamble hereto.

"Applicable Rate":  12.50% per annum.

"Assignee":  as defined in Section 8.7.

"Audited Financial Statements":   the audited consolidated balance sheet of Simo Holdings and its Subsidiaries for the fiscal year ended August 31, 2010, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of Simo Holdings and its Subsidiaries, including the notes thereto.

"Avoidance Actions":  claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

"Bankruptcy Code":  Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court":  the United States Bankruptcy Court for the Southern District of California.

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" and "Borrowers":  as defined in the preamble hereto.

2

"Borrower Representative" means Mark Simo, or any replacement made pursuant to Section 8.2(d)

"Borrowers' Knowledge" means the actual knowledge of the chief executive officer, president or chief financial officer of the Borrowers.

"Borrowing Date": the Closing Date and any other Business Day specified by the Borrower as a date on which the Borrower requests the Lender to make a Loan hereunder. There shall not be more than three Borrowing Dates.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"California UCC": the Uniform Commercial Code as in effect from time to time in the State of California.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve Out Amount": the amount from Borrowers' cash, cash equivalents and other assets representing (a) unpaid fees and expenses due to the clerk of the Bankruptcy Court and the U.S. Trustee pursuant to U.S.C. §1930(a), (b) unpaid fees, costs and expenses due to professional Persons retained by Borrowers or any Committee (collectively, the "Professionals"), in each case, incurred on or prior to receipt by Borrowers of a Notice of Default, and (c) unpaid fees, costs and expenses due to the Professionals incurred subsequent to receipt of the Notice of Default in an aggregate amount not to exceed $500,000 (the "Professional Expense Cap").

"Case": as defined in the preamble hereto.

"Cash Collateral": "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"Closing Date": April 22, 2011.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all of the "Collateral" referred to in the Order or the other Security Documents and all of the other property and assets that are or are intended under the terms of the Order or the other Security Documents to be subject to Liens in favor of the Lender.

"Commitment": the obligation of the Lender to make the Loans to the Borrowers in an aggregate principal amount up to $3,500,000.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Code.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Creditors' Committee":  the official committee appointed in the  Cases, and each of them.

"Debtor Relief Laws":   the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors,  moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default":  any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Deposit Account Control Agreement":  as defined in the Security Agreement.

"Disposition" or "Dispose":  (a) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Borrower (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Capital Stock owned by any Borrower, or any notes or accounts receivable or any rights and claims associated therewith and (b) the issuance of Capital Stock by any Subsidiary of any Borrower to any Person other than such Borrower.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default":  any of the events specified in Section 7, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Existing Credit Cash Facility": the collective reference to that certain Credit Card Receivables Advance  Agreement dated as of November 18, 2009, that certain Control Account Agreement dated as of November 18, 2009, and those certain Advance Schedules, No. 1. No. 2, No. 3, No. 4 and No. 5, in each case by and among No Fear Retail, Credit Cash NJ, LLC and the other parties thereto, if any.

"Existing Liens":  as defined in the recitals hereto.

"Facility":  the Commitment and the Loans made thereunder.

4

"Filing Date":  as defined in the recitals hereto.

"Financial Officer":  of any Person, the chief financial officer, principal accounting officer, or treasurer of such Person.

"First Day Orders":  as defined in Section 4.1(e).

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Approval":  any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees, any Indebtedness, lease, dividend or other obligation (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrowers in good faith.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables, wages, salaries and other obligations incurred in the ordinary course of such Person's business, including, without limitation, payments due in connection with operating leases and licenses incurred or otherwise due in the ordinary course of business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital

Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Intellectual Property Collateral": as defined in the Security Agreement.

"Intellectual Property Security Agreement": an intellectual property security agreement, substantially in the form of Exhibit A to the Security Agreement.

"Interest Payment Date": (a) the last Business Day of each calendar month and the Maturity Date, and (b) the date of any repayment or prepayment of any Loans.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.1 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Lender" as defined in the preamble hereto.

"Lien" any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan": an extension of credit by the Lender to the Borrowers pursuant to Section 2.1.

"Loan Documents": this Agreement, the Security Documents, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Notice": a notice of a borrowing substantially in the form of Exhibit A.

"Material Adverse Effect": (a) a materially adverse effect, not caused by the commencement or pendency of the Cases or any of them, on the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Borrowers, taken as a whole, (b) a

6

material impairment of the ability of any of the Borrowers to perform any material obligation under any Loan Document to which it is or will be a party or (c) a material impairment of any material right and remedy of or benefit available to the Lender under any Loan Document.

"Maturity Date":  the earliest of (a) August 24, 2012, (b) the date on which the Loans become due and payable upon the occurrence and during the pendency of an Event of Default, and (c) the effective date on which the Borrowers consummate a Plan of Reorganization following confirmation by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Non-Excluded Taxes": as defined in Section 2.7.

"Note":  a promissory note in the form of Exhibit C, as it may be amended, supplemented or otherwise modified from time to time.

"Notice of Default": as defined in Section 7.1.

"Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans, and all other obligations and liabilities of the Borrowers to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Lender, that are required to be paid by the Borrowers pursuant hereto) or otherwise.

"Order":  the order of the Bankruptcy Court in the Case in substantially the form attached hereto as Exhibit D authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to the Lender and the Borrowers.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Owned Real Property Sale":  the sale, transfer or other disposition by any Borrower to any Person other than another Borrower or an Affiliate of any Borrower of any real property owned by the Borrowers (other than leases or subleases in the ordinary course of business).

"Patriot Act":  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens":  as defined in the recitals hereto.

7

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"PIK Election" as defined in Section 2.5(c).

"PIK Interest Amounts" as defined in Section 2.5(c).

"Plan":  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which any Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization":  means a plan or plans or reorganization in respects of the Case.

"Quarterly Financial Statements":  means the unaudited consolidated financial statements of Simo Holdings and its Subsidiaries for the fiscal quarter ended March 31, 2011.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Requirement of Law":  as to any Person, the Bylaws and Articles of Incorporation or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  of any Person, the chief executive officer, president, chief financial officer or treasurer of the such Person or any other individual designated in writing to the Lender by the existing chief executive officer or president of such Person as an authorized signatory of any certificate or other document to be delivered hereunder.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations" as defined in the Security Agreement.

"Securities Account Control Agreement":  as defined in the Security Agreement.

"Securities Act":  the Securities Act of 1933, as amended from time to time and any successor statute.

"Security Agreement":  the Security Agreement to be executed and delivered by the Borrowers, substantially in the form of Exhibit B.

"Security Documents":  the collective reference to the Security Agreement, the Order, and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the Obligations.

"Simo Holdings": as defined in the preamble hereto.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrowers.

"Superpriority Claim":  a claim under Section 364(c)(1) of the Bankruptcy Code against the Borrowers in the Case which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code, other than claims relating to Avoidance Actions (and the recoveries and proceeds derived therefrom) and the Carve-Out Amount.

"Uniform Commercial Code" or "UCC":  the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"United States":  the United States of America.

"UST":  the United States Trustee appointed to serve in the Case.

1.2 Other Definitional Provisions.

(a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings set forth herein when such terms are used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)  As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)  The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this

9

Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

## SECTION 2.   AMOUNT AND TERMS OF COMMITMENT

2.1 <u>Commitment</u>.  Subject to the satisfaction of the conditions set forth in <u>Section 4.1</u> and <u>Section 4.2</u>, the Lender agrees to make on each Borrowing Date a Loan to the Borrowers; provided that (A) there shall be no more than three Borrowing Dates  (B) the aggregate principal amount of the Loans advanced shall not exceed the Commitment then in effect, and (C) the amount of the initial Loan made may, at Borrowers' discretion, equal the aggregate principal amount of the Commitment.  The Commitment shall be automatically reduced on each Borrowing Date by the amount of the Loans advanced on such Borrowing Date.  The Commitment to fund any subsequent Loans pursuant to the terms and conditions hereof shall terminate on the earlier to occur of (i) the expiration of one hundred eighty (180) days following the Closing Date, or (ii) October 31, 2011; provided, however, that such termination shall not be deemed to limit or modify the rights of the parties hereto with respect to the Loans funded prior to such termination.  Any principal amounts of the Loans borrowed and repaid or prepaid may not be reborrowed.

2.2 <u>Procedure for Borrowing</u>.

Upon receipt of a fully executed Loan Notice from Borrowers, Lender shall, subject to Borrowers' satisfaction of the conditions as set forth in Section 4.1, make  the initial Loan on the Closing Date in immediately available funds; provided, however, that the amount of such initial Loan may, at Borrowers' discretion, equal the aggregate principal amount of the Commitment.  With respect to any subsequent Loans hereunder, the Borrowers shall deliver to Lender a fully executed Loan Notice no later than 10:00 a.m. (New York City time) one Business Day prior to the requested Borrowing Date specifying the amount to be borrowed, in an amount not to exceed the Commitment then in effect.  Each borrowing under the Commitment shall be in a minimum principal amount of $500,000.    The Lender shall make the Loans available to the Borrowers not later than 5:00 p.m. (New York City time) on the applicable Borrowing Date by wire transfer of same day funds in Dollars to such account as Borrowers specify in the Loan Notice.

2.3 <u>Repayment of the Loans</u>.  The Loans (including any PIK Interest Amounts) of the Lender shall mature on the Maturity Date and shall be indefeasibly repaid in full in immediately available funds on the Maturity Date.

2.4 <u>Optional Prepayments</u>.

(a) The Borrowers may at any time and from time to time prepay the Loans, in whole or in part, upon irrevocable notice delivered to the Lender no later than 10:00 A.M., New York City time, one Business Day prior thereto, which notice shall specify the date and amount of prepayment, and whether such payment was voluntary or involuntary.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  All prepayments under this Section 2.4(a) shall be subject to Section 2.4(b) but otherwise without premium or penalty.  Voluntary partial prepayments of the Loans shall be in an aggregate principal amount of $500,000 or a whole multiple thereof.

10

(b)  In the event that for any reason the Loans are voluntarily prepaid in whole or in part on or prior to the first anniversary of the Closing Date, in each case the Borrowers shall pay to the Lender a prepayment premium of 3.0% on the amount so prepaid; provided, however, that, and by way of illustration and not of limitation, no such prepayment premium shall be required to be paid by the Borrowers if such prepayment or repayment was required to be made (1) as a result of Lender providing debt financing in connection with the consummation of a Plan of Reorganization proposed by one of the Borrowers and confirmed by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, and/or (2) as a result of prepayments in connection with a license or Disposition of the Intellectual Property Collateral required pursuant to Section 6.5(g) below.  Such prepayment premium shall be due and payable upon the date of any voluntary prepayment or the due date of such mandatory prepayment or required repayment, as the case may be.

2.5  Interest Rates and Payment Dates.

(a)  The Loans shall bear interest at a rate per annum equal to the Applicable Rate.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.

(b) (i)  On or prior to the Maturity Date, if any Event of Default shall occur, during the pendency of such Event of Default, the Loans (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2%, (ii) after the Maturity Date, the Loans shall bear interest at a rate per annum equal to the rate then applicable to the Loans plus 2% and (iii) if all or a portion of any interest payable on any Loans or any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to the Loans plus 2%, provided, however, that in each case, with respect to clauses (i), (ii) and (iii) above, (x) such interest shall be calculated from the date of such non-payment until such amount is indefeasibly paid in full in immediately available funds (as well after as before judgment), and (y) such additional 2%  shall not be cumulative (i.e., the total amount of interest is the Applicable Rate plus 2%).

(c)  Interest shall be payable in arrears in cash on each Interest Payment Date, provided that (i) interest accruing pursuant to paragraph (b) of this Section shall be payable from time to time on demand and (ii) 2% per annum of the interest for such period may be paid at the Borrowers' option either in cash or by adding such interest to the principal amount of the outstanding Loans (such option, a "PIK Election"; and such interest added to the principal amount of the outstanding Loans, the "PIK Interest Amounts").  The Borrowers will give notice of the terms of any PIK Election to the Lender at least three (3) Business Days prior to the beginning of each Interest Period.  For all purposes under this Agreement, all PIK Interest Amounts shall be treated as principal amounts of the Loans and all references in this Agreement to Loans shall include PIK Interest Amounts.

2.6  Pro Rata Treatment and Payments.

(a)  Amounts prepaid on account of the Loans may not be reborrowed.

(b)  All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Lender at the office of the Lender specified in Section 8.2 (or such other office as may be specified from time to time by the Lender by written notice to the Borrower Representative), in Dollars and in immediately available funds; provided that payments of interest through the addition of PIK Interest Amounts to the outstanding

11

principal amount of the Loans will not be paid as set forth in this Section and will be automatically added to the outstanding principal amount of the Loans on the applicable Interest Payment Date. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

2.7 <u>Taxes</u>.

(a) All payments made by the Borrowers under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("<u>Non-Excluded Taxes</u>") or Other Taxes are required to be withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall be increased to the extent necessary to yield to the Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, <u>provided</u>, <u>however</u>, that the Borrowers shall not be required to increase any such amounts payable to the Lender with respect to any Non-Excluded Taxes, in case of any person that becomes a Lender after the date hereof that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that the Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrowers with respect to such Non-Excluded Taxes pursuant to this paragraph.

(b) In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, subject to Borrowers' right to timely protest and challenge any such claim of Other Taxes owing (provided that Borrowers properly reserve sufficient amounts for such Other Taxes).

(c) Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrowers, as promptly as possible thereafter the Borrowers shall send to the Lender for its own account a certified copy of an original official receipt received by the Borrowers showing payment thereof, as applicable. If the Borrowers fail to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrowers shall indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

(d) The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.8 <u>Notes</u>. Upon request of the Lender, the Borrowers shall execute and deliver a Note to the Lender in the amount of the Loans held by the Lender.

2.9  Priority and Liens.

(a) Superpriority Claims and Liens. Each Borrower hereby covenants, represents and warrants that, upon entry of the Order, the Obligations of Borrowers under the Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several allowed superpriority administrative expense claims in the Case having priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, except for claims relating to Avoidance Actions (and the recoveries and proceeds derived therefrom) and the Carve-Out Amount; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of Borrowers that is not subject to Existing Liens or post-petition Permitted Liens (other than claims with respect to Avoidance Actions, certain attachment liens against Simo Holdings by Emler and FMF, real property leases in which Borrowers have an interest, and the proceeds therefrom); and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of Borrowers that is subject to Existing Liens and Permitted Liens.

(b) Real Property. Subject in all respects to the terms of the Order and the Security Agreement, each Borrower grants to the Lender a security interest in, and mortgage on, all of the right, title and interest of such Borrower in all real property owned by such Borrower, together in each case with all of the right, title and interest of such Borrower in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto and all proceeds thereof. Each Borrower shall acknowledge that, pursuant to the Order, the Liens in favor of the Lender on such real property shall be perfected without the recordation of any instruments of mortgage or assignment to the extent expressly provided in the Order.  Each Borrower agrees that upon the reasonable request of the Lender, such Borrower shall promptly enter into separate mortgages on owned real property in recordable form with respect to such properties on terms reasonably satisfactory to the Lender; provided such mortgage or pledge does not violate any obligations between the Borrowers and such non-Borrower Person with respect to such real property.

(c) Discharge.  Each Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Order, and described in Section 2.9(a) and the Liens granted to the Lender pursuant to the Order, and the Security Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

(d) In the event and to the extent that the provisions of this Section 2.9 shall conflict with what is set forth in the Order, the Order shall govern.

2.10 Security.  Upon entry of the Order, as security for the prompt payment and performance of all Secured Obligations of Borrowers, each Borrower has granted, in accordance with the provisions of the Security Documents applicable to such Borrower and the Order, to the Lender a security interest in all of its right, title and interest in and to all of its Collateral.  In the event and to the extent that the provisions of this Section 2.10 shall conflict with what is set forth in the Order, the Order shall govern.

2.11 Fees.  The Borrowers agree to pay the Lender from the proceeds received by Borrowers with respect to the initial Loan, a work fee equal to 3.5% of the principal amount of the Loans made in respect of the Commitments promptly following receipt of such funds.

13

## SECTION 3.  REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Loans each Borrower hereby represents and warrants to the Lender that, based upon reasonable inquiry by all persons, deemed necessary or appropriate to verify or confirm the statements contained herein and, subject to the express qualifications set forth herein:

3.1 <u>Existence; Compliance with Law</u>.  Each Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry of the Order, has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct its business in a manner in which its business is now being conducted, (c) is duly qualified as a foreign corporation and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except to the extent the failure to be so qualified or in good standing could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2 <u>Power; Authorization; Enforceable Obligations</u>.  Subject to the entry of the Order, each Borrower has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to obtain extensions of credit hereunder.  Each Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of this Agreement.  Other than Bankruptcy Court approval, no Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except the filings to perfect Liens granted under the Security Documents.  Each Loan Document has been duly executed and delivered on behalf of each Borrower.  This Agreement constitutes, and each other Loan Document upon execution and upon entry of the Order, will constitute, a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.3 <u>No Legal Bar</u>.  Subject to the entry of the Order, (i) the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of the Borrowers and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents) and (ii) no Requirement of Law or Contractual Obligation applicable to the Borrowers could reasonably be expected to have a Material Adverse Effect.

3.4 <u>No Default</u>.  To the Borrowers' Knowledge, and expressly excluding any default arising out of or in connection with the filing and the administration of the Cases,(a) No Borrower is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect, and (b)no Event of Default has occurred and is continuing.

14

3.5 <u>Federal Regulations</u>.  No part of the proceeds of the Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board.  If requested by the Lender, the Borrowers will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

3.6 <u>Investment Company Act; Other Regulations</u>.  No Borrower is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Borrower is not subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

3.7 <u>Accuracy of Information, etc.</u>   To the Borrowers' Knowledge, no statement, information, document, certificate or statement furnished by or on behalf of any Borrower to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact known to any Borrower that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

3.8     <u>Financial Statements; No Material Adverse Effect</u>.

(a)     To the Borrowers' Knowledge, the Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Simo Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of Simo Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness, to the extent required by GAAP to be shown therein.

(b)     To the Borrowers' Knowledge, the Quarterly Financial Statements, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, or, if prepared in accordance with a basis other than GAAP, including, without limitation, on a "cash basis", so provided in such financial statements, and (ii) fairly present in all material respects the financial condition of Simo Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments and expressly subject to any qualifications as set forth therein.

(c)     To the Borrowers' Knowledge, since the Filing Date, there has been no change, event, circumstance or development that, individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

15

3.9    Ownership Of Property; Liens; Investments.

(a)    To the Borrowers' Knowledge, each Borrower has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Schedule 3.9(b) lists completely and correctly as of the Closing Date all real property owned by the Borrowers and the addresses thereof. The Borrowers own in fee all the real property set forth on Schedule 3.9(b) as of the Closing Date.

(c)    Schedule 3.9(c) lists completely and correctly as of the Closing Date all real property leased by the Borrowers and the addresses thereof.  Except as otherwise described in Schedule 3.9(c), the Borrowers have valid leases in all the real property set forth therein as of the Closing Date.

(d)    The property of the Borrowers is not subject to any Liens, other than Liens permitted by Section 6.1.

## SECTION 4.  CONDITIONS PRECEDENT

4.1 Conditions to Initial Loan.  The agreement of the Lender to make the initial Loan requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such Loan on the Closing Date, of the following conditions precedent:

(a)    The Lender shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or prior to the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

(i)    duly executed counterparts of this Agreement,

(ii)    the Security Agreement, duly executed by the Borrowers, together with:

(A)    certificates representing the Initial Pledged Interests except as otherwise provided in the Security Agreement, accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank.

(B)    acknowledgment copies or stamped receipt copies of proper financing statements, duly filed on or before the Closing Date under the Uniform Commercial Code of all jurisdictions that the Lender may reasonably deem necessary in order to perfect and protect the first priority liens and security interests created under the Security Agreement, covering the Collateral described in the Security Agreement, and

16

(C)     copies of Uniform Commercial Code, tax and judgment lien searches with respect to the Borrowers in each of the jurisdictions where the Borrowers are located (within the meaning of Section 9-307 of the California UCC or the corresponding code or statute of any other applicable jurisdiction), dated on or before the Closing Date, together with copies of all such filings disclosed by such search;

(iii)     the Intellectual Property Security Agreement, duly executed by the Borrowers;

(iv)     any Deposit Account Control Agreement or Securities Account Control Agreement required to be delivered on the Closing Date pursuant to the terms of the Security Agreement, duly executed by the appropriate parties;

(v)     such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of each Borrower as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof (including, without limitation, the Financial Officer of such Borrower) authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(vi)     such documents and duly executed certifications as the Lender may reasonably require to evidence that each Borrower is duly organized or formed, and that each Borrower is validly existing and in good standing in the jurisdiction where it is formed;

(vii)     a certificate signed by a Responsible Officer of the Borrowers certifying (A) that the conditions specified in Sections 4.1(h) and (i) have been satisfied and (B) as of the Closing Date, since the Filing Date, there has been no change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect; and

(viii)     a Loan Notice.

(b)     The Borrowers shall have paid (or made provision for the payment out of the proceeds of the initial Loan of) all reasonable and appropriate accrued fees and expenses of the Lender (including the reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP) on or before the Closing Date, subject to Section 8.5.

(c)     The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(d)     The Existing Credit Cash Facility shall have been repaid so that not more than $570,000 is owing thereunder (and Lender shall have received reasonably satisfactory evidence thereof) and the Lender, No Fear Retail and Credit Cash NJ, LLC shall have entered into an

17

intercreditor agreement reasonably acceptable to the Lender and otherwise consistent with the lien priorities in favor of the Lender set forth in this Agreement.

(e)    The Lender shall have received, at least one Business Day prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, the forms of which have been provided by Lender to Borrowers at least two (2) Business Days prior to the Closing Date.

(f)    Each of the representations and warranties made by each Borrower in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties shall be true and correct on and as of such earlier date.

(g)    No Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(h)    Other than with respect to the filing and the administration of the Case, there shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)    Other than with respect to filing and the administration of the Case, no Borrower nor any of its Subsidiaries is in default under or with respect to any of its postpetition Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect.

4.2 <u>Conditions to Each Subsequent Loan</u>.    The obligation of Lender to make any subsequent Loans requested to be made by it on any date is subject to the satisfaction of the following conditions precedent:

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties made by each Borrower in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(b)    <u>No Event of Default</u>.    No Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    <u>Loan Notice</u>.    The Lender shall have received a Loan Notice.

## SECTION 5.    AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, so long as the Commitment remains in effect or any Loans or Obligations or other amounts are owing to the Lender hereunder or under the other Loan Documents, each Borrower shall:

18

5.1 <u>Further Assurances</u>. At any time or from time to time upon the request of the Lender, at the expense of the Borrowers, promptly execute, acknowledge and deliver such additional instruments, certificates or documents, and do all such other acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrowers which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, each Borrower shall execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from such Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent such Borrower is permitted by applicable law to do so). Each Borrower shall fully preserve or cause to be fully preserved the Liens granted by the Security Documents. Each Borrower agrees that all costs and expenses reasonably expended or otherwise incurred pursuant to this <u>Section 5.1</u> (including reasonable attorneys' fees and disbursements) by the Lender shall constitute Obligations and shall be paid by the Borrowers in accordance with the terms hereof.

5.2 <u>Use Of Proceeds</u>. Use the proceeds of the Loans (a) to pay fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (b) for working capital and other general corporate purposes of the Borrowers to the extent not expressly prohibited hereunder for all reasonable costs and expenses of operating Borrowers and administering the estates of Borrowers, (c) to pay fees, costs and expenses of the Professionals, and such other Borrowers' advisors (professionals employed pursuant to orders of the Bankruptcy Court) and the advisors to any Creditors' Committee, in each case associated with the Cases subject to the restrictions thereon set forth in the Order, (d) to pay fees, costs and expenses of professionals and advisors of Lender as provided herein, including, without limitation, Lender's counsel, (e) to payoff (in whole or in part) the outstanding Indebtedness under the Existing Credit Cash Facility on the Closing Date and (f) to make any other payments permitted to be made in the Order or in the First Day Orders, or by the Bankruptcy Court to the extent not prohibited by this Agreement or the Order or otherwise consented by the Lender. The foregoing notwithstanding, so long as no Event of Default shall have occurred and be continuing and no Notice of Default has been received by Borrowers, Borrowers shall be permitted to pay compensation and reimbursement of fees, costs and expenses allowed and payable under 11 U.S.C. §105(a), 330 and 331, as the same may be due and payable. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, nothing contained in this Agreement shall limit or impair (whether in whole or in part) any third party's rights with respect to the Carve-Out Amount and the use of the funds in connection therewith.

5.3 <u>Preservation Of Existence; Business, Etc</u>. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization consistent with the requirements of the Bankruptcy Code; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business consistent with the requirements of the Bankruptcy Code and/or in connection with the reasonable exercise of good faith business judgment by Borrowers; and (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks..

5.4 <u>Financial Information; Default Notices</u>. Deliver to the Lender, in form satisfactory to the Lender:

19

(a) within thirty (30) days after the end of each fiscal month, financial information regarding each of the Borrowers, certified by the chief financial officer thereof, consisting of consolidated (i) unaudited balance sheets as of the close of such fiscal month; (ii) unaudited statements of income and cash flows for such fiscal month and for the portion of the fiscal year then elapsed, setting forth in comparative form the figures for the corresponding period in the prior year, for all such financial statements described in clause (i) and (ii) herein (A) with respect to any fiscal month that does not constitute a fiscal quarter end, management prepared financial statements and (B) with respect to any fiscal month that constitutes a fiscal quarter end, prepared in accordance with GAAP (subject to, in each case of clause (i) and clause (ii), normal year-end adjustments and the absence of footnotes) or, if prepared in accordance with a basis other than GAAP, including, without limitation, on a "cash basis", so provided in such financial statements,; (iii) a summary of the outstanding balance of all intercompany loans as of the last day of that fiscal month; (iv) same store sales information and statistics for such fiscal month and for the then elapsed portion of the fiscal year consistent with internal and industry-wide reporting standards, each in form and substance reasonably satisfactory to the Lender; and (v) an unaudited variance report summarizing deviations from weekly budgeted expenses provided pursuant to Section 5.4(c) during such fiscal month.  Such financial information shall be accompanied by the certification of the chief financial officer of Simo Holdings that, to the best of such chief financial officer's knowledge, (x) such financial information presents fairly the financial position and results of operations of Borrowers, on a consolidated basis, in each case as at the end of such fiscal month and for that portion of the fiscal year then ended and (y) any other information presented is true, correct and complete in all material respects and that there was no Event of Default in existence as of such time or, if an Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Event of Default;

(b) within one hundred twenty (120) days after the end of each fiscal year, (i) unaudited financial statements for the Borrowers on a consolidated basis, consisting of balance sheets and statements of income and retained earnings and cash flows, setting forth in comparative form in each case the figures for the previous fiscal year, which financial statements shall be prepared in accordance with GAAP and certified, by an independent certified accounting firm of national standing or otherwise acceptable to the Lender; and (ii) a narrative report and management's discussion and analysis, in a form reasonably satisfactory to the Lender, of the financial condition and results of operations of the Borrowers for such fiscal year, as compared to amounts for the previous fiscal year.  Such financial statements shall be accompanied by (x) a report from such accounting firm to the effect that, in connection with their audit examination, they have not become aware that a Default or Event of Default has occurred and is continuing (or specifying those Defaults and Events of Default that they became aware of), it being understood that such audit examination extended only to accounting matters and that no special investigation was made with respect to the existence of Defaults or Events of Default, (y) the annual letters to such accountants in connection with their audit examination detailing contingent liabilities and material litigation matters, and (z) the certification of the chief executive officer or chief financial officer of Simo Holdings that all such financial statements present fairly in accordance with GAAP the financial position, results of operations and statements of cash flows of the Borrowers on a consolidated basis, as at the end of such fiscal year and for the period then ended, and that there was no Event of Default in existence as of such time or, if an Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Event of Default;

(c) within four (4) Business Days after the end of each week, financial information regarding the Borrowers, certified by the chief financial officer of Simo Holdings, consisting of consolidated weekly "flash" budget reports in the form of a 13-week cashflow forecast reflecting, on a cash basis; revenues, expenditures, receivables and inventory, including actual variances from budgeted expenses incurred as of the week covered by the report;

(d) copies of (i) all monthly reports, projections, or other information in respect of the Borrowers' business or financial condition or prospects required by court order, or provided by or to the UST (or any monitor or interim receiver, if any, appointed in any Case), at the time such document is filed with the Bankruptcy Court, or provided by or, to the UST (or any monitor or interim receiver, if any, appointed in any Case), and (ii) all pleadings filed by the Borrowers with the Bankruptcy Court at the time such pleading is filed with the Bankruptcy Court;

(e) promptly upon request by the Lender, such other information and data with respect to any Loan Party as from time to time may be requested by the Lender; and

(f) promptly (and in any event within five (5) Business Days) provide written notice to the Lender of the occurrence of any Event of Default, describing the nature of such Event of Default and any remedial actions being taken with respect thereto.

5.5 <u>Insurance</u>. Keep its insurable properties adequately insured at all times at the same level as maintained as of the commencement of the Case or as required by the Office of the United States Trustee, whichever is greater by insurers acceptable to the Office of the United States Trustee; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar industry and engaged in the same or similar business activities in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law and/or in connection with the reasonable exercise of good faith business judgment by Borrower.

## SECTION 6.  NEGATIVE COVENANTS

Each Borrower hereby agrees that, so long as the Commitment remains in effect or any Loans or other Obligations or other amounts are owing to the Lender hereunder or under any other Loan Document, no Borrower shall, nor will they cause or permit any of their Subsidiaries to, directly or indirectly:

6.1 <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names any Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document and the Order;

(b)    Liens existing on the date hereof and listed on <u>Schedule 6.1</u>, as such <u>Schedule 6.1</u> may be revised from time to time , and which Liens shall secure only the obligations referenced on <u>Schedule 6.1</u>;

(c)    Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    landlords', carriers', warehousemen's, mechanic's, materialmen's, repairmen's or other like Liens arising in the ordinary course of business which, to the extent not subject to Section 362 of the Bankruptcy Code, are not overdue for a period of more than 30 days or which are

being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)      pledges, deposits or claims in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)      deposits and other claims and obligations to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the ordinary course of business; and

(g)      Permitted Liens.

6.2      <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness under the Loan Documents; and

(B)      Indebtedness outstanding on the date hereof,  and Indebtedness arising from and after the date hereof and resulting from subsequent loans as may be permitted from time to time consistent with the Bankruptcy Code on an unsecured basis only and not the subject of any superpriority administrative claim status under the Bankruptcy Code, which the Borrowers shall promptly list and update on <u>Schedule 6.2</u>, as such may be updated from time to time.

6.3      <u>Investments</u>.  Make or hold any Investments, except:

(a)      Investments held by the Borrowers in the form of cash or cash equivalents;

(b)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(c)      Investments existing on the date hereof.

6.4      <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than with another Borrower); provided, however, that the provisions of this Section 6.4 shall not be deemed to limit, prevent or impair Borrowers from discontinuing one or more lines of business, products or services as presently conducted or provided, to the extent such discontinuance is consistent with the requirements of the Bankruptcy Code and/or in connection with the reasonable exercise of good faith business judgment by Borrowers.

6.5      <u>Dispositions</u>.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)      Dispositions of obsolete or worn out property or property no longer used or useful in the business of the Borrowers (other than any Intellectual Property Collateral), whether now or hereafter owned or leased, in the ordinary course of business of such Person;

22

(b)    Dispositions of inventory in the ordinary course of business or through a store closing program whereby inventory is liquidated on-site in Borrowers' existing stores by a professional liquidator selected by the Borrowers' Chief Restructuring Officer with the approval of the Creditors' Committee;

(c)    the sale, lease, sub-lease, license, sub-license or consignment of personal property of the Borrowers in the ordinary course of business (other than any Intellectual Property Collateral) and leases or subleases of real property permitted by clause (a) for which rentals are paid on a periodic basis over the term thereof;

(d)    the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice;

(e)    sale, exchange or other disposition of cash and cash equivalents in the ordinary course of business;

(f)    Owned Real Property Sales, subject to the prior written consent of the Lender, not to be unreasonably withheld (it being agreed that within 30 days prior to filing a motion to approve any such Owned Real Property Sale, the Borrowers shall provide to the Lender a detailed plan showing the intended uses of the net cash proceeds of such Owned Real Property Sale); provided that all net cash proceeds of such Owned Real Property Sale must be applied towards the working capital obligations of the Borrowers in accordance with such plan and may not be used to satisfy any Indebtedness other than the Obligations; and

(g)    the license or other Disposition of Intellectual Property Collateral; provided, however, that Borrowers shall have received the prior written consent of the Lender solely with respect to any license or other Disposition of Intellectual Property Collateral proposed to take effect prior to the effective date on which the Borrowers consummate a Plan of Reorganization following confirmation by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, which consent shall not unreasonably be withheld (it being understood that it shall be reasonable for the Lender to withhold consent for any such license or other Disposition of Intellectual Property Collateral where (i) it could reasonably be expected to impair or interfere in any material respect with the operation of the business conducted by the Borrowers or result in a Material Adverse Effect or adversely affect the value of the Intellectual Property Collateral, (ii) it contains terms that are not commercially unreasonable or (iii) the proceeds of the license or other Disposition of Intellectual Property Collateral are not used to repay the Loans). The foregoing notwithstanding, the requirement for Lender's consent as expressly provided herein with respect to the license or other Disposition of Intellectual Property Collateral shall not apply in connection with the license or other Disposition of Intellectual Property Collateral relating to the extension, renewal or replacement of existing licenses or other Disposition of Intellectual Property Collateral; provided, however, that such extension, renewal or replacment does not need to be with the same Person as presently a party to such existing license or other Disposition of Intellectual Property Collateral, nor does it need to be on the same terms and conditions as presently provided in the existing agreements concerning existing license or other Disposition of Intellectual Property Collateral, as long as such terms are not commercially unreasonable.

6.6    Change In Nature Of Business. Engage in any line of business different from those lines of business conducted by the Borrowers on the date hereof, except as otherwise consistent with the requirements of the Bankruptcy Code and/or in connection with the reasonable exercise of good faith business judgment by Borrowers; provided, however, that the provisions of this Section 6.6 shall not be deemed to limit, prevent or impair Borrowers from discontinuing one or more lines of business,

23