Borrower to perform or observe any of the provisions hereof, expressly subject to the terms and conditions as set forth in Section 8.5 of the Credit Agreement.

Section 19. Amendments; Waivers; Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and, with respect to any amendment, the Borrowers, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 20. Notices, Etc. All notices, requests and demands to or upon the Lender or the Borrowers hereunder shall be effected in the manner provided for in Section 8.2 of the Credit Agreement.

Section 21. Continuing Security Interest; Assignments under the Credit Agreement. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitments have been terminated, (b) be binding upon each Borrower, its successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder and its respective successors and permitted assigns as set forth in the Credit Agreement. Without limiting the generality of the foregoing clause (c), the Lender may not assign or otherwise transfer all or any portion of its rights and obligations hereunder and/or under the Credit Agreement to any other Person except as otherwise provided in Section 8.7 of the Credit Agreement.

Section 22. Release; Termination. At such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds, the Commitments shall be terminated, and the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrowers. Upon any such termination, the Lender will, at such Borrower's expense, promptly execute and deliver to each Borrower such documents as such Borrower shall reasonably request to evidence such termination. Upon such termination, Lender shall take such actions, and execute and deliver such documents, instruments, certificates and agreements as reasonable and appropriate, in each case, as requested by the Borrowers from time to time in furtherance of such termination and release as contemplated herein.

Section 23. Execution in Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Section 24. Governing Law. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of California, and to the extent applicable, the Bankruptcy Code.

[Remainder of page left blank]

18

644461.06-Los Angeles Server 2A - MSW

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

SIMO HOLDING, INC.

By _____
    Name:
    Title:

NO FEAR RETAIL STORES, INC.

By _____
    Name:
    Title:

NO FEAR MX, INC.

By _____
    Name:
    Title:

1903 ONSHORE FUNDING, LLC,
as Lender

By:    GB MERCHANT PARTNERS, LLC,
       its Investment Manager

       By: _____
          Name:
          Title:

**Exhibit A to the
Security Agreement**

FORM OF
**SUPERPRIORITY DEBTOR-IN-POSSESSION
INTELLECTUAL PROPERTY SECURITY AGREEMENT**

THIS SUPERPRIORITY DEBTOR-IN-POSSESSION INTELLECTUAL PROPERTY SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement") dated [_____], 20[__], between Simo Holdings, Inc., a California corporation, No Fear Retail Stores, Inc., a California corporation, No Fear MX, Inc., a California corporation (each a "Borrower" and collectively, the "Borrowers") and 1903 Onshore Funding, LLC, as lender (the "Lender").

WHEREAS, each Borrower, a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, has entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of April [__], 2011 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with 1903 Onshore Funding, LLC, as the Lender. Terms defined in the Credit Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement.

WHEREAS, as a condition precedent to the making of the Loan by the Lender under the Credit Agreement, each Borrower has executed and delivered that certain Superpriority Debtor-in-Possession Security Agreement dated April [__], 2011 among the Borrowers and the Lender (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement").

WHEREAS, under the terms of the Security Agreement, each Borrower has granted to the Lender a security interest in the Additional Collateral (as defined in Section 1 below) of such Borrower and has agreed as a condition thereof to execute this IP Security Agreement for recording with the United States Patent and Trademark Office and/or the United States Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Borrower agrees as follows:

SECTION 1.  Grant of Security.  Each Borrower hereby grants to the Lender a security interest in all of such Borrower's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by such Borrower, wherever located, and whether now or hereafter existing or arising, except to the extent any applicable law, regulation, agreement with a domain name registrar or other contractual arrangement prohibits the creation of a security interest therein or would otherwise invalidate such Borrower's right, title or interest therein (the "Additional Collateral"):

      (i)      the patents and patent applications set forth in Schedule A hereto (the "Patents");

      (ii)      the trademark and service mark registrations and applications set forth in Schedule B hereto (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together with the goodwill symbolized thereby (the "Trademarks");

(iii)    the copyright registrations and applications set forth in <u>Schedule C</u> hereto (the "<u>Copyrights</u>");

(iv)    all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations of any of the foregoing (as applicable), all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Borrower accruing thereunder or pertaining thereto;

(v)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages; and

(vi)    any and all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral of or arising from any of the foregoing.

SECTION 2.  <u>Supplement to Security Agreement</u>.  Schedule IV to the Security Agreement is, effective as of the date hereof, hereby supplemented to add to such Schedule the Additional Collateral.

SECTION 3.  <u>Security for Obligations</u>.  The grant of a security interest in, the Additional Collateral by each Borrower under this IP Security Agreement secures the payment of all Secured Obligations of each Borrower now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise.

SECTION 4.  <u>Recordation</u>.  Each Borrower authorizes and requests that the Register of Copyrights, the Commissioner for Patents and the Commissioner for Trademarks and any other applicable government officer record this IP Security Agreement.

SECTION 5.  <u>Execution in Counterparts</u>.  This IP Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 6.  <u>Grants, Rights and Remedies</u>.  This IP Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Borrower does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Lender with respect to the Additional Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  If there is a conflict between this IP Security Agreement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

SECTION 7.  <u>Governing Law</u>.  This IP Security Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

[Remainder of page left blank]

IN WITNESS WHEREOF, each of the undersigned have caused this IP Security Agreement to be duly executed and delivered as of the date first above written.

SIMO HOLDING, INC.

By _____

    Name:
    Title:


NO FEAR RETAIL STORES, INC.

By _____

    Name:
    Title:


NO FEAR MX, INC.

By _____

    Name:
    Title:

1903 ONSHORE FUNDING, LLC,
as Lender

By:      GB MERCHANT PARTNERS, LLC,
         its Investment Manager


         By: _____
             Name:
             Title:

**Exhibit B to the
Security Agreement**

**FORM OF
SUPERPRIORITY DEBTOR-IN-POSSESSION
INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT**

This SUPERPRIORITY DEBTOR-IN-POSSESSION INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT (this "IP Security Agreement Supplement") dated [_____], 20[__], between the Person listed on the signature page hereof (the "Borrower") and 1903 Onshore Funding, LLC, as lender (the "Lender").

WHEREAS, Simo Holdings, Inc., a California corporation, No Fear Retail Stores, Inc., a California corporation, and No Fear MX, Inc., a California corporation, each a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, has entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of April [__], 2011 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with 1903 Onshore Funding, LLC, as the Lender. Terms defined in the Credit Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement.

WHEREAS, pursuant to the Credit Agreement, the Borrower and certain other Persons have executed and delivered (i) that certain Superpriority Debtor-in-Possession Security Agreement dated April [__], 2011 among the Borrower, such other Persons and the Lender (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement") and (ii) that certain Superpriority Debtor-in-Possession Intellectual Property Security Agreement dated April [__], 2011 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement") among the Borrower, such other Persons and the Lender.

WHEREAS, under the terms of the Security Agreement, the Borrower has granted to the Lender a security interest in the Additional Collateral (as defined in Section 1 below) of the Borrower and has agreed as a condition thereof to execute this IP Security Agreement Supplement for recording with the United States Patent and Trademark Office and/or the United States Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower agrees as follows:

SECTION 1. Grant of Security. The Borrower hereby grants to the Lender a security interest in all of the Borrower's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Borrower, wherever located, and whether now or hereafter existing or arising, except to the extent any applicable law, regulation, agreement with a domain name registrar or other contractual arrangement prohibits the creation of a security interest therein or would otherwise invalidate the Borrower's right, title or interest therein (the "Additional Collateral"):

    (i)    the patents and patent applications set forth in Schedule A hereto (the "Patents");

    (ii)    the trademark and service mark registrations and applications set forth in Schedule B hereto (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in

which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together with the goodwill symbolized thereby (the "Trademarks");

(iii)    the copyright registrations and applications set forth in Schedule C hereto (the "Copyrights");

(iv)    all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations of any of the foregoing (as applicable), all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Borrower accruing thereunder or pertaining thereto;

(v)    all any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages; and

(vi)    any and all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing or arising from any of the foregoing.

SECTION 2.    Supplement to Security Agreement.    Schedule VI to the Security Agreement is, effective as of the date hereof, hereby supplemented to add to such Schedule the Additional Collateral.

SECTION 3.    Security for Obligations.    The grant of a security interest in the Additional Collateral by the Borrower under this IP Security Agreement Supplement secures the payment of all Secured Obligations of the Borrower now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise.

SECTION 4.    Recordation.    The Borrower authorizes and requests that the Register of Copyrights, the Commissioner for Patents and the Commissioner for Trademarks and any other applicable government officer to record this IP Security Agreement Supplement.

SECTION 5.    Grants, Rights and Remedies.    This IP Security Agreement Supplement has been entered into in conjunction with the provisions of the Security Agreement.    The Borrower does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Lender with respect to the Additional Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.    If there is a conflict between this IP Security Agreement Supplement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

SECTION 6.    Governing Law.    This IP Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

Security Agreement

IN WITNESS WHEREOF, each of the undersigned have caused this IP Security Agreement Supplement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

[NAME OF BORROWER]

By      _____
             Name:
             Title:


1903 ONSHORE FUNDING, LLC,
as Lender

By:    GB MERCHANT PARTNERS, LLC,
        its Investment Manager


    By: _____
        Name:
        Title:

Security Agreement

**EXHIBIT 3**

## LIEN SUBORDINATION AND INTERCREDITOR AGREEMENT

This Lien Subordination and Intercreditor Agreement ("**Agreement**") is entered into by and between CREDIT CASH NJ, LLC ("**Credit Cash**") and 1903 ONSHORE FUNDING, LLC ("**DIP Lender**").

**WHEREAS,** Credit Cash has extended credit (the "**Credit Cash Loan**") to No Fear Retail Stores, Inc, a California corporation ("**Borrower**" or "**Merchant**") pursuant to that certain Credit Card Receivables Advance Agreement dated as of November 18, 2009 ("**Credit Cash Loan Agreement**"), that certain Control Account Agreement dated as of November 18, 2009 ("**Control Agreement**"), and those certain Advance Schedules, No. 1. No. 2, No. 3, No. 4 and No. 5 (collectively "**Advance Schedules**"). The Credit Cash Loan Agreement, the Control Agreement and the Advance Schedules are collectively referred to herein as the "**Credit Cash Loan Documents**".

**WHEREAS,** Credit Cash has a properly perfected first priority security interest in the following assets of Borrower: (a) all accounts, including, without limitation, all of Merchant's existing and future receivables and other rights to payment arising out of Merchant's acceptance or other use of its customer's credit cards (collectively, "**Credit Card Receivables**"); (b) all other payment rights arising out of the provision of goods or services by Merchant; (c) the Collection Account (as defined in the Credit Cash Loan Documents); (d) all rights to receive payments from the Processor arising out of or otherwise relating to the Collection Account; (d) all rights to receive payments from the Processor arising out of or otherwise relating to the Processor Agreement (as defined in the Credit Cash Loan Documents); (e) chattel paper, including electronic chattel paper and tangible chattel paper; (f) commercial tort claims; (g) documents; (h) equipment, machinery, furniture, furnishings and fixtures and all parts, tools, accessories and Accessions; (i) fixtures; (j) general intangibles, including but not limited to patents, trademarks, customer lists and tradenames and the goodwill and inherent value associated therewith, tax refunds, insurance claims and goodwill of Borrower; (k) goods; (l) instruments; (m) inventory, merchandise, materials, whether raw, work in progress or finished goods, packaging and shipping materials and all other tangible property held for sale or lease; (n) investment property; (o) payment intangibles; (p) proceeds, including cash proceeds and non-cash proceeds, and proceeds of any insurance policies covering any of the Credit Cash Collateral (defined below); (q) promissory notes; (r) records, including all books, records and other documents, in any and all media, at any time evidencing or relating to any of the foregoing; (s) to the extent not otherwise included above, all collateral support and supporting obligations relating to any of the foregoing; and (t) to the extent not otherwise included above, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (collectively, the "**Credit Cash Collateral**"). All terms in this description defined in the UCC shall have the meanings given to them under the UCC. In addition to the foregoing, the security interest in the Credit Cash Collateral secures the payment and performance of all existing and future obligations of any nature whatsoever of Merchant to Lender, including, without limitation, the Merchant's obligation to pay all Collection Amounts (as defined in the Credit Cash Loan Documents), fees, and Reimbursable Expenses (as defined in the Credit Cash Loan Documents) owing at any time under this Agreement and/or any related agreements. This Agreement is without prejudice to the rights of the official creditors' committee appointed in Merchant's chapte

11 case to challenge Credit Cash's existing security interests. Any such challenge must be brought by filing a complaint with the Court presiding over Borrower's Chapter 11 Case (as defined below) no later than _____, 2011.

**WHEREAS,** on February 24, 2011, Borrower and certain related entities filed petitions under Chapter 11 of the United States Bankruptcy Code. Borrower's Chapter 11 case is pending in the United States Bankruptcy Court for the Southern District of California as Case No. 11-02896-11 (the "**Chapter 11 Case**").

**WHEREAS,** DIP Lender has been requested by Borrower, to extend financial accommodations to it (the "**DIP Loan**") pursuant to that certain Superpriority Debtor-In-Possession Credit Agreement, dated as of April [__], 2011 (the "**DIP Credit Agreement**"), among Simo Holdings, Inc., a California corporation, the Borrower, No Fear MX, Inc., a California corporation, and DIP Lender, the other Loan Documents (as defined in the DIP Credit Agreement) and certain other agreements (together with the DIP Credit Agreement and the other Loan Documents, collectively, the "**DIP Loan Documents**") pursuant to which, among other things, DIP Lender has been granted a security interest in the Intellectual Property Collateral (as defined below), the Equity Collateral (as defined below), the Inventory Collateral (as defined below), the Proceeds Collateral (as defined below) and substantially all of the Borrower's other assets whether now owned or existing or hereafter acquired or arising (collectively, the "**DIP Collateral**") and DIP Lender is unwilling to do so unless in connection therewith it has obtained under the DIP Loan Documents and this Agreement:

(a)    a first priority security interest in the following assets of the Borrower, whether now owned or existing or hereafter acquired or arising (collectively, the "**Intellectual Property Collateral**"):

(i)    all patents, patent applications and inventions claimed or disclosed therein and all improvements thereto;

(ii)    all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered, together, in each case, with the goodwill symbolized thereby;

(iii)    all copyrights, including, without limitation, copyrights in computer software, Internet web sites, style guides, brand books and the content thereof, whether registered or unregistered;

(iv)    all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing, other than such software commonly found for the general use and operation of computer and computer equipment and such other software, programs and rights which Borrower may not grant liens on;

Page 2

(v)    all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, and all other intellectual property of any type;

(vi)    all registrations and applications for registration for any of the foregoing, together with, as applicable, all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)    all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Borrower accruing thereunder or pertaining thereto;

(viii)    all written agreements, now or hereafter in effect, granting to any third person any right to make, use or sell any invention on which a patent, now or hereafter owned by the Borrower or that the Borrower otherwise has the right to license, is in existence, or granting to the Borrower any right to make, use or sell any invention on which a patent, now or hereafter owned by any third person, is in existence, and all rights of the Borrower under any such agreement;

(ix)    all written agreements, now or hereafter in effect, granting to any third person any right to use any trademark now or hereafter owned by any Borrower or that the Borrower otherwise has the right to license, or granting to the Borrower any right to use any trademark now or hereafter owned by any third person, and all rights of the Borrower under any such agreement;

(x)    all written agreements, now or hereafter in effect, granting any right to any third person under any copyright now or hereafter owned by the Borrower or that the Borrower otherwise has the right to license, or granting any right to the Borrower under any copyright now or hereafter owned by any third person, and all rights of the Borrower under any such agreement;

(xi)    all other agreements, permits, consents, orders and franchises relating to the license, sublicense, development, use or disclosure of any of the foregoing to which the Borrower, now or hereafter, is a party or a beneficiary; and

(xii)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(b)    a first priority security interest in the following assets (collectively, the "**Equity Collateral**"): all capital stock of the Borrower and the certificates, if any, representing

645340.06-Los Angeles Server 2A - MSW

the capital stock of the Borrower, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the capital stock of the Borrower and all subscription warrants, rights or options issued thereon or with respect thereto;

(c)    a first priority security interest in the following assets of the Borrower, whether now owned or existing or hereafter acquired or arising (collectively, the "**Inventory Collateral**"): all inventory;

(d)    a first priority security interest in the following assets (collectively, the "**Proceeds Collateral**"): all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the collateral described in clauses (a), (b) and (c) above (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a), (b) and (c) above and this clause (d)) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the DIP Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the Intellectual Property Collateral, the Equity Collateral, the Inventory Collateral or the Proceeds Collateral and (B) tort claims related to the Intellectual Property Collateral, the Equity Collateral, the Inventory Collateral or the Proceeds Collateral including, without limitation, all commercial tort claims; provided that the Proceeds Collateral shall not include accounts receivable and proceeds thereof related to the sale of Inventory Collateral in the ordinary course of Borrower's business; and

(e)    a second priority security interest in all of the Credit Cash Collateral not listed in clauses (a), (b), (c) and (d) above, subordinated to the security interests of Credit Cash as set forth herein.

All Credit Cash Collateral except the Intellectual Property Collateral, the Equity Collateral, the Inventory Collateral and the Proceeds Collateral is "**Credit Cash Priority Collateral**" for purposes of this Agreement.   All Intellectual Property Collateral, Equity Collateral, Inventory Collateral and Proceeds Collateral is "**DIP Priority Collateral**" for purposes of this agreement.

**WHEREAS**, Credit Cash, having extended credit to Borrower is desirous of maintaining its security interest in the assets of Borrower and Credit Cash is unwilling to consent to the extension of the DIP Loan unless the security interest of DIP Lender in the Credit Cash Priority Collateral is at all times inferior and junior to that of Credit Cash.

**WHEREAS,** Credit Cash is willing to subordinate its security interest in the DIP Priority Collateral to the security interest of DIP Lender therein.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants set forth herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, it is agreed:

1.    That as a condition precedent to the effectiveness of this Agreement, Credit Cash shall have received a cash payment in an amount not less than $564,663 in respect of the Credit Cash Loan.

2.    The liens held by Credit Cash shall be subordinate in right to those granted to DIP Lender in the DIP Priority Collateral, subject to the terms set forth herein. The aforesaid security interest or lien of DIP Lender in the DIP Priority Collateral, as defined above shall be superior and prior in right to any security interest or lien of Credit Cash now or hereafter existing in and on any such assets or property which constitute the DIP Priority Collateral. It is understood and agreed that Credit Cash's agreement to subordinate its interest in the DIP Priority Collateral does not, in any way, affect Credit Cash's interest or priority in any other Credit Cash Collateral that is not DIP Priority Collateral.

3.    The aforesaid subordination shall be effective notwithstanding the terms or provisions of any agreement or arrangement which Credit Cash may now or hereafter have with the Borrower, or any rule of law, and irrespective of the time, order or method of attachment or perfection of any financing statement, recordation or other filing of public record.

4.    DIP Lender recognizes and acknowledges that Credit Cash has a valid, enforceable, properly perfected security interest in the Credit Cash Collateral. DIP Lender further recognizes and acknowledges that the security interests of Credit Cash are senior to those of DIP Lender in all Credit Cash Collateral except for the DIP Priority Collateral. Credit Cash recognizes and acknowledges that DIP Lender has a valid, enforceable, properly perfected security interest in the DIP Collateral. Credit Cash further recognizes and acknowledges that the security interests of DIP Lender are senior to those of Credit Cash in all DIP Collateral except for the Credit Cash Priority Collateral.

5.    So long as any of the Borrower's obligations to Credit Cash remain unpaid, Credit Cash shall have the sole and exclusive right to control, administer, account for, safeguard, enforce rights and exercise remedies (including set-off and the right to credit bid any claims or amounts owing in connection with any sale, disposition or exercise of remedies) with respect to the Credit Cash Priority Collateral and make determinations regarding the release, disposition, or restrictions with respect to the Credit Cash Priority Collateral without any consultation with or the consent of the DIP Lender, including but not limited to, the sole and exclusive right to collect all of the Credit Card Receivables of Borrower and retain a portion of such proceeds to repay the Credit Cash Loan, all as more fully provided in the Credit Cash Loan Agreement. DIP Lender agrees that, so long as any Borrower obligations to Credit Cash remain outstanding, DIP Lender will not exercise any rights or assert any claims with respect to any Credit Cash Priority Collateral, including Credit Card Receivables or the proceeds thereof. This provisions refers expressly and without limitation to the accounts receivable generated subsequent to the filing of the Chapter 11 case including Credit Card Receivables (including, for the avoidance of doubt, accounts receivable related to sale of inventory in the ordinary course of Borrower's business). Any actions taken by Credit Cash with regard to the disposition of property of Borrower's bankruptcy estate shall be subject to approval of the Court presiding over the Chapter 11 case based upon a duly noticed motion for relief from stay.

Page 5

6.      So long as any of the Borrower's obligations to DIP Lender remain unpaid, DIP Lender shall have the sole and exclusive right to control, administer, account for, safeguard, enforce rights and exercise remedies (including set-off and the right to credit bid any claims or amounts owing in connection with any sale, disposition or exercise of remedies) with respect to the DIP Priority Collateral and make determinations regarding the release, disposition, or restrictions with respect to the DIP Priority Collateral without any consultation with or the consent of Credit Cash, provided, however, that DIP Lender shall provide Credit Cash not less than five (5) days (or in the event such notice period could result in loss or damage to any DIP Collateral, such shorter period as is practicable under the circumstances) prior written notice in the event DIP Lender shall decide to exercise any of its rights or remedies in respect of any default by Borrower under the DIP Loan Documents.  Credit Cash agrees that, so long as any Borrower obligations to DIP Lender remain outstanding, Credit Cash will not exercise any rights or assert any claims with respect to any DIP Priority Collateral.  Any actions taken by DIP Lender with regard to the disposition of property of Borrower's bankruptcy estate shall be subject to approval of the Court presiding over the Chapter 11 case based upon a duly noticed motion for relief from stay.

7.      To the extent funds are collected or retained consistent with this Agreement, (i) DIP Lender agrees that it will not assert any claims to the monies collected and/or retained by Credit Cash after the filing of the petition in this case, nor shall DIP Lender object to any motion by Credit Cash and/or Borrower seeking authorization or permitting Credit Cash to continue to collect and retain the Credit Card Receivables during this proceeding, and (ii) Credit Cash agrees that it will not assert any claims to the monies collected and/or retained by DIP Lender after the filing of the petition in this case, nor shall Credit Cash object to any motion by DIP Lender and/or Borrower seeking authorization or permitting DIP Lender to continue to be entitled to and to retain the DIP Priority Collateral during this proceeding.  Credit Cash and DIP Lender each agree not to contest, protest or object to any foreclosure proceeding or other action brought by the other or any other exercise by the other of any rights and remedies (or the forbearance by the other from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies) with respect to: (a) in the case of Credit Cash, the DIP Priority Collateral and (b) in the case of DIP Lender, the Credit Cash Priority Collateral.

8.      So long as any of the Borrower's obligations to Credit Cash remain unpaid, any Credit Cash Priority Collateral or proceeds thereof received by the DIP Lender in connection with the exercise of any right or remedy (including set-off) relating to the Credit Cash Priority Collateral shall be segregated and held in trust and forthwith paid over to Credit Cash in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  Credit Cash is hereby authorized to make any such endorsements as agent for the DIP Lender.  This authorization is coupled with an interest and is irrevocable until the discharge of the Borrower's obligations to Credit Cash under the Credit Cash Loan Documents. So long as any of the Borrower's obligations to the DIP Lender remain unpaid, any DIP Priority Collateral or proceeds thereof received by Credit Cash in connection with the exercise of any right or remedy (including set-off) relating to the DIP Priority Collateral shall be segregated and held in trust and forthwith paid over to DIP Lender in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  DIP Lender is hereby authorized to make any such endorsements as agent for Credit Cash.  This

authorization is coupled with an interest and is irrevocable until the discharge of the Borrower's obligations to DIP Lender under the DIP Loan Documents.

9.     If, in connection with the exercise of Credit Cash's remedies in respect of the Credit Cash Priority Collateral provided for in this Agreement, Credit Cash releases any of its liens on any part of the Credit Cash Priority Collateral, then the liens, if any, of the DIP Lender on such Credit Cash Priority Collateral that has been so released by Credit Cash shall be automatically, unconditionally and simultaneously released.  The DIP Lender promptly shall execute and deliver to Credit Cash termination statements, releases and other documents as Credit Cash may request to effectively confirm such release.  If, in connection with the exercise of the DIP Lender's remedies in respect of the DIP Priority Collateral provided for in this Agreement, the DIP Lender releases any of its liens on any part of the DIP Priority Collateral, then the liens, if any, of Credit Cash on such DIP Priority Collateral that has been so released by the DIP Lender shall be automatically, unconditionally and simultaneously released.  Credit Cash promptly shall execute and deliver to the DIP Lender termination statements, releases and other documents as the DIP Lender may request to effectively confirm such release.

10.     In addition to the initial payment to Credit Cash referred to in paragraph 1 above, it is understood that Borrower shall make weekly payments to Credit Cash in the amount of $25,000 (the "**Fixed Weekly Payment**") until the Credit Cash Loan is repaid in full.  Such payments shall be made in accordance with the following subparagraphs (a), (b), (c) and (d).

(a)     The Merchant represents and warrants to Credit Cash that all of the Merchant's Credit Card Receivables are or will be processed by CHASE PAYMENTECH (together with any subsequent successors or assigns, the "**Processor**").  The Merchant has executed and delivered to Credit Cash, and the Processor has executed and delivered to Credit Cash (the "**Payment Instruction Agreement**").  The Payment Instruction Agreement provides that (i) the Processor is to periodically remit, via electronic funds transfer, to the Collection Account (as defined in the Credit Cash Loan Agreement) all of the Merchant's Credit Card Receivables collected by the Processor (net of any discounts, fees and/or similar amounts payable to the Processor by the Merchant which the Processor is entitled to deduct from the proceeds of the Credit Card Receivables pursuant to the terms of the Processor Agreement (as defined in the Credit Cash Loan Agreement) and net of any charge-backs, offsets and/or other amounts which the Processor is entitled to deduct from the proceeds of the Merchant's Credit Card Receivables pursuant to the terms of the Processor Agreement), and (ii) the Processor must continue transferring such funds until such time as Credit Cash gives the Processor written notice that (A) Credit Cash has received payment in full of the Credit Cash Loan, and (B) there are no Reimbursable Expenses (as defined in the Credit Cash Loan Agreement) or other fees or changes then outstanding.

(b)     The Merchant has executed and delivered a control agreement or similar agreement among the Merchant, Credit Cash and the Collection Account Bank ("**Control Account Agreement**") whereby, among other things, Credit Cash shall be deemed to have "control" of the Collection Account and all funds at any time deposited therein for purposes of UCC § 9-104(a)(2) or (3), as Credit Cash so elects.  The Control Account Agreement provides that the Collection Account Bank is to periodically remit, via electronic funds transfer, all funds

on deposit in the Collection Account to a bank account designated by Credit Cash (the "**Credit Cash Account**").  Insofar as funds on deposit in the Collection Account are remitted to the Credit Cash Account, Credit Cash will retain a fixed amount each week to credit to the Collection Account, in an amount of the Fixed Weekly Payment until payment in full of the Credit Cash Loan, (plus all Reimbursable Expenses and all other fees and charges due under this Agreement) and remit to Merchant, via electronic funds transfer to a bank account designated by the Merchant in a writing delivered to Credit Cash, the balance of all such funds in Credit Cash Account.

(c)    In the event Merchant does not maintain sufficient balances in the Collection Account for Credit Cash to retain the Fixed Weekly Payment, Merchant will be subject to a late fee equal to five percent (5%) of the deficiency, which would be automatically added to the next daily payment.

(d)    If the Fixed Weekly Payment is not received by Credit Cash by the Collection Date specified in Exhibit 2 to the Motion of Debtors and Debtors in Possession for Order Authorizing Debtors to Enter into Debtor in Possession Credit Facility with Hilco Brands, LLC and Infinity FS Brands, LLC (as may be modified from time to time), or if any other Event of Default exists, the Merchant shall immediately pay to Credit Cash the balance of the Fixed Weekly Payment (or if greater an amount equal to the Collection Amount plus all Reimbursable Expenses) that has not yet been remitted to and received by Credit Cash.  Notwithstanding Credit Cash's right to demand the immediate payment of all outstanding obligations hereunder on the Collection Date, in the event Merchant's obligation to pay the Fixed Weekly Payment (plus Reimbursable Expenses and all other fees and charges due under the Credit Cash Loan Documents and the Related Agreements) is not satisfied on or before the Collection Date, and provided Merchant is not otherwise in default of this Agreement, in lieu of increasing the Fixed Weekly Payment, Credit Cash may, at Credit Cash's option, extend the Collection Date for one or more periods of thirty (30) days and continue to apply the specified Fixed Weekly Payment to the obligations of the Merchant hereunder.  In consideration of Credit Cash extending the Collection Date, Merchant hereby understands and agrees that, for each extension, Merchant shall pay to Credit Cash an extension fee equal to two percent (2%) of the highest outstanding balance of the Collection Amount during the 30-day period immediately preceding the applicable extension period.  The extension fee would automatically be charged to Merchant's account on the first (1st) day of the applicable extension period.  Merchant further understands and agrees that if any event or condition specified in the first sentence of this Section 8(d) exists, Credit Cash may, in Credit Cash's reasonable business discretion, increase the Fixed Weekly Payment to 100% of the funds received into the Collection Account and, as such, recover from the Collection Account and/or retain in Credit Cash Account all amounts due Credit Cash under this Agreement and any related Agreements.

11.    Borrower, DIP Lender, and Credit Cash expressly waive the right to object to the validity, enforceability or priority of the respective security interests in the Credit Cash Collateral and the DIP Collateral, as the case may be, and none of them shall object to the secured claim of the other in the Bankruptcy Case.

12.    In the event of a default by Borrower pursuant to the obligations due to either Credit Cash or DIP Lender, (i) Credit Cash's interest in the Credit Cash Priority Collateral shall be superior in right to that of DIP Lender until such time as all of the obligations of Borrower to Credit Cash are satisfied in full and (ii) DIP Lender's interest in the DIP Priority Collateral shall be superior in right to that of Credit Cash until such time as all of the obligations of Borrower to DIP Lender are satisfied in full.  Credit Cash and DIP Lender each agree to provide written notice to the other prior to or simultaneously with any notice of default delivered to Borrower.

13.    All notices, requests, demands and other communications under this Agreement shall be in writing and will be personally served, telecopied (or sent by other electronic image scan transmission (e.g., .pdf via email)) or sent by overnight courier service or United States mail and will be deemed to have been given: (i) if delivered in person, when delivered; (ii) if delivered by telecopy, on the date of transmission if transmitted on a business day before 4:00 p.m. New York time or, if not, on the next succeeding business day; (iii) if delivered by overnight courier, the following business day after depositing with such courier, properly addressed; or (iv) if by U.S. Mail, four (4) business days after depositing in the United States mail, with postage prepaid and properly addressed.  All notices, requests and demands are to be given or made to the respective parties at the addresses set forth below or at such other addresses as either party may designate in writing by notice in accordance with the provisions of this paragraph.

If to DIP Lender:

Lender

_____

Attention: _____
Fax No: _____

with a copy to:

Name of Attorney (if requested by DIP Lender).

_____
_____

Attention: _____
Fax No: _____

If to Credit Cash:

Credit Cash
505 Park Avenue, 6th Floor
New York, New York 10022
Attention: Portfolio Manager
Fax No.: (212) 838-4820

14. This Agreement shall remain in full force and effect until all obligations to Credit Cash have been paid in full. As soon as practicable upon request by DIP Lender, Credit Cash agrees to execute and deliver an acknowledgement of satisfaction and termination of its security interests after Credit Cash has been indefeasibly paid in full.

15. Both DIP Lender and Credit Cash acknowledge and agree that they have received adequate consideration for the execution and delivery of this Agreement, the nature and extent of which are hereby acknowledged.

16. Credit Cash warrants and represents that it has not assigned or transferred any interest or rights in any DIP Priority Collateral or any other security interest subordinated by this Agreement.

17. This Agreement in no way affects any security interest or lien which DIP Lender may have in property of the Borrower other than the Credit Cash Priority Collateral. Nothing contained herein shall be construed as a waiver by DIP Lender or Credit Cash of any rights other than as expressly set forth hereinabove. Except as expressly provided herein the terms and conditions of the Credit Cash Loan Documents shall remain in full force and effect.

18. This Agreement is solely and exclusively for the benefit of the parties hereto and their permitted successors and assigns (including, without limitation, successors and assigns permitted under the Cash Credit Loan Documents and the DIP Loan Documents) and no present or future third parties or entities are intended nor shall be deemed to derive any benefit from this Agreement.

19. This Agreement shall be governed by the laws of the State of California. **EACH PARTY HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE. THE COURT PRESIDING OVER THE CHAPTER 11 CASE SHALL HAVE EXCLUSIVE JURISDICTION TO RESOLVE ANY DISPUTES RELATING TO THIS AGREEMENT AND THE PARTIES SUBMIT TO THE JURISDICTION OF THE COURT PRESIDING OVER THE CHAPTER 11 CASE.**

20. This Agreement contains the entire agreement of the parties on the subject matter hereof, and there are no other terms, covenants or conditions except as specifically set forth herein.

21. This Agreement may be executed in counterparts. Each counterpart shall be deemed an original but all of which together shall constitute one and the same instrument. An executed facsimile of the Agreement shall be deemed to be a valid and binding agreement between the parties hereto.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized officers as of the _____ day of _____, 20____.

**CREDIT CASH NJ, LLC**

By:      _____
Name:  _____
Title:   _____

DIP Lender acknowledges, agrees and consents to the foregoing Lien Subordination and Intercreditor Agreement and acknowledges and agrees that it derives substantial benefit from its execution and delivery.

**DIP LENDER**

By:      _____
Name:  _____
Title:   _____

Borrower acknowledges, agrees and consents to the foregoing Lien Subordination and Intercreditor Agreement and further acknowledges and agrees that it derives substantial benefit from its execution and delivery.

ACKNOWLEDGED AND AGREED:

**BORROWER**

NO FEAR RETAIL STORES, INC.

By:      _____
Name:  Mark Simo
Title:   Chief Executive Officer

645340.06-Los Angeles Server 2A - MSW

89

**EXHIBIT 4**

CSD 1001A [11/15/04] **(Page 1)**
Name, Address, Telephone No. & I.D. No.

David S. Kupetz (CA Bar No. 125062)
  dkupetz@sulmeyerlaw.com
Steven F. Werth
  swerth@sulmeyerlaw.com
SulmeyerKupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520
Attorneys for No Fear Retail Stores, Inc., No Fear MX, Inc., and
Simo Holdings, Inc., Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re.

NO FEAR RETAIL STORES, INC., a California corporation, NO FEAR MIX INC., a California corporation, and SIMO HOLDINGS, INC., a California corporation,

BANKRUPTCY NO. 11-02896-MM11

(Jointly Administered with Case Nos. 11-02897-MM11; 11-02898-MM11)

Date of Hearing:    April 18, 2011
Time of Hearing:    10:00 a.m.
Name of Judge:    Hon. Margaret M. Mann

Debtors.

## ORDER AUTHORIZING DEBTORS TO ENTER INTO DEBTOR IN POSSESSION CREDIT FACILITY WITH 1903 ONSHORE FUNDING, LLC

**IT IS ORDERED THAT** the relief sought as set forth on the continuation pages attached and numbered two (2)

through _____ with exhibits, if any, for a total of _____ pages, is granted. Motion/Application Docket Entry No. 87.

//

//

//

DATED: April 18, 2011

_____
Judge, United States Bankruptcy Court

Signature by the attorney constitutes a certification under Fed. R. of Bankr. P. 9011 that the relief in the order is the relief granted by the court.

Submitted by:

_____
SulmeyerKupetz, A Professional Corporation

By: _____
    Attorney for ☒ Movant ☐ Respondent
    No Fear Retail Stores, Inc., No Fear MX, Inc., and Simo Holdings, Inc., Debtors and Debtors in Possession

90

The Court has considered the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "DIP Financing Order") authorizing the Debtors to obtain postpetition financing.  On April 7, 2011, the Court entered its Order on Motion for Debtor sand Debtors in Possession for Order Authorizing Debtors to Enter Into Debtor in Possession Credit Facility with Hilco Brands, LLC and Infinity FS Brands, LLC [Docket No. 145] (the "Hilco Order").  The Court has considered the record of the Debtors' bankruptcy cases, including, without limitation, the filings made pursuant to the Hilco Order, the positions of the Debtors, the official committees of unsecured creditors appointed in these cases (the "Creditors' Committees"), and other parties in interest, and the evidence before this Court.  After due deliberation, the Court finds as follows:

A.      The relief granted in this DIP Financing Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and due and sufficient cause exists for the Court to grant such relief under sections 105 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001(c) of the Federal Rules of the Bankruptcy Procedures (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the Southern District of California, the Guidelines for Motions to Use Cash Collateral or to Obtain Credit (the "Guidelines"), and other applicable law, rules, and guidelines.

B.      Due and sufficient notice of the relief granted in this DIP Financing Order has been provided under the circumstances, and no other or further notice is required.

C.      Any objections to the relief granted herein have been withdrawn or resolved, or are overruled.

D.      The Debtors have determined not to pursue financing from Hilco Brands, LLC and Infinity FS Brands, LLC as allowed under the Hilco Order.

E.      The Debtors seek authority to enter into the credit agreement (the "DIP Agreement"), substantially in the form attached hereto as Exhibit A, and the security agreement (collectively with the DIP Agreement and related agreements, including, without limitation, the Intercreditor Agreement (defined below), the "DIP Documents," and, the financing provided thereunder, the "DIP Facility," and, the Debtors' obligations thereunder, the "Obligations") substantially in the form attached hereto as Exhibit B, with 1903 Onshore Funding

CSD 1001A [11/15/04] (Page 3)

LLC or its designee (collectively, the "Lender").  Capitalized terms not defined in this DIP Financing Order shall have the meanings ascribed to them in the DIP Documents.

F.    In connection with the DIP Facility, the Debtors also seek approval of the intercreditor agreement by and between the Lender and Credit Cash NJ, LLC (the "Intercreditor Agreement"), substantially in the form attached hereto as Exhibit C.

G.    The Debtors do not have sufficient available resources of working capital and financing to carry on the operation of their business in the ordinary course without the DIP Facility.  The Debtors have an immediate need to obtain financing under the DIP Facility in order to permit, among other things, the Debtors to continue their business operations in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, satisfy other working capital and operational needs, and fund payment of administrative expenses.

H.    The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.  The Lender has indicated its willingness to provide financing to the Debtors under the terms and conditions of the DIP Documents.  The Debtors are otherwise unable to obtain financing on more favorable terms from sources other than the Lender under the terms of the DIP Documents.

I.    The DIP Facility and the Intercreditor Agreement have been negotiated in good faith and at arm's length.  Any credit extended and loans made to the Debtors pursuant to the DIP Facility shall be deemed to have been extended, issued, or made, as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

J.    The terms of the DIP Facility and this DIP Financing Order are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  To the extent that any provision of this DIP Financing Order or the DIP Documents departs from the Guidelines, the Court finds that compelling circumstances justify any such departure.  Absent entry of this DIP Financing Order, the Debtors' estate could be immediately and irreparably harmed.

CSD 1001A [11/15/04] (Page 4)

### ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis, subject to the terms, conditions, and modifications set forth in this DIP Financing Order.

2.      The terms of the DIP Documents are approved, and the Debtors are authorized to borrow under the DIP Facility subject to the terms and conditions set forth in the DIP Documents.  To the extent of any inconsistency between this DIP Financing Order and the DIP Documents, this DIP Financing Order shall control.

3.      The Debtors are authorized and directed to take any and all actions as are necessary or appropriate to effect the relief granted in this DIP Financing Order and the transactions contemplated by the DIP Documents.  Without limiting the foregoing, the Debtors shall (a) execute and deliver the DIP Credit Documents together with any other document of any kind required to be executed and delivered in connection therewith, (b) comply with and perform, and be bound by, all of the terms, conditions, and waivers contained in the DIP Documents, (c) repay amounts borrowed, with interest, and reasonable fees and expenses, and any other allowed charges and amounts, to the Lender in accordance with and subject to the terms and conditions set forth in the DIP Documents and this DIP Financing Order.

4.      The Debtors shall pay all reasonable fees and expenses, including, without limitation, all reasonable fees and expenses of professionals engaged by the Lender, in accordance with the terms of the DIP Documents without any further order of this Court.  None of the Lender's fees and expenses, including, without limitation, those of its professionals, shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any application with respect thereto.  The Committees shall be provided  ten (10) business days notice of Lender's fees and expenses and shall have the opportunity to object to the reasonableness of Lender's fees and expenses by filing a written objection with the Court within that period.

5.      The Intercreditor Agreement is approved and shall bind all parties in interest.

6.      Repayment of the Obligations shall be secured by the following:

    a.   pursuant to section 364(c)(1) of the Bankruptcy Code, the Obligations shall at all times constitute joint and several allowed superpriority administrative expense claims having priority over all other costs and expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code, subject to claims relating to Avoidance Actions

CSD 1001A [11/15/04] (Page 5)

(and the recoveries and proceeds derived therefrom) and the Carve-Out Amount (defined below);

b.    except as otherwise provided in the Intercreditor Agreement, pursuant to section 364(c)(2) of the Bankruptcy Code, the Obligations shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of the Debtors that is not subject to Existing Liens or post-petition Permitted Liens (other than with respect to Avoidance Actions, certain attachment liens against Simo Holdings, Inc., held by Don Emler and FMF Racing, and real property leases in which the Debtors have an interest and the proceeds therefrom);

c.    consistent with the Intercreditor Agreement, pursuant to section 364(c)(2) of the Bankruptcy Code, the Obligations shall at all times be secured by a perfected first priority Lien on all Intellectual Property Collateral; and

d.    pursuant to section 364(c)(3) of the Bankruptcy Code, the Obligations shall be secured by a perfected Lien upon all tangible and intangible property of the Debtors that is subject to Existing Liens or post-petition Permitted Liens, junior to such Existing Liens or Permitted Liens except as otherwise provided in the Intercreditor Agreement or the DIP documents, and such liens shall not attach to Avoidance Actions (and the proceeds and recoveries derived therefrom) or to the Debtors' interests in real property leases.

As used herein, "Carve-Out Amount" means the amount from the Debtors' cash, cash equivalents, and other assets representing (i) unpaid fees and expenses due to the clerk of the Bankruptcy Court and the U.S. Trustee pursuant to U.S.C. §1930(a), (ii) unpaid fees, costs, and expenses due to professional Persons retained by Borrowers or any Committee (collectively, the "Professionals"), in each case, incurred on or prior to receipt by the Debtors of a Notice of Default, and (iii) unpaid fees, costs, and expenses due to the Professionals incurred subsequent to receipt of the Notice of Default in an aggregate amount not to exceed $500,000.

7.    The collateral securing repayment of the Obligations shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code.

8.    Subject to the foregoing priorities, the Obligations shall also be secured by a security interest in, and mortgage on, all of the Debtors' right, title, and interest in all real property owned by the Debtors, together in each case with all of the Debtors' right, title, and interest in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto, and all proceeds thereof.

9.    The liens provided under and/or in connection with this DIP Financing Order or the DIP Documents shall be valid, binding, and perfected automatically upon the entry of this Financing Order. The Lender shall not be required to file, record, or serve financing statements, mortgages, notices of lien, or similar instruments that otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking

CSD 1001A [11/15/04] (Page 6)

possession, to validate and perfect such liens.  If the Lender determines, in its sole discretion, to file any such

financing statements, mortgages, agreements, notices of lien, or similar instruments, or to otherwise confirm

perfection of such liens, the Debtors shall, at the Debtors' expense, cooperate with and assist in such process to

the extent provided in the DIP Documents or this DIP Financing Order.

          10.     Without limiting any rights of access and information afforded to the Lender under the DIP

Documents, the Debtors shall (a) afford representatives, agents, and/or employees of the Lender reasonable

access to the Debtors' premises and the Debtors' records and (b) provide the Lender with such additional written

reports as the Lender may reasonably request, including, without limitation, detailed weekly cash flow reports, and

the Debtors shall provide the Committees with copies of such reports.

          11.     In light of the Court's findings regarding good faith, the Lender is entitled to the protections

of section 364(e) of the Bankruptcy Code.

          12.     The provisions of this DIP Financing Order and any actions taken pursuant hereto shall

survive entry of any order (a) confirming any plan in the Debtors' bankruptcy cases, (b) converting the Debtors'

bankruptcy cases to chapter 7 cases; or (c) substantively consolidating or dismissing the Debtors' bankruptcy

cases.  To the greatest extent permitted by applicable law, the terms and provisions of this DIP Financing Order

and the DIP Documents, including, without limitation, the superpriority claims and lien priorities granted to the

Lender hereunder, shall continue in full force and effect notwithstanding the entry of any such order and, without

limiting the foregoing, such superpriority claims and liens shall maintain their priorities as provided by this DIP

Financing Order and the DIP Documents until all of the Obligations are indefeasibly paid in full.

          13.     The determinations, findings, judgments, decrees, and orders set forth and incorporated in

this DIP Financing Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule

7052, made applicable to this proceeding to Bankruptcy Rule 9014.  Each finding of fact set forth or incorporated in

this DIP Financing Order, to the extent that it is or may be deemed a conclusion of law, shall also constitute a

conclusion of law.  Each conclusion of law set forth or incorporated in this DIP Financing Order, to the extent it is or

may be deemed a finding of fact, shall also constitute a finding of fact.

          14.     Notwithstanding any stay that might be imposed by Bankruptcy Rule 6004(h) or otherwise,

this DIP Financing Order shall be effective and enforceable immediately upon entry hereof

CSD 1001A [11/15/04] **(Page 7)**

15.     To the fullest extent permitted by law, the provisions of this DIP Financing Order and the DIP Documents shall be binding upon and inure to the benefit of the parties thereto, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these bankruptcy cases or in any subsequent chapter 7 case as a legal representative of the Debtors or their estates.

16.     This Court shall retain jurisdiction to enforce this DIP Financing Order, and over any matters or disputes arising from or relating to the implementation of this DIP Financing Order.

***

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 333 South Hope Street, Thirty-Fifth Floor, Los Angeles, California  90071-1406

A true and correct copy of the foregoing document described as  DEBTOR'S STATEMENT OF POSITION RE DEBTOR IN POSSESSION CREDIT FACILITY; DECLARATION OF MATTHEW VENTURI will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On  April 11, 2011  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address indicated below:

| | | |
|---|---|---|
| ➤ | Robert R. Barnes — Landlords Affiliated with General Growth Properties | bbarnes@allenmatkins.com<br>bcrfilings@allenmatkins.com |
| ➤ | Jeffrey D. Cawdrey — Jido & Juniar, Inc. | jcawdrey@gordonrees.com<br>ebojorquez@gordonrees.com |
| ➤ | Jeffrey W. Dulberg — No Fear Retail Stores Creditors' Committee | jdulberg@pszjlaw.com |
| ➤ | Christine Fitzgerald — FMF Racing/Don Emler | cfitzgerald@scckg.com |
| ➤ | Thomas M. Geher — Ultimate Brand Management, LLC | tmg@jmbm.com |
| ➤ | Jeffrey Goodfried — 5060 Montclair Plaza Lane Holdings, LLC | jgoodfried@perkinscoie.com |
| ➤ | Sue J. Hodges — Credit Cash NJ, LLC | sue.hodges@klgates.com |
| ➤ | Mark S. Hoffman — LFP Apparel, LLC | mshllh@aol.com |
| ➤ | Haeji Hong — OUST (SD) | Haeji.Hong@usdoj.gov |
| ➤ | Brian D. Huben — The Macerich Company/Westfield, LLC | brian.huben@kattenlaw.com<br>carole.levine@kattenlaw.com |
| ➤ | David S. Kupetz — Debtor No Fear Retail Stores, Inc. | dkupetz@sulmeyerlaw.com |
| ➤ | Jeffrey N. Pomerantz — No Fear Retail Stores Creditors' Committee | jpomerantz@pszjlaw.com<br>scho@pszjlaw.com |
| ➤ | Daniel Silva — Jido & Juniar, Inc. | dsilva@gordonrees.com |
| ➤ | United States Trustee | ustp.region15@usdoj.gov |
| ➤ | Steven F. Werth — Debtor No Fear Stores, Inc. | swerth@sulmeyerlaw.com |
| ➤ | Dennis J. Wickham — Cobra-Blackmore, LP | wickham@scmv.com<br>havard@scmv.com |

☐ Service Information continued on attached page.

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On  April 11, 2011  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST

☒ Service Information continued on attached page.

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P.5 and/or controlling LBR, on  April 11, 2011  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method ) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST

☒ Service Information continued on attached page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 15, 2011 | Debbie A. Perez | *(signature)* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

ADDITIONAL SERVICE INFORMATION (if needed):

**INTERESTED PARTIES — SERVED VIA E-MAIL**

| | | |
|---|---|---|
| ➢ | Jonathan Brown, Esq. — LFP Apparel, LLC | jbrown@lglaw.com |
| ➢ | Bill Bussiere — Rep. for No Fear Retail Stores Creditors' Committee La Jolla Group | bill.bussiere@lajollagroup.com |
| ➢ | John O. Cronin, Esq. — Heather Moates | john@croninandcronin.com |
| ➢ | Joel F. Crystal, Esq. — Centro Properties Group/Centro Independence, LLC | joel.crystal@centroprop.com |
| ➢ | Josh Garver — Venturi & Co., LLC | jgarver@venturico.com |
| ➢ | Ken Glowacki — Interested Party | kglowacki@gibsondunn.com |
| ➢ | Ivan M. Gold, Esq. | igold@allenmatkins.com |
| ➢ | Barry R. Gore, Esq. — Secured Creditor FMF Racing/Don Emler | bgore@scckg.com |
| | | lee@fmfracing.com |
| ➢ | Lorraine Green, Analyst — OUST (SD) | Lorraine.green@usdoj.com |
| ➢ | Laith Haisha — Jido & Juniar, Inc. | laith@jandjclothing.com |
| ➢ | Nicole Kelley — Orange 21 N.A., Inc. | nkelley@o21na.com |
| ➢ | Jared Hickey — Serigraphic Screen Printin | Jared@serigraphic-screen.com |
| ➢ | Dean Landis — Secured Creditor Credit Cash NJ, LLC | dlandis@egcap.com |
| | | jricchiuti@egcap.com |
| ➢ | Thomas J. Leanse, Esq. — The Macerich Company/Westfield, LLC. | thomas.leanse@kattenlaw.com |
| ➢ | Cecilia Morales — Firemaster | cemorales@firemaster-mpc.com |
| ➢ | Ernie Zachary Park, Esq. — The Irvine Co., LLC | ernie.park@bewleylaw.com |
| ➢ | Jeffrey M. Pomeroy — Rep. for NFRS Creditors' Comm. Reno Retail Company, LLC | jpomeroy@bayerproperties.com |
| ➢ | Matthew B. Venturi — Venturi & Co., LLC | mventuri@venturico.com |
| ➢ | Ryan White— Rep. for NFRS Creditors' Committee SRH Productions Inc. | Ryan@srh.com |
| ➢ | Van C. Durrer II, Esq.— 1903 Onshore Funding LLC (Gordon Bros.) | van.durrer@skadden.com |
| ➢ | Ramon M. Naguiat, Esq.— 1903 Onshore Funding LLC (Gordon Bros.) | ramon.naguiat@skadden.com |

Office Of The U.S. Trustee
Haeji Hong, Trial Attorney
Haeji.Hong@usdoj.gov

Office Of The U.S. Trustee
Lorraine Green, Analyst
Lorraine.green@usdoj.com

**FINANCIAL ADVISOR TO DEBTOR**
VENTURI & COMPANY, LLC
c/o Matthew B. Venturi/Josh Garver
mventuri@venturico.com
jgarver@venturi@venturico.com

**NO FEAR RETAILS STORES, INC.
UNSECURED CREDITORS' COMMITTEE**

**SERVED VIA E-MAIL**

LA JOLLA GROUP
Attn: Bill Bussiere
bill.bussiere@lajollagroup.com

Reno Retail Company, LLC
Attn: Jeffrey M. Pomeroy
2222 Arlington Avenue
Birmingham, AL 35205
jpomeroy@bayerproperties.com

SRH Productions Inc.
Attn: Ryan White
2826 La Mirada Dr., Suite B
Vista, CA 92081
Ryan@srh.com

**COUNSEL FOR NFRS CREDITORS' COMM.**
c/o Jeffrey W. Dulberg
Pachulski Stang Ziehl & Jones LLP
jdulberg@pszjlaw.com

**COUNSEL FOR NFRS CREDITORS' COMM.**
c/o Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
jpomerantz@pszjlaw.com

LA JOLLA GROUP, INC.
c/o Benjamin S. Seigel, Esq.
Buchalter Nemer
bseigel @ buchalter.com
[REQUEST TO BE REMOVED 3/21/11]

**COUNSEL FOR 1903 ONSHORE FUNDING
LLC (GORDON BROS.)**
Van C. Durrer II, Esq.
Ramon M. Naguiat, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
van.durrer@skadden.com
ramon.naguiat@skadden.com

**NO FEAR MX, INC.
UNSECURED CREDITORS' COMMITTEE**

**SERVED VIA E-MAIL**

J2 LLC
Attn: Jeff Surwall
P.O. Box 130040
Carlsbad, CA 92013
surwall@yahoo.com

Mage Design, LLC
Attn: Josh Kritman
2922 Pico Boulevard
Santa Monica, CA 90405
josh@snrgy.net

Silver Triangle Industries
Attn: Jorge Navarro
11211 Sorrento Valley Road, Suite I
San Diego, CA 92121
silverind@aol.com

**COUNSEL FOR 1903 ONSHORE FUNDING
LLC (GORDON BROS.)**
Van C. Durrer II, Esq.
Ramon M. Naguiat, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
van.durrer@skadden.com
ramon.naguiat@skadden.com

**SIMO HOLDINGS, INC.**
**UNSECURED CREDITORS' COMMITTEE**

<u>SERVED VIA E-MAIL</u>

FMF Racing
Attn: Don Elmer
18033 S. Santa Fe Avenue
Rancho Dominguez, CA 90221
Dre@sfmfracing.com

Jamie Leigh Middleton
8102 N. Mummy Mtn. Road
Paradise Valley, AZ 85253
4JLM@aol.com

Jido & Juniar, Inc. dba N&L Productions
Attn: Laith Haisha
6214 Topiary St.
Carlsbad, CA 92009
laith@jandjclothing.com

DON EMLER/FMF RACING [SECURED CREDITOR]
c/o Barry R. Gore, Esq.
Clarkson, Gore & Marsella
bgore@scckg.com

FMF Racing
18033 S. Santa Fe
Compton, CA 90221
lee@fmfracing.com

Jido & Juniar, Inc.
c/o Daniel C Silva, Esq.
Gordon & Rees LLP
dsilva@gordonrees.com

<u>COUNSEL FOR 1903 ONSHORE FUNDING
LLC (GORDON BROS.)</u>
Van C. Durrer II, Esq.
Ramon M. Naguiat, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
van.durrer@skadden.com
ramon.naguiat@skadden.com

**SECURED CREDITORS**

<u>SERVED VIA E-MAIL/U.S. MAIL</u>

CREDIT CASH NJ, LLC
c/o James Ricchiuti, V.P./Dean Landis, President
Entrepreneur Growth Capital LLC
505 Park Ave., 6th Floor
New York, NY 10022
dlandis@egcap.com
jricchiuti@egcap.com

AFCO
Dept. LA 21315
Pasadena, CA 91185

Don Emler
18033 South Santa Fe
Compton, CA 90221

FMF Racing
18033 South Santa Fe
Compton, CA 90221
lee@fmfracing.com

[CLAIM NO. 10]
Ford Motor Credit Co.
PO Box 7172
Pasadena, CA 91109-7172

Ford Motor Credit Co. [SHI CLAIM NO. 10]
c/o Randall P. Mroczynski, Esq.
Cookesy, Toolen, Gage, Duffy & Woog
535 Anton Blvd., 10th Floor
Costa Mesa, CA 92626

**INTERESTED PARTIES —**

<u>SERVED VIA E-MAIL</u>

LFP APPAREL, LLC [20 Largest Unsecured
c/o Jonathan Brown, Esq.
Lipsitz Green Scime Cambria, LLP
jbrown@lglaw.com

HEATHER MOATES [CREDITOR]
c/o John O. Cronin, Esq.
Cronin & Cronin
john@croninandcronin.com

CENTRO PROPERTIES GROUP/
CENTRO INDEPENDENCE, LLC
c/o Joel F. Crystal, V.P. Corp. Legal Service
joel.crystal@centroprop.com

Ivan M. Gold, Esq.
Allen Matkins Leck Gamble Mallory & Natsis, LLP
igold@allenmatkins.com

DON EMLER/FMF RACING [SECURED CREDITOR]
c/o Barry R. Gore, Esq.
Clarkson, Gore & Marsella
bgore@scckg.com

FMF Racing
18033 S. Santa Fe
Compton, CA  90221
lee@fmfracing.com

ORANGE 21 N.A., INC. [20 Largest]
c/o Nicole Kelley, A/R Supervisor
nkelley@o21na.com

Jared Hickey [Vendor]
Executive Sales Manager
Serigraphic Screen Printing
Jared@serigraphic-screen.com

CREDIT CASH NJ, LLC [SECURED CREDITOR]
Dean Landis,  President
James Ricchiuti, V.P.
dlandis@egcap.com
jricchiuti@egcap.com

WESTFIELD, LLC/THE MACERICH CO.
c/o Thomas J. Leanse, Esq.
Katten Muchin Rosenman, LLP
thomas.leanse@kattenlaw.com

FIREMASTER [CREDITOR]
Attn:  Cecilia Morales
cemorales@firemaster-mpc.com

THE IRVINE COMPANY, LLC
c/o Ernie Zachary Park, Esq.
Bewley, Lassleben & Miller, LLP
Ernie.park@bewleylaw.com

### INTERESTED PARTIES —

### SERVED VIA U.S. MAIL

IKON FINANCIAL SERVICES
BANKRUPTCY ADMINISTRATION
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

Simon Property Group, Inc.
225 W. Washington St.
Indianapolis, IN 46204

DPEREZ\ 714768.1