David S. Kupetz (CA Bar No. 125062)
dkupetz@sulmeyerlaw.com
Steven F. Werth (CA Bar No. 205434)
swerth@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Bankruptcy Counsel for No Fear Retail Stores, Inc. Simo Holdings, Inc, and No Fear MX, Inc., Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**Southern District of California**

In re

NO FEAR RETAIL STORES, INC., a California corporation, SIMO HOLDINGS, INC., a California corporation, and NO FEAR MX, INC., a California corporation,

Related Debtors.

Employer ID Nos. 20-5238208, 93-1037856, 26-0432196

Case No. 11-02896-MM11

(Jointly Administered with Case Nos. 11-02897-MM11; 11-02898-MM11)

Chapter 11 Cases

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION TO CLOSE STORES AND REJECT UNEXPIRED LEASES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARK SIMO**

**[Relates to (1) Altamonte Mall, Altamonte Springs, Florida and (2) Volusia Mall, Daytona Beach, Florida]**

DATE: [To Be Set]
TIME: [To Be Set]
PLACE: U.S. Bankruptcy Court
325 West "F" Street
San Diego, CA 92101

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**TO THE HONORABLE MARGARET M. MANN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE OFFICIAL COMMITTEES OF UNSECURED CREDITORS AND THEIR COUNSEL, THE LANDLORDS OF THE AFFECTED PROPERTIES, AND PARTIES ENTITLED TO NOTICE:**

## MOTION

No Fear Retail Stores, Inc. ("NFRS"), Simo Holdings, Inc. ("Simo Holdings"), and No Fear MX, Inc. ("NFMX", and together with NFRS and Simo Holdings, the "Debtors"), are the debtors and debtors in possession herein. Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtors remain in possession of their assets and continue to operate their business as a debtors in possession. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

Through this "Motion of Debtors and Debtors in Possession to Close Stores and Reject Unexpired Leases," the Debtors request that the Court approve the Debtors' rejection of the unexpired leases relating to two retail stores NFRS operated in the State of Florida, which have been closed by the Debtors and the inventory and personal property located therein moved to other of the Debtors' properties. The retail stores are known as (1) No. 1483, Altamonte Mall, 451 East Altamonte Drive, Altamonte Springs, Florida 32701, and (2) No. 532, Volusia Mall, 1700 W. International Speedway Boulevard, Daytona Beach, Florida 32114 (collectively, the "Properties").

The Debtors seek an order approving rejection of the unexpired leases relating to the Properties effective as of the date on which the Debtors returned possession of the Properties back to the respective landlords of the Properties in broom swept condition. The Debtors are closing these stores and rejecting these leases on the grounds that it is no longer cost-effective for the Debtors to maintain the subject retail stores, and that the leases, which collectively require the Debtors

to pay approximately $20,000 per month in rent and common area maintenance charges, are burdensome to the estates.

This Motion is based on the separately filed notice of Motion, the attached Memorandum of Points and Authorities and declaration of Mark Simo submitted in support thereof, the files and pleadings in the Debtors' cases, all judicially noticeable facts, and the arguments and testimony to be presented at the hearing on the Motion.

**WHEREFORE** the Debtors respectfully request that the Court enter an order:

(1) granting this Motion;

(2) approving the rejection of the unexpired leases relating to the Properties effective as of the date possession of the subject premises was returned to the respective landlords in broom swept condition; and

(3) granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: June 2, 2011

Respectfully submitted,

**Sulmeyer**Kupetz
A Professional Corporation

By: */s/ Steven F. Werth*
Steven F. Werth
Bankruptcy Counsel for No Fear Retail Stores, Inc. Simo Holdings, Inc, and No Fear MX, Inc., Debtors and Debtors in Possession

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.

## FACTS

### A. Background

The Motion is brought by the Debtors, who commenced these cases by filing voluntary chapter 11 petitions on February 24, 2011. The Debtors remain in possession of their assets and are acting as debtors in possession pursuant to Sections 1107(a) and 1108.

On March 4, 2011, this Court entered an order providing for joint administration of the chapter 11 cases of NFRS (Bankruptcy Case No. 11-02896-MM11), Simo Holdings (Bankruptcy Case No. 11-02898-MM11), and NFMX (Bankruptcy Case No. 11-02897-MM11).

The Debtors are related entities that are operated and function together as a business enterprise that primarily involves the retail and wholesale sale of casual apparel and accessories as well as protective motocross equipment and the development and licensing of intellectual property rights in consumer products brands. At the time of the commencement of the Debtors' chapter 11 cases, the Debtors operated 40 retail stores in seven different states, including two in Florida—the Properties identified above. The Debtors lease stores through leases executed by NFRS.

### B. Factors That Precipitated These Chapter 11 Filings

The Debtors commenced these cases as a result of a combination of factors. As a consumer business selling discretionary items, the Debtors have been negatively impacted by the recession that hit the United States in late 2007. The downturn in consumer spending disproportionately impacted the Debtors

[1] All capitalized terms not otherwise defined herein shall have the same meaning scribed to them in the foregoing Motion.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

given (i) the discretionary nature of their products, (ii) their target customer, and (iii) their geographic concentration.

The Debtors' businesses primarily consist of the retail sale of casual apparel and accessories as well as protective motocross equipment and the development and licensing of intellectual property rights in consumer products brands. Casual apparel and accessories and motocross equipment are discretionary purchases for consumers, which decreased significantly in the economic downturn. Further, much of the Debtors' customer base is made up of "blue collar" workers, who have been hurt severely by the housing and labor crises, and whose discretionary spending power has weakened substantially. In addition, the Debtors' retail stores are concentrated in California, Arizona and Nevada -- three of the economically hardest-hit areas in the United States.

These factors resulted in declining comparable store sales and overall sales for the last three years. Sales declined approximately 20% in NFRS's fourth fiscal quarter of 2010 compared to the fourth quarter of 2009 and same store sales were down approximately 12% in fiscal 2010. NFRS is bound by a number of long term leases with landlords who, prior to the commencement of the Debtors' chapter 11 cases, generally were unwilling to renegotiate the terms of those leases to reflect the fundamental changes that the recession has caused in the retail industry generally and NFRS's business in particular.

The Debtors also are burdened by significant expenses incurred in a failed attempt in 2009 and 2010 to raise capital through a proposed reverse merger a public stock offering with Gatorz Inc. The Debtors incurred approximately $1,000,000 in professional fees, including legal and accounting fees, in order to execute that financing transaction. That financing ultimately failed.

Further, prior to the Petition Date, due to its inability to obtain necessary financing, the Debtors' ability to purchase inventory for its stores was severely impacted. The resulting inventory deficiencies created a negative downward spiral

– the lack of inventory impaired store sales, which impacted cash flow, which, in turn, further impaired the Debtors' ability to secure inventory.

**C. The Subject Leases**

Prior to the Petition Date, NFRS was party to numerous leases in connection with the operation of its retail business. On March 14, 2008, the Debtor became the lessor of retail space located at Altamonte Mall in Altamonte Springs, Florida, commonly known as No. 1483, Altamonte Mall, 451 East Altamonte Drive, Altamonte Springs, Florida 32701 (the "Altamonte Property"), which is owned by Altamonte Mall Venture (the "Altamonte Landlord"). A true and correct copy of the lease between NFRS and the Altamonte Landlord relating to the Altamonte Property (the "Altamonte Lease") is attached hereto as **Exhibit "1"**. The Altamonte Property served as one of the Debtors' two retail outlets in the State of Florida for the retail sale of apparel and accessories. The Altamonte Lease currently requires NFRS to pay the Altamonte Landlord $14,013 per month in rent and common area maintenance charges ("CAM"). The term of Altamonte Lease expires on April 30, 2018.

The Altamonte Property was one of the Debtors' weaker performing stores and did not appear to present an opportunity for profitable operations in the near term. The Debtors carefully evaluated the operation of the Altamonte Store and determined that closing the store was in the best interests of the estates because the monthly rent and CAM for the location represented 42% of store revenues for 2010 and represents 39% of projected store revenues for 2011. The average of these costs for the Debtors' stores is 17.6%. The Altamonte Property has also lost money on a store level every year for the past four years, and, at the current rent and CAM levels, the Debtors believe that the Altamonte Property store cannot feasibly turn a profit.

On or about January 29, 2010, the Debtor became the lessor of retail space located at Volusia Mall in Daytona Beach, Florida, commonly known as No.

532, Volusia Mall, 1700 W. International Speedway Boulevard, Daytona Beach, Florida, 32114 (the "Daytona Property", and together with the Altamonte Property, the "Properties"), which is owned by CBL & Associates Management, Inc. (the "Daytona Landlord"). A true and correct copy of the lease between NFRS and the Daytona Landlord relating to the Daytona Property (the "Daytona Lease") is attached hereto as **Exhibit "2"**. The Daytona Property served as the other of the Debtors' two retail outlets in the State of Florida for the retail sale of apparel and accessories. The Daytona Lease currently requires NFRS to pay the Daytona Landlord fees of approximately $5,858 per month. The Daytona Lease is currently a month-to-month lease.

The Daytona Property has also been one of the Debtors' weaker performing stores and was determined not to present an opportunity for profitability in the near term. The Debtors carefully evaluated the operation of the Daytona store and determined that closing the store was in the best interests of the estates because Daytona has lost money 10 of 14 months since opening in February 2010. Additionally, in the Debtors' experience, stores perform much better when in groups of at least two and with no other stores in the state of Florida other than the Altamonte Property (which the Debtors have also closed) the prospects of the Daytona Property improving to profitability are very slim. Thus, the Debtors believe that their resources could be much better utilized elsewhere.

**D. <u>Reorganization Cases</u>**

The Debtors commenced these reorganization cases on February 24, 2011. On February 25, 2011, the Debtors filed numerous "first day" motions before this Court, seeking (among other things) authority to use cash collateral, to establish procedures relating to utility providers, to pay employees' priority prepetition claims, preserve existing cash management systems, reject twelve real property leases, and for joint administration of these cases. These motions were granted

by the Court. The Debtors have obtained post-petition financing and are in the process of identifying sources of fund for and developing a chapter 11 plan of reorganization or other appropriate disposition, with the goal of maximizing/optimizing the value of the estates. In connection therewith, the Debtors are evaluating their retail store leases and determining whether certain of such those leases should be assumed or rejected.

II.

**THE DEBTORS' CLOSING OF THE STORES AND REJECTION OF THE LEASES IS BASED ON SOUND BUSINESS JUDGMENT AND IS IN THE BEST INTEREST OF THE ESTATES**

Bankruptcy Code section 365 provides that "[e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365. Section 365 applies equally to debtors in possession, who have the rights and powers of a trustee. See 11 U.S.C. § 1107(a). "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." Nat. Labor Relations Board v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984); see also In re Pomona Valley Medical Group, Inc., 476 F.3d 665, 670 (9th Cir. 2006) (stating that section 365(a) is "aimed at relieving the debtor of burdensome performance obligations while it is trying to recover financially.").

Section 365(a) does not provide a standard for determining when assumption or rejection of an unexpired lease or executory contract is appropriate. See 11 U.S.C. § 365(a); Monarch Tool & Mfg. Co. v. Monarch Product Sales Corp. (In re Monarch Tool and Mfg. Co.), 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990). However, courts hold that "[s]ection 365(a) gives debtors wide latitude in deciding whether to assume or reject a contract ..." In re Pomona Valley Medical Group,

Inc., 476 F.3d at 672. More specifically, in determining whether assumption or rejection is appropriate, the Ninth Circuit applies the "business judgment rule." See, e.g., In re Pomona Valley Medical Group, Inc., 476 F.3d 665, 670 (9th Cir. 2006) ("Specifically, a bankruptcy court applies the business judgment rule to evaluate a [debtor-in-possession]'s rejection decision ..."); In re G.I. Industries, Inc., 204 F.3d 1276, 1282 (9th Cir. 2000); Robertson v. Pierce (In re Huang), 23 B.R. 798, 800-01 (9th Cir. B.A.P. 1982). Under this rule, a court will approve an assumption or rejection that is based on the sound business judgment of the trustee or debtor in possession. See, e.g., In re Pomona Valley Medical Group, Inc., 476 F.3d at 670 ("[The court] should approve the rejection of an executory contract under § 365(a) unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'"); In re G.I. Industries, Inc., 204 F.3d at 1282; Robertson v. Pierce (In re Huang), 23 B.R. at 800.

"In making its determination, a bankruptcy court need engage in 'only a cursory review of a [debtor-in-possessions]'s decision to reject the contract." In re Pomona Valley Medical Group, Inc., 476 F.3d at 670. Furthermore, the court should presume that the debtor-in-possession acted in its sound business judgment. See In re Pomona Valley Medical Group, Inc., 476 F.3d at 670 ("Thus, in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate.").

Here, the Debtors have carefully evaluated the Leases, and their value (or lack thereof) to the estates. The Leases were entered in a generally more favorable retail tenant market than currently exists and provide no value to the estates. Specifically, the Debtors have considered, among other things: (1) the

continued rent liabilities associated with the Leases (which total approximately $20,000 per month -- $14,013 for the Altamonte Property and $5,858 for the Daytona Property) and the negative impact of such liability on the Debtors' estates; (2) the lack of residual value of the Leases; (3) the costs associated with the Leases, including the relatively higher costs of shipping inventory between the Debtors' warehouse in Carlsbad, California, and Florida; and (4) various financial factors dictating that the Debtors' interests in the Leases is not worth marketing to proposed assignees, including: (a) above market rental rates or rental rates within a range of market rents that cause it not to be feasible for the Debtors to assign its interests in the Leases when considering the time necessary to market, (b) the cost of carrying the Leases while marketed, (c) the remaining term of the Leases (including options), (d) the likelihood of lease premiums being paid in a cash lump sum payment or over time, and (e) legal fees and transaction costs association with assumption and assignment of the Leases.

Based on the evaluation of the aforementioned factors, the Debtors determined that the Leases are burdensome to the Debtors and the estates, and that such burden outweighs any benefit that may be derived from the Leases. Accordingly, in the sound exercise of business judgment the Debtors determined that the stores located at the Properties should be closed, the inventory and other personal property located at the Properties be transferred to other retail stores operated by the Debtors or to the Debtors' warehouse in Carlsbad, California, as appropriate, and that rejection of the Leases is in the best interests of the estates. The Court should therefore authorize the rejection of the Leases under Bankruptcy Code section 365(a) effective as of the date that possession of the premises is relinquished to the respective landlords in broom swept condition.

/ / /

/ / /

/ / /

## III.

## CONCLUSION

For the reasons set forth above, the Debtor respectfully requests that the Court enter an order:

1. Approve the rejection of the Leases effective with respect to each leases, independently, as of date by which the Debtors return possession (by returning the keys) of the Altamonte Property back to the Altamonte Landlord in broom swept condition, and return possession (by returning the keys) of the Daytona Property back to the Daytona Landlord in broom swept condition; and

2. Granting such other relief as the Court deems just and proper.

Dated: June 2, 2011

Respectfully submitted,

**Sulmeyer**Kupetz
A Professional Corporation

By: */s/ Steven F. Werth*
Steven F. Werth
Bankruptcy Counsel for No Fear Retail Stores, Inc. Simo Holdings, Inc, and No Fear MX, Inc., Debtors and Debtors in Possession

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**DECLARATION OF MARK SIMO**

I, Mark Simo, declare:

1. I am the Chief Executive Officer of No Fear Retail Stores, Inc. ("NFRS"), Simo Holdings, Inc. ("Simo Holdings"), and No Fear MX, Inc. ("NFMX"), the debtors and debtors in possession in the above-captioned bankruptcy cases, (collectively, the "Debtors").

2. I have been employed by Simo Holdings as its Chief Executive Officer since its founding in 1990. I have been the Chief Executive Officer of NFRS since its incorporation in 2006 and of NFMX since its formation in 2007. I am actively involved in the Debtors' affairs since those dates and matters impacting, or relating to, the Debtors' bankruptcy cases.

3. I make and execute this declaration in support of the "Motion of Debtors and Debtors in Possession for Extension of Time to Assume or Reject Unexpired Real Property Leases" (the "Motion"). I have personal knowledge of that facts stated herein and can testify that said facts are true and correct.

4. On February 24, 2011 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their assets and continue to manage their affairs as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5. The Debtors are related entities that are operated and function together as a business enterprise that primarily involves the retail and wholesale sale of casual apparel and accessories as well as protective motocross equipment and the development and licensing of intellectual property rights in consumer products brands. At the time of the commencement of the Debtors' chapter 11 cases, the Debtors operated 40 retail stores in seven different states. The Debtors lease stores through leases executed by NFRS.

6. The Debtors commenced these cases as a result of a combination of

factors. As a consumer business selling discretionary items, the Debtors have been negatively impacted by the recession that hit the United States in late 2007. The downturn in consumer spending disproportionately impacted the Debtors given (i) the discretionary nature of their products, (ii) their target customer, and (iii) their geographic concentration.

7. The Debtors' businesses primarily consist of the retail sale of casual apparel and accessories as well as protective motocross equipment and the development and licensing of intellectual property rights in consumer products brands. Casual apparel and accessories and motorcross equipment are discretionary purchases for consumers, which decreased significantly in the economic downturn. Further, much of the Debtors' customer base is made up of "blue collar" workers, who have been hurt severely by the housing and labor crises, and whose discretionary spending power has weakened substantially. In addition, the Debtors' retail stores are concentrated in California, Arizona and Nevada -- three of the economically hardest-hit areas in the United States.

8. These factors resulted in declining comparable store sales and overall sales for the last three years. Sales declined approximately 20% in NFRS's fourth fiscal quarter of 2010 compared to the fourth quarter of 2009 and same store sales were down approximately 12% in fiscal 2010. NFRS is bound by a number of long term leases with landlords who generally were unwilling to renegotiate the terms of those leases to reflect the fundamental changes that the recession has caused in the retail industry generally and NFRS's business in particular.

9. The Debtors also are burdened by significant expenses incurred in a failed attempt in 2009 and 2010 to raise capital through a proposed reverse merger a public stock offering with Gatorz Inc. The Debtors incurred approximately $1,000,000 in professional fees, including legal and accounting fees, in order to execute that financing transaction. That financing ultimately failed.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

10. Further, prior to the Petition Date, due to its inability to obtain necessary financing, the Debtors' ability to purchase inventory for its stores was severely impacted. The resulting inventory deficiencies created a negative downward spiral – the lack of inventory impaired store sales, which impacted cash flow, which, in turn, further impaired the Debtors' ability to secure inventory.

11. The Debtors commenced these cases on February 24, 2011. On February 25, 2011, the Debtors filed numerous "first day" motions before this Court, seeking (among other things) authority to use cash collateral, to establish procedures relating to utility providers, to pay employees' priority prepetition claims, preserve existing cash management systems, reject twelve real property leases, and for joint administration of these cases. These motions were granted by the Court.

12. On March 18, 2011, the Debtors filed a motion for order authorizing them to enter into a debtor-in-possession credit facility with Hilco Brands, LLC, and Infinity FS Brands, LLC, subject to allowing other lenders to present more favorable proposals [Docket #87], (the "Financing Motion"). On April 7, 2011, the Court entered an order granting the Financing Motion on an interim basis [Docket #145], (the "Interim Financing Order").

13. After entry of the Interim Financing Order, 1903 Onshore Funding, LLC, ("Onshore"), offered to provide post-petition financing on terms somewhat more favorable to the Debtors than those proposed by Hilco Brands, LLC, and Infinity FS Brands, LLC. As a result, at a hearing on April 18, 2011, the Court granted the Financing Motion on a final basis and authorized the Debtors to enter into a post-petition financing agreement with Onshore. An order granting the Financing Motion on a final basis was entered on April 25, 2011. [Docket. No. 201]. Shortly thereafter, Onshore provided its funding to the Debtors under the credit facility approved by the Court.

14. Through the foregoing "Motion of Debtors and Debtors in Possession

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

to Close Stores and Reject Unexpired Leases," the Debtors request that the Court approve the Debtors' rejection of two retail stores NFRS operated in the State of Florida. The retail stores are commonly known as (1) No. 1483 Altamonte Mall, 451 East Altamonte Drive, Altamonte Springs, Florida 32701, and (2) No. 532 Volusia Mall, 1700 W. International Speedway Boulevard, Daytona Beach, Florida 32114 (collectively, the "Properties").

15. The Debtors seek an order approving the rejection of the unexpired leases relating to the Properties effective as of the date on which the Debtors returned possession of the Properties back to the respective landlords of the Properties in broom swept condition. The Debtors are closing these stores and rejecting these leases on the grounds that it is no longer cost-effective for the Debtors to continue to operate the subject retail stores, and that the leases, which collectively require the Debtors to pay approximately $20,000 per month in rent and common area maintenance charges, are burdensome to the estates.

16. Prior to the Petition Date, NFRS was party to numerous leases in connection with the operation of its retail business. On March 14, 2008, the Debtor became the lessor of retail space located at Altamonte Mall in Altamonte Springs, Florida, commonly known as No. 1483 Altamonte Mall, 451 East Altamonte Drive, Altamonte Springs, Florida 32701 (the "Altamonte Property"), which is owned by Altamonte Mall Venture (the "Altamonte Landlord"). A true and correct copy of the lease between NFRS and the Altamonte Landlord relating to the Altamonte Property (the "Altamonte Lease") is attached hereto as **Exhibit "1"**. The Debtors' the Altamonte Property served as one of two retail outlets in the State of Florida for the retail sale of apparel and accessories. The Altamonte Lease currently requires NFRS to pay the Altamonte Landlord $14,013 per month in rent and common area maintenance charges ("CAM"). The term of Altamonte Lease expires on April 30, 2018.

17. The Altamonte Property was one of the Debtors' weaker performing

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

stores and did not appear to present an opportunity for profitable operations in the near term. The Debtors carefully evaluated the operation of the Altamonte Store and determined that closing the store was in the best interests of the estates because the monthly rent and CAM for the location represented 42% of store revenues for 2010 and represents 39% of projected store revenues for 2011. The average of these costs for the Debtors' stores is 17.6%. The Altamonte Property has also lost money on a store level every year for the past four years and, at current rent and CAM levels, the Debtors believe that the Altamonte store cannot feasibly turn a profit.

18. On or about January 29, 2010, the Debtor became the lessor of retail space located at Volusia Mall in Daytona Beach, Florida, commonly known as No. 532 Volusia Mall, 1700 W. International Speedway Boulevard, Daytona Beach, Florida, 32114 (the "Daytona Property", and together with the Altamonte Property, the "Properties"), which is owned by CBL & Associates Management, Inc. (the "Daytona Landlord"). A true and correct copy of the lease between NFRS and the Daytona Landlord relating to the Daytona Property (the "Daytona Lease") is attached hereto as **Exhibit "2"**. The Daytona Property served as the other of the Debtors' two retail outlets in the State of Florida for the retail sale of apparel and accessories. The Daytona Lease currently requires NFRS to pay the Daytona Landlord fees of approximately $5,858 per month. The Daytona Lease is currently a month-to-month lease.

19. The Daytona Property has also been one of the Debtors' weaker performing stores and was determined not to present an opportunity for profitability in the near term. The Debtors carefully evaluated the operation of the Daytona store and determined that closing the store was in the best interests of the estates because Daytona has lost money 10 of 14 months since opening in February 2010. Additionally, in the Debtors' experience, stores perform much better when in groups of at least two and, with no other stores in the state of

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

Florida other than the Altamonte Property (which the Debtors also have closed), the prospects of the Daytona Property improving to profitability are very slim. Thus, the Debtors believe that their resources could be much better utilized elsewhere.

20. Here, the Debtors have carefully evaluated the Leases, and their value (or lack thereof) to the estates. The Leases were entered in a generally more favorable retail tenant market than currently exists and provide no value to the estates. Specifically, the Debtors have considered, among other things: (1) the continued liabilities associated with the Leases (which total approximately $20,000 per month -- $14,013 for the Altamonte Property and $5,858 for the Daytona Property) and the negative impact of such liability on the Debtors' estates; (2) the lack of residual value of the Leases; (3) the costs associated with the Leases, including the relatively higher costs of shipping inventory between the Debtors' warehouse in Carlsbad, California, and Florida; and (4) various financial factors dictating that the Debtors' interests in the Leases is not worth marketing to proposed assignees, including: (a) above market rental rates or rental rates within a range of market rents that cause it not to be feasible for the Debtors to assign its interests in the Leases when considering the time necessary to market, (b) the cost of carrying the Leases while marketed, (c) the remaining term of the Leases (including options), (d) the likelihood of lease premiums being paid in a cash lump sum payment or over time, and (e) legal fees and transaction costs association with assumption and assignment of the Leases.

21. Based on the evaluation of the aforementioned factors, the Debtors determined that the Leases are burdensome to the Debtors and the estates, and that such burden outweighs any benefit that may be derived from the Leases. Accordingly, in the sound exercise of business judgment the Debtors determined that the stores located at the Properties should be closed, the inventory and other personal property located at the Properties be transferred to other retail stores

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

operated by the Debtors or to the Debtors' warehouse in Carlsbad, California, as appropriate, and that rejection of the Leases is in the best interests of the estates.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 2, 2011, at Carlsbad, California

Mark Simo

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

Case 11-02896-MM11 Filed 06/02/11 Entered 06/02/11 18:17:46 Doc 307 Pg. 19 of 24

# Exhibit 1

EXHIBIT 1
19

# ALTAMONTE MALL

THIS LEASE is between ALTAMONTE MALL VENTURE, a Florida general partnership ("Landlord"), and NO FEAR RETAIL STORES, INC., a California corporation ("Tenant"). The date of this Lease is March 14, 2008 ("Commencement Date"). The Leased Premises are located in the ALTAMONTE MALL ("Shopping Center") in the City of Altamonte Springs, County of Seminole, and State of Florida .

## REFERENCE PROVISIONS

The following references define terms used in the specified Articles and elsewhere in this Lease and shall be construed in accordance with the provisions and conditions in this Lease:

1.01 Leased Premises: 1483 ALTAMONTE MALL, containing approximately 2280 square feet of floor area

[ARTICLE 1(a)]

1.02 Expiration Date: April 30, 2018

[ARTICLE 1(b)]

1.03 Permitted Use: Only for the retail sale of apparel, shoes, accessories, sunglasses, goggles and other products of the No Fear, Spy Optic, FMF Racing and So Cal brands, and the products of other brands which are consistent with the No Fear theme, and for no other use or purpose whatsoever.

[ARTICLE 1(c)]

1.04 Submittal date for preliminary plans: Landlord has received preliminary plans.

[ARTICLE 2(d)]

Submittal date for final plans and specifications: Landlord has received final plans

[ARTICLE 2(d)]

1.05 Beginning Work Date: February 11, 2008

[ARTICLE 2(e)]

1.06 Opening Date: May 1, 2008.

[ARTICLE 3]

1.07 Minimum Annual Rental:

[ARTICLE 4(a)]

| | | | | |
|---|---|---|---|---|
| Rental Commencement Date | - | (4/30/2010) | $75,240.00 per year | ($6,270.00 per month) |
| (5/1/2010) | - | (4/30/2012) | $79,800.00 per year | ($6,650.00 per month) |
| (5/1/2012) | - | (4/30/2014) | $84,360.00 per year | ($7,030.00 per month) |
| (5/1/2014) | - | (4/30/2016) | $88,920.00 per year | ($7,410.00 per month) |
| (5/1/2016) | - | Expiration Date | $93,480.00 per year | ($7,790.00 per month) |

1.08 Percentage Rate: 6%

[ARTICLE 4(b)]

1.09 Annual Sales Base:

[ARTICLE 4(b)]

| | | | |
|---|---|---|---|
| Rental Commencement Date | - | (4/30/2010) | $1,368,000.00 per year |
| (5/1/2010) | - | (4/30/2012) | $1,444,000.00 per year |
| (5/1/2012) | - | (4/30/2014) | $1,520,000.00 per year |
| (5/1/2014) | - | (4/30/2016) | $1,596,000.00 per year |
| (5/1/2016) | - | Expiration Date | $1,672,000.00 per year |

1.10 Address of Landlord:

[ARTICLES 4 and 30]

Landlord's Notice Address
ALTAMONTE MALL
c/o ALTAMONTE MALL VENTURE
110 N. Wacker Dr.
Chicago, IL 60606
Attn: Law/Lease Administration Department

Landlord's Payment Address:
ALTAMONTE MALL VENTURE
1203 Paysphere Circle
Chicago, IL 60674

WITH A COPY TO:
ALTAMONTE MALL
451 East Altamonte Drive
Suite 2165
Altamonte Springs, FL 32701
ATTN: GENERAL MANAGER

1.11 Address of Tenant:

[ARTICLE 30]

**NO FEAR RETAIL STORES, INC.**
**1812 Aston Avenue**
**Carlsbad, California 92008**
**Attn: General Counsel**

1.12 Additional Gross Leasable Area Annual Rental Increase: **Not applicable**

[ARTICLE 4(c)]

1.13 Anchor Minimum Annual Rental Increase: **Not applicable**

1.14 Trade Name: "No Fear"

[ARTICLE 25]

1.15 **Intentionally omitted**

[ARTICLE 37]

1.16 Initial Assessment: **Not applicable**

[ARTICLE 37]

1.17 Preliminary Rent: **Not applicable**

1.18 Construction Allowance: **$55,000.00**

**Landlord agrees to pay to Tenant, if Tenant is not then in default, bankrupt or insolvent, the cost of Tenant's Work up to the aggregate sum of $55,000.00, but not more than that amount, subsequent to the fulfillment of all of the following requirements:**

**A. $41,250.00 after Tenant has opened the Leased Premises for business to the public and within 20 days after Tenant's written request; and**

**B. $13,750.00 within 30 days after fulfillment of the following:**

**1. Completion of Tenant's Work in accordance with EXHIBIT P (Tenant's approved plans), lien free and in a manner reasonably satisfactory to Landlord and Landlord's Architect;**

**2. Presentation to Landlord, in form and detail satisfactory to Landlord, of:**

**a. Contractor's Sworn Statement showing that the amount requested by Tenant has been spent by Tenant on the Leased Premises and listing all subcontractors, sub-subcontractors and material suppliers and amounts which they were to be paid and were paid for work performed for or on the Leased Premises or for materials supplied for Tenant;**

**b. Tenant's Architect shall provide an Original and Notarized Affidavit or Final Waiver of Lien indicating that the Architect had been paid in full;**

**c. Contractor's Original and Notarized Final Waiver of Lien;**

     d. Copies of Final Waivers of Lien from all architects, subcontractors, sub-subcontractors and material suppliers providing goods and services in excess of $5,000.00; and

3. Presentation to Landlord of unconditional Certificates of Occupancy from all applicable governmental authorities.

Landlord shall be entitled to any unpaid portion of the amount in the event of a default, bankruptcy or insolvency by Tenant, beyond applicable notice and cure periods, even if Tenant shall have paid all or a portion of the cost of Tenant's Work.

If and to the extent Tenant emerges from bankruptcy or ceases to be insolvent or cures such default, Landlord shall be obligated to pay the cost of Tenant's Work that was previously withheld.

Tenant's request for payment should be sent to Landlord' Notice Address shown in Reference Provision 1.10 and directed to Attn: Tenant Allowance Administration. The Construction Allowance monies will be paid to Tenant only for Tenant's payment for construction work performed in the Leased Premises, including the cost of raw materials, labor, architects fees, permits, and related costs of construction. Construction work does not include inventory, supplies, Tenant's moveable property or the cost of training Tenant's employees.

The terms of this Reference Provision shall be a condition precedent to Tenant's right to receive its Construction Allowance, and no portion of said sum shall vest in Tenant, nor shall Tenant sell, assign, encumber or create a security interest in such allowance prior to full compliance with the terms of this Reference Provision.

[ARTICLE 2]

1.19 Security Deposit: Not applicable

[ARTICLE 46]

1.20 Radius: Not applicable

[ARTICLE 58]

1.21 Intentionally omitted

[ARTICLE 16]

1.22 Operating Expenses Payment: $68,764.80 ($30.16 per square foot) per year for the calendar year 2008, payable in equal monthly installments, subject to the annual increases provided in the Lease.

[ARTICLE 7]

1.23 Not applicable

1.24 Chargeback Waiver: Notwithstanding anything to the contrary contained in EXHIBIT C attached hereto, the construction chargeback items which Tenant shall be obligated to pay Landlord in connection with the construction of the Leased Premises pursuant to EXHIBIT C shall be waived. Notwithstanding the foregoing, floor tile costs, fire alarm connection fees, temporary electrical service, construction deposit, temporary trash removal charges, sprinkler shutdown fees (if applicable) and barricade costs (if required and not installed by Tenant) contained in EXHIBIT C shall not be waived, reduced or capped in any way.

1.25 Not applicable

1.26 A. Not applicable

B. Not applicable

1.27 Termination Right: Notwithstanding anything to the contrary contained in this Lease, in the event Tenant's Net Sales (as defined in ARTICLE 5) made from the Leased Premises fails to exceed $700,000.00 ("Threshold Amount") during the 5th full Lease Year of the Term ("Measuring Period"), Tenant or Landlord shall have the right to terminate this Lease upon 60 days written notice to the other party, given within 180 days after the end of the Measuring Period. In the event Landlord exercises its right to terminate this Lease as provided above, Tenant shall not have to pay Landlord a termination fee. In the event Tenant exercises its right to terminate this Lease as provided above, Tenant shall pay Landlord a termination fee in the amount of the unamortized portion of the Construction Allowance as set forth in Reference Provision 1.18, based on a straight line amortization schedule over the entire Term. Such repayment shall be made prior to the Effective Date of such termination. Despite any such election to terminate, Tenant shall remain liable for the performance of all terms, covenants and conditions of this Lease through the effective date of such termination.

For each day that Tenant is closed in violation of this Lease, Tenant's Net Sales for such day shall be deemed to be the highest average daily Net Sales of Tenant achieved during the same month of any prior year of the Term. **Notwithstanding anything herein to the contrary, Tenant shall not be entitled to terminate the Lease pursuant to the provisions of this Reference Provision if: (i) Tenant has ceased operating its business in the Leased Premises, as of the date of tenant's termination notice, (ii) Tenant has otherwise ceased operating for business under the Permitted Use, as of the date of Tenant's Termination notice, (iii) Tenant is otherwise in default under this Lease beyond any applicable notice and cure periods as of the date of Tenant's termination notice, or (iv) Tenant shall have assigned, sublet or otherwise transferred this Lease to another person or entity, other than a parent, subsidiary or other affiliated entity which owns at least 50% of the equity interests in Tenant or in which Tenant owns at least 50% of the equity interest in the affiliated entity.**

1.28 **Not applicable**

1.29 **Not applicable**

1.30 **Not applicable**

1.31 **Not applicable**

1.32 **Not applicable**

1.33 **Not applicable**

1.34 **Not applicable**

1.35 Anchors: An "anchor" for all purposes under this Lease is any operation, land, building, store or business, whether owned or leased, which leases or occupies 50,000 square feet or more of space in the Shopping Center.

References to articles are for convenience and designate some of the other provisions where references to the particular Reference Provisions appear. If there is a conflict between a Reference Provision and the other provisions of this Lease, the former shall control.

# ALTAMONTE MALL

TABLE OF CONTENTS

REFERENCE PROVISIONS

ARTICLE

1 Leased Premises, Term and Use
2 Original Construction
3 Rental Commencement Date
4 Rental
5 Definition of Net Sales
6 Records and Audits
7 Operating Expenses
8 Subordination and Attornment
9 Additional Construction
10 Condition of Premises
11 Tenant's Repairs and Maintenance
12 Alterations
13 Fixtures and Personal Property
14 Liens
15 Laws and Ordinances
16 Environmental Services
17 Joint Use Areas
18 Damage to Leased Premises
19 Insurance
20 Indemnification
21 Assignment, Subletting and Ownership
22 Access to Leased Premises
23 Defaults by Tenant
24 Surrender of Leased Premises
25 Tenant's Conduct of Business
26 Rules and Regulations
27 Eminent Domain
28 Attorneys' Fees
29 Sale of Leased Premises by Landlord
30 Notices

ARTICLE

31 Remedies
32 Successors and Assigns
33 Representations
34 Waiver
35 Holding Over
36 Interpretation
37 Advertising and Promotional Service
38 Quiet Enjoyment
39 Waiver of Redemption
40 Fees
41 Tenant's Property
42 Lease Status
43 Recording
44 Force Majeure
45 Construction of Lease
46 Security Deposit
47 Captions
48 Severability
49 Objection to Statements
50 Liability of Landlord
51 No Option
52 Execution of Documents
53 Corporate Tenant
54 Printed Provisions
55 Entire Agreement
56 No Third-Party Rights
57 Financial Statements
58 Other Locations
59 Tenant's Failure
60 Ownership
61 Special Provisions

AFFIDAVIT

EXHIBITS

EXHIBIT A, A-1 Plans of Leased Premises
EXHIBIT B Site Plan
EXHIBIT C Description of Landlord/Tenant Work
EXHIBIT F-T Operating Charge for Water, Sewer and Maintenance for Heating, Ventilation and Air Conditioning